IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

MICHAEL CARGILL    :
           :  CIVIL ACTION NO.: 1:19-cv-349-DAE
           :
     Plaintiff,  :
           :
    v.     :
           :
WILLIAM BARR,    :
IN HIS OFFICIAL CAPACITY AS  :
ATTORNEY GENERAL   :
OF THE UNITED STATES, et al.  :
           :
     Defendants.  :

<u>PLAINTIFF'S TRIAL BRIEF</u>

   Plaintiff, Michael Cargill, through undersigned counsel respectfully submits the following trial brief.

## I. FACTS

Under the National Firearms Act (NFA), 26 U.S.C. §§ 5812(a), 5861, Congress criminalized the possession or transfer of an unregistered firearm, while also prohibiting the registration of firearms otherwise banned by law. In 1968, Congress passed the Gun Control Act (GCA), criminalizing possession of firearms for certain classes of people. *See* 18 U.S.C. § 921 *et seq*. In 1986 Congress amended the GCA, codified at 18 U.S.C. § 922(o), to outlaw most machineguns and simultaneously make it unlawful for any person to register those weapons. Today it is a federal felony, punishable by up to 10 years in prison for first-time offenders, for any person to "transfer or possess a machinegun." 18 U.S.C. §§ 922(o), 924(a)(2).

Under both the GCA and NFA, the term "machinegun" means "any weapon which shoots … automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(23).

"Bump fire" is a shooting technique where a user of a firearm quickly engages the trigger of a semiautomatic weapon multiple times, resulting in rapid fire. (AR, 72.) Bump stock help facilitate bump fire. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514, 66516 (Dec. 26, 2018) (hereinafter, *Final Rule*). According to Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), when using a bump stock, a shooter places his trigger finger on a plastic ledge that is part of the bump stock (and not on the trigger itself), with that dominant hand holding the stock firmly against his shoulder. *Id.* Then, while "maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's ledge with constant rearward pressure[,]" the shooter engages the trigger. *Id.* at 66518. The recoil from the initial shot pushes the firearm rearward and causes the trigger to lose contact with the finger and *manually* reset. *Id.* at 66516-17. By applying continuous forward pressure with the non-trigger hand, the shooter is able to force the trigger back into his trigger finger, and thus "re-engages by 'bumping' the shooter's stationary

finger" into the trigger. *Id.* at 66516.

ATF, through its Firearms Technology Branch (FTB), has issued 24 classification letters evaluating whether certain bump stocks fall under the definition of a machinegun set out in 26 U.S.C. § 5845(b). (*See* AR, 106, 111, 116, 126, 134, 138, 157, 160, 167, 171, 179, 191, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) FTB must physically examine a device prior to classification, and FTB has insisted that it "<u>cannot</u> make a classification on pictures, diagrams, or theory." (AR, 95.) In every classification of bump stocks since 2006, ATF had followed its internal ruling, *Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm*, ATF Rul. 2006-2, at 3 (Dec. 13, 2006) (ATF Rul. 2006-2; AR, 81), and concluded these devices were not machineguns so long as they lacked an internal mechanism, such as a spring. (*See* AR, 106, 111, 116, 126, 134, 138, 157, 160, 167, 171, 179, 191, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.)

FTB approved the Slide Fire. The "Slide Fire" is a type of bump stock that was commercially available in the United States starting in 2010. (Complaint, ¶ 47; Answer, ¶ 47.) On June 7, 2010, ATF concluded that the Slide Fire "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed," and thus "is a firearm part and is not regulated as a firearm under [the] Gun Control Act or the National Firearms Act." (AR, 126.)

ATF reaffirmed these interpretations in formal communications with Congress. (AR, 145, 175, 198.) These exchanges included specific reference to the legality of the Slide Fire. (AR, 145, 175, 198.)

In April 2018, Plaintiff, Mr. Cargill, acquired two Slide Fire devices in reliance on ATF's approval. (Complaint, ¶ 123; Answer, ¶ 123.)

On October 1, 2017, a shooter opened fire on a large crowd of people in Las Vegas, Nevada, killing 58 people and injuring hundreds of others. *Final Rule*, 83 Fed. Reg. at 66516. Some of the firearms found at the scene were equipped with bump fire stocks. (AR, 391.)

Even in the wake of this tragedy, ATF reaffirmed its understanding that bump stocks were

"'ATF approved' as advertised." (AR, 323, 330.) According to the agency, "unless there is some self-acting mechanism that allows a weapon to shoot more than one round, you cannot have a machinegun." (AR, 361.) As of October 2017, the United States had also never brought a criminal charge under 18 U.S.C. § 922(o) based on the theory that a bump stock was a machinegun. (AR, 681.) On March 16, 2018, ATF Acting Director Thomas E. Brandon[1] testified before the Senate Judiciary Committee that he had consulted with "technical experts," "firearms experts" and "lawyers" within ATF in October 2017 and that the consensus was that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act." (AR, 1094.)

On October 6, 2017, Jim Cavanaugh, a "Law Enforcement Analyst" for NBC and MSNBC, sent Acting Director Brandon an email outlining his "outside view" "on Bump Stocks." (AR, 685.) Cavanaugh "recommend[ed] an overruling of the prior decision[s] and putting it under the NFA." (AR, 685.) Cavanaugh continued, "Regardless of what Congress does or does not do ... You can do it fast and it is the right thing to do, don't let the technical experts take you down the rabbit hole[.]" (AR, 685.) Acting Director Brandon replied, "Thanks, Jim. At FTB now. Came to shoot it myself. I'm very concerned about public safety and share your view. Have a nice day, Tom." (AR, 685.)

Acting Director's Brandon's calendar for that day indicates his presence at ATF's National Training Center in Martinsburg, WV. (AR, 686.) There is no other indication in the record that any officer or employee of ATF test-fired, or physically re-evaluated any bump-stock device following the October 2, 2017 shooting in Las Vegas.

Meanwhile, political figures intensely pressured the agency over its classifications of bump stocks in a series of letters. (*See* AR, 539, 541, 545, 717.) At least five different bills were also proposed in Congress that would have banned or restricted the sale of bump stocks—mostly *prospectively*. (*See*

---

[1] Current ATF Acting Director Regina Lombardo has been substituted as a defendant.

Complaint, ¶¶ 88, 90, 91, 94, 101; Answer, ¶¶ 88, 90, 91, 94, 101.)

On October 11, 2017, Rick Vasquez, Former Assistant Chief and Acting Chief of the FTB, submitted a letter to ATF defending the Slide Fire classification. (AR, 705.) Vasquez explained the prior classification was based on the testing officer's determination that the Slide Fire could not fire multiple rounds without also *manually* resetting the trigger mechanism. (AR, 706.)

On October 12, 2017, Michael R. Bouchard, President of the ATF Association, issued a public letter defending the prior classifications. (AR, 708-09.) According to the letter, the "**law is very clear and it does not currently allow ATF to regulate**" "bump slide" devices. (AR, 708.)

On October 12, 2017, Earl Griffith, Chief of ATF's Firearms and Ammunition Technology Division (FATD), reported in internal emails that ATF had "been asked by DOJ to look at our legal analysis on bump stocks." (AR, 713.) Shortly thereafter on November 9, 2017, Acting Director Brandon sent an email to senior staff saying that "the Department has reached a decision that ATF is to move forward with the issuance of a regulation on bump-stocks." (AR, 753.) On February 20, 2018 President Trump issued a memorandum, "directing the Department of Justice to dedicate all available resources" "to propose … a rule banning all devices that turn legal weapons into machineguns[.]" (*See* AR, 790.) Afterward, all five Congressional proposals stalled, and none became law. (*See* Complaint, ¶¶ 89, 93, 95, 102, 107; Answer, ¶¶ 89, 93, 95, 102, 107.)

On December 26, 2018, the Attorney General and ATF issued the Final Rule. (83 Fed. Reg. at 66514; AR, 4032.) The Final Rule alters the statutory definition of a "machinegun" by amending three regulations: 27 C.F.R. §§ 447.11, 478.11 and 479.11. *Final Rule*, 83 Fed. Reg. at 66553-54. As relevant here, the amendment to Section 478.11 modifies the definition of machinegun under the GCA, purportedly under the AG's authority set out in 18 U.S.C. § 926(a). *Id.* at 66554. The amendment to Section 479.11 modifies the definition of machinegun under the NFA, purportedly under the authorization of 26 U.S.C. § 7805. *Id.* For all provisions, a "machinegun" means any weapon

which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. … For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means *a single pull of the trigger* and analogous motions. The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed *so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

*Id.* at 66553-54 (emphasis added).

Because these devices had been previously approved by ATF for sale, "current possessors of these devices w[ere] required to destroy the devices or abandon them at an ATF office prior to the effective date of the rule," which was March 26, 2019. *Id.* at 66514, 66555.

ATF estimated that as many as 520,000 bump-stocks were sold legally between 2010 and 2018. *Final Rule*, 83 Fed. Reg. at 66547. Americans spent approximately $102.5 million on the purchase of these devices, all of which have now been ordered to be destroyed or surrendered to ATF. *Id.*

In response to the Final Rule, on March 25, 2019, Mr. Cargill surrendered both of his Slide Fire devices to ATF, but ATF has agreed to preserve his Slide Fire devices pending the outcome of this lawsuit. (Complaint, ¶ 124; Answer, ¶ 124.)

## II. ARGUMENT

The Final Rule is invalid for six independent reasons. First, the Final Rule is ultra vires because ATF lacks authority to issue any legislative rules. Second, there is no statutory ambiguity in the term "machinegun," and thus ATF has no authority to issue a legislative rule purporting to fill a gap left in that term. Third, the Final Rule conflicts with the statutory definition of a machinegun and thus exceeds ATF's authority. Fourth, the Final Rule constitutes an invalid and unreasonable interpretation of the statutory definition of a machinegun. Fifth, because ATF relied on impermissible factors in enacting the Final Rule, it constitutes arbitrary and capricious agency action. Sixth, alternatively, the

Final Rule is an exercise of legislative power that has been improperly divested by Congress.

## A. Legal Overview

Article I, § 1 of the U.S. Constitution vests "[a]ll legislative powers" in the Congress. Article I, § 7, Clauses 2 and 3 require that "Every Bill" shall be passed by both the House and the Senate and signed by the President "before it [may] become a Law." Article II, § 3 of the Constitution directs that the President "shall take Care that the Law be faithfully executed … ." Under this structure "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 756-57 (1996).

Thus, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And an agency may only "fill [] statutory gap[s]" left by "ambiguities in statutes within an agency's jurisdiction to administer" to the extent Congress "delegated" such responsibility to the agency. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

"Agency authority may not be lightly presumed." *Texas v. United States*, 497 F.3d 491, 502 (5th Cir. 2007) (citation omitted). "[W]hen Congress has made an explicit delegation of authority to an agency, Congress did not intend to delegate additional authority *sub silentio*." *Id.* at 501.

Further, an agency can only fill in any "gaps" in a statute. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

In "review[ing] an agency's construction of [a] statute," the first question then is "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter, for the court as well as the agency, must give effect

to the unambiguously expressed intent of Congress." *Id.*

The Administrative Procedure Act (APA) separately allows a court to "hold unlawful and set aside" an agency's rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. §§ 706 (2)(A), (B), (C).

Even when agency action is otherwise permitted, it can still constitute an invalid exercise of legislative power. "[T]he integrity and maintenance of the system of government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989) (citation omitted).

### B. As Set out in Plaintiff's Complaint, Counts I, III, IV, V, VII, and VIII, ATF Had No Authority to Issue the Final Rule Because It Is a Legislative Rule

ATF has acknowledged that it lacks authority to issue any legislative rule concerning the definition of a machinegun. *See* Br. for the Respondents in Opp. at 14, 25, *Guedes v. ATF*, No. 19-296, (Dec. 4, 2019) ("*Guedes* Br."); Br. for Appellees at 40-41, *Aposhian v. Barr*, No. 19-4036 (10th Cir. Aug. 26, 2019) ("*Aposhian* Br."). Because the Final Rule is legislative, and purports to impose new legal obligations, it exceeds ATF's authority. The Final Rule is invalid pursuant to Article I, §§ 1, 7, and Article II, § 3 of the U.S. Constitution and pursuant to the APA, 5 U.S.C. §§ 706(A), (C), as set out in Counts, I, III, IV, V, VII and VIII of Plaintiff's Complaint.

As a threshold issue, the Final Rule is a legislative rule. Even though both the Court of Appeals for the District of Columbia Circuit and the Court of Appeals for the Tenth Circuit upheld the Final Rule on other grounds in split decisions, both courts unanimously rejected ATF's argument that the rule was a mere interpretation. As the D.C. Circuit said, "All pertinent indicia of agency intent confirm that the Bump-Stock Rule is a legislative rule." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 18 (D.C. Cir. 2019). The Tenth Circuit agreed, saying that "it is evident that the Final Rule intends to speak with the force of law." *Aposhian v. Barr*, 958 F.3d 969, 980 (10th Cir. 2020). Yet both

circuits somehow missed the implication of that determination for the rule.

Agency statements usually take one of two forms: "interpretive rules" or "legislative rules." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204, 1206 (2015). A "legislative rule," also known as a substantive rule, is "issued by an agency pursuant to statutory authority and has the force and effect of law." *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019) (citation omitted). A legislative rule "affect[s] individual rights" and "create[es] new law." *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999). "[N]onlegislative rules do not have the force of law[.]" *DOL v. Kast Metals Corp.*, 744 F.2d 1145, 1152 (5th Cir. 1984).

Both the *Guedes* and *Aposhian* courts recognized that three factors conclusively established that the Final Rule is a legislative rule. First, the Final Rule purported to take effect in the future. It "unequivocally bespeaks an effort by the Bureau to adjust the legal rights and obligations of bump-stock owners—i.e., to act with the force of law. The Rule makes clear throughout that possession of bump-stock devices *will become unlawful* only as of the Rule's effective date, not before." *Guedes, 920 F.3d at 19; accord Aposhian*, 958 F.3d at 980.

Second, "[t]he Rule's publication in the Code of Federal Regulations also indicates that it is a legislative rule." *Guedes*, 920 F.3d at 19; *accord Aposhian*, 958 F.3d at 980. Publication in the CFR is limited to rules "having general applicability and *legal effect*." 44 U.S.C. § 1510 (emphasis added). The Final Rule purports to amend three sections of the code, 27 C.F.R. §§ 447.11, 478.11, 479.11. 83 Fed. Reg. at 66519, which "would be highly unusual for a mere interpretive rule." *Guedes*, 920 F.3d at 19.

Third, "the agency has explicitly invoked its general legislative authority" by "invoking two separate delegations of legislative authority." *Id.*; *accord Aposhian*, 958 F.3d at 980. The Final Rule cites to 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a) and claims that these provisions vest "the responsibility for administering and enforcing the NFA and GCA" in the AG. 83 Fed. Reg. at 66515.

There is yet another reason the Final Rule is legislative that was not considered by the *Guedes*

Court—it has a significant economic impact. "[A]gency action cannot be a general statement of policy if it substantially affects the rights of persons subject to agency regulations." *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1112 (D.C. Cir. 1974) (collecting cases). Legislative rules "produce [] significant effects on private interests." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 236 (5th Cir. 2015) (citation omitted). The Final Rule voids the lawful sale of as many as 520,000 bump-stock devices, with an economic impact of approximately $102.5 million. *See Final Rule*, 83 Fed. Reg. at 66547. Such a massive financial impact is quintessentially the type of "significant effect[] on private interests" that only a legislative rule could produce. *See Gulf Restoration Network*, 783 F.3d at 236.

Because the Final Rule is legislative, it exceeds ATF's authority. ATF is correct that there is no "reason to think that" "Congress intended to confer on the Attorney General any legislative-rulemaking authority to fill in gaps" "in the course of enacting a criminal prohibition on possession of new machineguns[.]" *See Guedes* Br. at 25-26. But the Final Rule nonetheless purports to amend the statutory definition of machinegun found in the NFA under the authorization of 26 U.S.C. § 7805, and purports to amend the same statutory definition as it applies to the GCA under the authority set out in 18 U.S.C. § 926(a). *Final Rule*, 83 Fed. Reg. at 66554. As ATF now acknowledges, neither provision allows ATF to issue legislative rules creating new criminal prohibitions.

First, the AG has no legislative rulemaking authority under 26 U.S.C. § 7805(a) because that authority was never "expressly given" to him under Title 26. The only power expressly given to the AG or ATF under the NFA was that of "administration and enforcement" of the statute and "interpretation[]" of its terms. 26 U.S.C. §§ 7801(a)(1)(2)(A), (a)(2)(B). Issuing a legislative rule that rewrites a statutory definition and creates half a million new felons is not an act of "administration and enforcement" that the AG is empowered to undertake, nor is it an act of "interpretation[]" authorized to ATF. Indeed, ATF now correctly agrees that a legislative regulation "with the force of law" exceeds ATF's interpretive authority under Section 7805. *Guedes* Br. at 20; *Aposhian* Br. at 40-41.

9

The AG's authority under the GCA also cannot support the Final Rule. The Act allows the AG to "prescribe only such rules and regulations as are necessary to carry out the provisions of" the GCA. 18 U.S.C. § 926(a). ATF acknowledges this does not allow it to issue new legislative rules about the scope of crimes. *Guedes* Br. at 15, 20; *Aposhian* Br. at 40-41. The Final Rule goes far beyond a housekeeping regulation designed to implement the GCA of the kind permitted by Section 926(a).

The presence of the delegations of interpretive authority under 26 U.S.C. § 7805(a) and implementing authority under 18 U.S.C. § 926(a) also confirms that Congress withheld a different type of rulemaking authority. Mindful that "[a]gency authority may not be lightly presumed," Congress's "explicit delegation" of such limited authority is proof that it "did not intend to delegate additional authority *sub silentio*." *See Texas*, 497 F.3d at 501-02. Thus "neither the agency nor the courts are free to assume that Congress intended the [agencies] to act in situations left unspoken." *See id.* at 502.

### C. As Set out in Plaintiff's Complaint, Counts I, III, IV, V, VII, and VIII, ATF Had No Authority to Issue the Final Rule Because There Is No Statutory Gap to Fill

Next, there is no statutory ambiguity in the term "machinegun," and thus ATF has no authority to issue a legislative gap-filling rule. ATF has long argued that the term "machinegun" is not ambiguous, which is a point ATF maintains in related litigation. *See Aposhian* Br. at 35-36. Without a statutory ambiguity, there is no gap for ATF to attempt to fill through its legislative rule. The Final Rule is therefore ultra vires and invalid pursuant to Article I, §§ 1, 7, and Article II, § 3 of the U.S. Constitution and pursuant to the APA, 5 U.S.C. §§ 706(A), (C), as set out in Counts, I, III, IV, V, VII and VIII of Plaintiff's Complaint.

Rulemaking "comes into play, of course, only as a consequence of statutory ambiguity[.]" *Texas*, 497 F.3d at 501. An unambiguous statute "means that there is 'no gap for the agency to fill' and thus 'no room for agency discretion.'" *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487 (2012) (citation omitted).

In construing statutes, courts "give undefined terms their ordinary meanings," and the lack of a statutory definition does not render a statute ambiguous. *In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018); *see also United States v. Day*, 700 F.3d 713, 725 (4th Cir. 2012) ("It is beyond cavil that a criminal statute need not define explicitly every last term within its text[.]"). "[S]ilence does not always constitute a gap an agency may fill"; often it "simply marks the point where Congress decided to stop authorization to regulate." *Oregon Rest. & Lodging Ass'n v. Perez*, 843 F.3d 355, 360, 362 (9th Cir. 2016) (O'Scannlain, J., dissenting from the denial of rehearing en banc on behalf of 10 judges).

A court must also "exhaust all the traditional tools of construction" before "wav[ing] the ambiguity flag." *Kisor*, 139 S.Ct. at 2415 (citations omitted). "[O]nly when that legal toolkit is empty … can a judge conclude that it is more one of policy than of law." *Id.* (citations omitted).

The statute defines a "machinegun" as "any weapon which shoots … automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). And in the course of criminally prosecuting people for violating the law, DOJ has successfully argued that the precise terms it now seeks to redefine were not ambiguous. *See, e.g.*, *United States v. Williams*, 364 F.3d 556, 558 (4th Cir. 2004) (finding the definition of "machinegun" to be unambiguous). Courts have likewise consistently ruled that the statutory definition of "machinegun" "is unambiguous." *United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 n. 4 (9th Cir. 2006). The "common meaning of 'automatically' is readily known by laypersons" and "a person of ordinary intelligence would have understood the common meaning of the term—'as the result of a self-acting mechanism.'" *United States v. Olofson*, 563 F.3d 652, 660 (7th Cir. 2009). The phrase "a single function of the trigger" is "plain enough" that efforts to parse it further become "brazen" and "puerile." *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002).

ATF is therefore correct that "there is no ambiguity" in the "terms used to define 'machinegun' in the National Firearms Act[.]" *Aposhian* Br. at 35-36. This means that ATF lacks any gap to fill

through the Final Rule and lacks the authority to issue a gap-filling regulation.

> **D. As Set out in Plaintiff's Complaint, Counts I, III, IV, V, VII, and VIII, ATF Had No Authority to Issue the Final Rule Because It Contradicts the Statutory Definition of a Machinegun**

Next, the Final Rule conflicts with the statutory definition of a machinegun and thus exceeds ATF's authority. Under the Final Rule's analysis, a weapon becomes a machinegun even if the shooter must engage the trigger mechanism for each round fired. That change restores a statutory distinction expressly eliminated in 1968. *See* Gun Control Act, tit. II, § 201 (codified at 26 U.S.C. § 5845(b)). The Final Rule is an invalid attempt to rewrite the statute pursuant to Article I, §§ 1, 7, and Article II, § 3 of the U.S. Constitution and pursuant to the APA, 5 U.S.C. §§ 706(A), (C), as set out in Counts, I, III, IV, V, VII and VIII of Plaintiff's Complaint.

The Supreme Court has explained that the current definition of a machinegun

> refer[s] to a weapon that fires repeatedly with a single pull of the trigger. *That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.* Such weapons are 'machineguns' within the meaning of the Act. We use the term *'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger*, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

*Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994) (emphasis added).

A weapon functions "automatically" when it "discharge[s] multiple rounds" "as the result of a self-acting mechanism" "that is set in motion by a single function of the trigger and is accomplished without manual reloading." *Olofson*, 563 F.3d at 658.

ATF has long recognized that bump stock devices are not machineguns because they require manual manipulation of the firearm between firing of rounds in order to reset and engage the trigger mechanism between shots. ATF has publicly stated at least 27 times, either in classification rulings or formal letters defending those classifications, that bump stock devices are not machineguns. (*See* AR, 106, 111, 116, 126, 134, 138, 145, 157, 160, 167, 170, 175, 179, 191, 198, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) The reasoning of these 24 classification rulings is consistent—in each

case ATF determined that the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand to manually engage the triggering mechanism between the firing of rounds. (*See* AR, 106, 111, 116, 126, 134, 138, 157, 160, 167, 171, 179, 191, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) In other words, after every round is fired, the trigger is "mechanically reset" and the shooter must "pull[] the firearm forward" again to re-engage the trigger. (AR, 106.) "Each shot" is therefore individually "fired by a single function of the trigger." (AR, 106.) This is not automatic firing of multiple rounds as contemplated by the statute.

ATF's prior classifications were premised on intensive fact-finding and manual review and test-firing of the devices. All classifications are based on FTB's manual inspection of the firearms. (*See* Complaint, ¶¶ 33-37; Answer, ¶¶ 33-37.) The record is filled with circumstances where FTB declined to classify devices because the requesting party had failed to furnish a sample. (*See* AR, 84, 95, 101, 102, 188, 210, 212, 228, 231, 233.) As FTB wrote in one such letter, "FTB <u>cannot</u> make a classification on pictures, diagrams, or theory." (AR, 95.)

Even now, ATF adheres to its basic *technical* understanding of how a bump stock operates, and reaffirms the analysis done by FTB in the prior classifications. As said in the Final Rule, "bump firing" is a shooting technique where a shooter fires a semiautomatic weapon by allowing the weapon to slide against his trigger finger such that he "re-engages" the trigger "by 'bumping' [his] stationary finger." *Final Rule*, 83 Fed. Reg. at 66532-33. Bump firing may be accomplished "without a bump-stock device" and could be achieved with "items such as belt loops that are designed for a different primary purpose but can serve an incidental function of assisting with bump firing." *Id.* Bump stocks also merely facilitate bump firing and require the shooter to "maintain[] constant forward pressure with the non-trigger hand on the barrel shroud or fore-grip of the rifle, and maintain[] the trigger finger on the device's extension ledge with constant rearward pressure[.]" *Final Rule*, 83 Fed. Reg. at 66518, 66533.

Despite this settled meaning and technical understanding, ATF has now adopted an invalid

statutory interpretation. ATF's new definition contradicts the statute, first, because it improperly defines the term "automatically" to disregard a shooter's additional manual manipulation of the firearm's *trigger* between shots. The statute speaks of automatic fire "that is set in motion by a single function of the trigger," *Olofson*, 563 F.3d at 658, but the Final Rule pretends that a shooter initiates automatic fire with a bump stock by only "'pull[ing]' the trigger once," even though he must continue "bumping" the trigger between each shot. *Final Rule*, 83 Fed. Reg. at 66533. But "bumping" a trigger is functionally the same as "pulling" it. Even now ATF concedes that "bumping" the trigger "re-engage[s]" it between shots. *Final Rule*, 83 Fed. Reg. at 66516. And, in a dissenting opinion in the D.C. Circuit, Judge Karen LeCraft Henderson noted that "a semiautomatic rifle equipped with a bump stock *cannot* fire more than one round with a *single* function of the trigger" because "the trigger of a semiautomatic rifle must release the hammer for each individual discharge." *Guedes*, 920 F.3d at 47. In a separate dissenting opinion in the Tenth Circuit, Judge Joel Carson said it simply—on a firearm equipped with a bump stock "the trigger … must still 'function' every time a shot is fired." *Aposhian*, 958 F.3d at 992 (Carson, J., dissenting). Thus, ATF can only reach its preferred outcome by pretending that the well understood shooting technique of bump firing somehow does not involve additional physical manipulation of the trigger, even though it plainly does.

Second, the rule disregards the other physical manipulation bump firing requires. As Judge Henderson put it, "A 'machinegun,' then, is a firearm that shoots more than one round by a single trigger pull without manual reloading. The statutory definition of 'machinegun' does not include a firearm that shoots more than one round 'automatically' by a single pull of the trigger **AND THEN SOME** (that is, by 'constant forward pressure with the non-trigger hand')." *Id.* at 44. The rule's new definition says that additional physical manipulation is irrelevant if it is not "of the *trigger* by the shooter." *Final Rule*, 83 Fed. Reg. at 66553-54 (emphasis added). Bump stocks, which require the shooter to "maintain[] constant forward pressure with the non-trigger hand on the barrel shroud or

fore-grip of the rifle, and maintain[] the trigger finger on the device's extension ledge with constant rearward pressure," are now deemed machineguns by the Final Rule because ATF no longer considers the shooter's physical actions between shots to be relevant. *Final Rule*, 83 Fed. Reg. at 66518, 66533. ATF now ignores manual manipulation by the shooter's "non-trigger hand," *Final Rule*, 83 Fed. Reg. at 66518, 66533, even though that manual manipulation is what resets the trigger before each shot. Thus a "nonmechanical" "bump stock" "is not 'self-acting or self-regulating' on the trigger" "[b]ecause the user of the firearm must also apply constant forward pressure with his or her nontrigger hand for the bump stock to work." *Aposhian*, 958 F.3d at 992 (Carson, J., dissenting).

Indeed, "[t]he Rule's very description of a non-mechanical bump stock manifests that its proscription is *ultra vires*:

> [Bump stock] devices replace a rifle's standard stock and free the weapon to slide back and forth rapidly, harnessing the energy from the firearm's recoil either through a mechanism like an internal spring or *in conjunction with the shooter's maintenance of pressure* (typically constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, *and* constant rearward pressure on the device's extension ledge with the shooter's trigger finger).

*Guedes*, 920 F.3d at 46 (Henderson, J., dissenting) (quoting *Final Rule*, 83 Fed. Reg. at 66516).

Next, the Final Rule improperly disregards "the longstanding distinction between 'automatic' and 'semiautomatic'" firearms, which "depended on whether the shooter played a manual role in the loading and firing process." *Guedes*, 920 F.3d at 45 (Henderson, J., dissenting). Congress chose to include semiautomatic weapons in the original definition of a machinegun. *See Hearing on H.R. 9066, House Ways and Means Comm.*, 73rd Cong., 40, 41 (1934) (Testimony of Karl T. Frederick). Congress changed the law in 1968, however, and ever since that time, semiautomatic weapons have not come under the statute's prohibition. *See Staples*, 511 U.S. at 602 n. 1. But "the Bump Stock Rule reinterprets 'automatically' to mean what 'semiautomatically' did in 1934—a pull of the trigger *plus*. The Congress deleted 'semiautomatically' from the statute in 1968 and the ATF is without authority to resurrect it by regulation." *Guedes*, 920 F.3d at 45 (Henderson, J., dissenting).

15

Finally, the new rule would exclude some *actual machineguns* by re-defining the phrase "single function of the trigger" to mean only the "deliberate and volitional act of the user pulling the trigger." *Final Rule*, 83 Fed. Reg. at 66534. The statute focuses on the trigger's "function," which encompasses conduct beyond merely pulling a piece of metal. *See* 26 U.S.C. § 5845(b). ATF even noted in the Final Rule that "the courts have made clear that whether a trigger is operated through a 'pull,' 'push,' or some other action such as a [*sic*] flipping a switch, does not change the analysis of the functionality of a firearm." *Final Rule*, 83 Fed. Reg. at 66518 n. 5. Courts have emphasized that a trigger's function is defined by how it mechanically operates, not by how the shooter engages it. *See United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (citation omitted) ("single function of the trigger" "implies no intent to restrict" the meaning to only encompass "pulling a small lever," and instead means any action that "initiated the firing sequence"); *Fleischli*, 305 F.3d at 655 (minigun was machinegun because it fired automatically following a single activation of an electronic on-off switch).

The new rule, however, elevates one specific movement—a "pull of the trigger"—to a determinate place. If a shooter pulls only once, or perhaps merely pushes a firearm with his non-trigger hand in a way that causes the trigger to reset more than once, the rule says he is firing a machinegun. The rule recognizes that bump stocks require the shooter to "re-engage [the trigger] by 'bumping' the shooter's stationary finger" into the trigger but insists that a "bump" is not a "pull of the trigger" because it is not a backward action on the trigger lever. *Final Rule*, 83 Fed. Reg. at 66516. Whether a trigger is pushed or bumped though, it must move backwards to the same point in order to reset the trigger and fire the next shot. Thus, "[t]he Bump-Stock Rule … fails to consider that the user must apply constant forward pressure with his or her nontrigger hand (a task that requires a fair amount of strength and dexterity) to make the bump stock work, which runs afoul of the word 'automatically' in the NFA." *Aposhian*, 958 F.3d at 992 (Carson, J., dissenting). In short, the "rule cannot withstand judicial scrutiny;" the "clear [statutory] language ties our hands." *Id.* at 992, 994.

16

**E. As Set out in Plaintiff's Complaint, Counts I, III, IV, V, VII, and VIII, ATF's Interpretation of the Statute Is Unreasonable and Therefore Ultra Vires**

ATF's construction of the definition of machinegun must be set aside because the Court owes no deference to ATF's reading, and the best interpretation of the statute runs counter to the Final Rule. Further, even if the Court were to consider deferring to ATF's construction, it is so unreasonable that it still must be rejected. The Final Rule exceeds ATF's authority pursuant to Article I, §§ 1, 7, and Article II, § 3 of the U.S. Constitution and pursuant to the APA, 5 U.S.C. §§ 706(A), (C), as set out in Counts, I, III, IV, V, VII and VIII of Plaintiff's Complaint.

ATF has conceded that it is not entitled to any deference for its interpretation of the statute. *See Guedes* Br. at 14, 25-27. As Justice Gorsuch recently wrote in a statement respecting denial of certiorari in the interlocutory appeal in *Guedes*, "at least one thing should be clear … *Chevron U.S.A. Inc.* [] has nothing to say about the proper interpretation of the law before us." 140 S. Ct. 789 (2020). Indeed, "because the definition of 'machinegun' in the NFA carries the possibility of criminal sanctions, *Chevron* is likewise inapplicable." *Aposhian*, 958 F.3d at 998 (Carson, J., dissenting) (citation omitted). ATF's concession is appropriate for at least three reasons.

First, ATF's inconsistent interpretation is not owed deference. Deference is premised on the assumption that an agency "with great expertise and charged with responsibility for administering the provision would be in a better position to do so" than courts. *See Chevron*, 467 U.S. at 865. An interpretive pedigree carries significance, and courts do not defer to interpretation that has "not been uniform." *Baldwin v. United States*, 140 S. Ct. 690, 693 (2020) (Thomas, J., dissenting from denial of certiorari) (quoting *Merritt v. Cameron*, 137 U.S. 542, 552 (1890)). Thus, an interpretation that "conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30 (1987) (citation omitted).

The Court owes no deference here because ATF has not provided adequate justification for its shift in policy. ATF consistently interpreted the statutory language to exclude bump stocks. (*See*

AR, 106, 111, 116, 126, 134, 138, 145, 157, 160, 167, 170, 175, 179, 191, 198, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) It even followed this understanding *after* the tragedy in Las Vegas in October 2017. (*See* AR, 358, 361, 533.) This consistent interpretation across administrations of both political parties was based on the agency's physical examination of these devices and its expertise in the area. As described below, suddenly ATF changed course without conducting additional physical examinations, and without providing adequate reasons for disregarding its prior interpretation. The statute did not change, nor did the way a bump stock operates. ATF simply changed its mind.

Second, ATF disregarded its own technical expertise in writing the rule, and thus no deference is warranted for this reason as well. A Court does not owe an agency deference "when the promulgating agency lacks expertise in the subject matter being interpreted." *United States v. Orellana*, 405 F.3d 360, 369 (5th Cir. 2005); *see also Kisor*, 139 S.Ct. at 2413 (deference presumes that "[a]gencies (unlike courts) have unique expertise, often of a scientific or technical nature, relevant to applying a regulation to complex or changing circumstances") (citation omitted).

Even after the tragedy the consensus within the agency was that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act." (AR, 1094.) Nevertheless, the agency issued the Final Rule at the insistence of the President, overruling the experts within the agency. (AR, 1094.) There is no indication in the record that ATF re-examined any bump-stock devices or test fired any bump-stock devices between the October 2, 2017, shooting and ATF's change in position.

Third, deferring to the ATF here would violate the separation of powers. A court owes no deference to a prosecutor's interpretation of a criminal law. *Abramski v. United States*, 134 S.Ct. 2259, 2274 (2014). Instead, "any ambiguity concerning the ambit of criminal statutes" is resolved "in favor of lenity." *Yates v. United States*, 135 S.Ct. 1074, 1088 (2015) (citation omitted). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining

18

criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985).

Thus, "whatever else one thinks about *Chevron*, it has no role to play when liberty is at stake." *Guedes*, 140 S. Ct. at 790 (Gorsuch, J.) (statement regarding denial of certiorari). As the Fifth Circuit has recognized, when a statute is ambiguous and an agency purports to interpret it, the rule of lenity "cuts the opposite way" from deference "for the purpose of imposing *criminal liability*[.]" *Orellana*, 405 F.3d at 369. Indeed, the Fifth Circuit has accepted the government's "reservations as to whether [a criminal] ATF regulation as a whole is entitled to any level of deference whatsoever" because of the rule of lenity. *Id.* To defer to ATF's interpretation would "upend ordinary principles of interpretation" and allow "federal administrators [to] in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain." *Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., statement regarding denial of certiorari, joined by Thomas, J.).

ATF has "consistently maintained that *Chevron* is not applicable" in this case, likely because the Final Rule implicates criminal consequences. *See Guedes* Br. at 14. The Final Rule purports to make the estimated 520,000 people who purchased bump stocks in reliance on ATF approval into federal felons under 18 U.S.C. § 922(o). *Final Rule*, 83 Fed. Reg. at 66547. Even now as ATF disclaims deference to its interpretation, it insists that anyone who has ever possessed a bump stock, including Mr. Cargill, has violated the criminal prohibition on machineguns and faces up to 10 years in federal prison. *Guedes Br.* at 20, 23-24. Because of these consequences, the rule of lenity compels this Court to resolve any ambiguity in Mr. Cargill's favor. Thus, even if the definition of machinegun were ambiguous, this Court would have to reject ATF's new interpretation.

When deference is not applicable, the statute "means what it means—and the court must give it effect, as the court would any law." *Kisor*, 139 S. Ct. at 2415. Under its natural reading, ATF was correct in its initial understanding that bump-stock devices are not machineguns. As described by the Supreme Court, a machinegun is activated "by a single function of the trigger" and continues firing

"automatically" until the "ammunition supply is exhausted." *Staples*, 511 U.S. at 602 n. 1. A firearm does not meet this definition if either [1] the shooter is required to provide additional "manual manipulation" between shots; or [2] the trigger "mechanical[ly] reset[s]" between shots. *Id.* Moreover, the requisite manipulation of the trigger can be accomplished in ways other than simply pulling a lever on the underside of a firearm. *See Fleischli*, 305 F.3d at 655. Thus, the most natural reading of the statute has been the one adopted by ATF itself since 2006—a machinegun continuously fires rounds following [1] a single function of the trigger, no matter how initiated, and [2] without any additional manual manipulation, until the supply of ammunition is exhausted.

The new regulatory definition alters both conditions—it says that a "single function of the trigger" actually means a "single pull of the trigger" at the exclusion of all other means of causing the trigger to function. *Final Rule*, 83 Fed. Reg. at 66553-54. It also says that additional manual manipulation excludes any form of physical activity not directed at the trigger lever. *Final Rule*, 83 Fed. Reg. at 66518, 66533. These limitations are not found in the statute and must be rejected.

Finally, even if this court were to consider deferring to ATF's interpretation under *Chevron*, that interpretation goes so far beyond any rational understanding of the statutory text that it is unreasonable and must be rejected. Courts have had no trouble defining a machinegun under the NFA's terms, and ATF has previously adopted a consistent and reasonable interpretation that respects the statutory language. The Final Rule, which conflicts with court interpretations and more than a decade of consistent ATF interpretation, is not reasonable.

**F. As Set out in Count VI of Plaintiff's Complaint, the Final Rule Is Arbitrary, Capricious, an Abuse of Discretion and Otherwise Not in Accordance with Law, Violating 5 U.S.C. § 706(2)(A)**

The Final Rule is also arbitrary and capricious and thus invalid. ATF relied almost exclusively on overtly political factors in crafting the rule. ATF not only ignored its own factual findings and technical expertise, but it also expressly repudiated its prior findings without conducting any new

factual investigation. Its actions and decision-making process were arbitrary and capricious. This violated the limitations set out in 5 U.S.C. § 706(2)(A), as set out in Plaintiff's Count VI.

A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[2] "The Court must make a 'searching and careful review' to determine whether an agency action was arbitrary and capricious[.]" *Texas Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 933 (5th Cir. 1998) (citation omitted). There must be "substantial evidence in the record" to support the agency decision. *Id.* at 933-34 (citation omitted). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

ATF's actions here were invalid. First, ATF "relied on factors which Congress had not intended it to consider" in promulgating the Final Rule, because it was crafted solely in response to political pressure. Prior to the Las Vegas shooting, ATF consistently insisted that bump fire stocks were not machineguns. (*See* AR, 106, 111, 116, 126, 134, 138, 145, 157, 160, 167, 170, 175, 179, 191, 198, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) This understanding was reaffirmed on October 2, 2017, by ATF in internal emails. (*See* AR, 358, 361.) At that point, the United States had never brought a criminal charge under 18 U.S.C. § 922(o) based on the theory that a bump stock was a machinegun. (AR, 681.) Even after the tragedy, ATF insisted that "unless there is some self-acting

---

[2] While courts review agency action for reasonableness using an arbitrary and capricious standard and use the same language for review under 5 U.S.C. § 706(2)(A), "the Venn diagram of the two inquiries is not a circle." *Humane Society of the United States v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017). Each inquiry is distinct, and agency action may be invalid under either form of review. *Id.*

mechanism that allows a weapon to shoot more than one round, you cannot have a machinegun," and thus bump stocks are not regulated devices. (AR, 361.)

The change in position was entirely political. Politicians intensely pressured the agency over its classifications of bump stocks. (*See* AR, 539, 541, 545, 717.) At the same time, at least five different bills were advanced in Congress that would have banned or restricted the sale of bump stocks—mostly *prospectively*. (*See* Complaint, ¶¶ 88, 90, 91, 94, 102; Answer, ¶¶ 88, 90, 91, 94, 102.) This pressure worked on the executive branch—on October 12, 2017, internal emails show that ATF had "been asked by DOJ to look at our legal analysis on bump stocks." (AR, 713.) Then on November 9, 2017, Acting Director Brandon sent an email to senior staff saying that "the Department has reached a decision that ATF is to move forward with the issuance of a regulation on bump-stocks." (AR, 753.) DOJ, and *not* ATF, was the impetus for the change in interpretation. Of course, Acting Director Brandon admitted this, testifying that on October 1, 2017, he had consulted with "technical experts," "firearms experts" and "lawyers" within ATF, and the consensus within the agency was that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act," but acknowledging that ATF's change in position had occurred after he had gone "outside and over to DOJ." (AR, 1094.)

The change was not spurred by new factual analysis. Classification rulings can *only* be issued after a physical examination of a device. (*See* AR, 84, 95, 101, 102, 188, 210, 212, 228, 231, 233.) Every *approval* of bump-stock devices arose after such a physical examination. (*See* AR, 106, 111, 116, 126, 134, 138, 157, 160, 167, 171, 179, 191, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) But there is no evidence that FTB reexamined any of the devices.[3]

Most tellingly, Acting Director Brandon tipped his hand in emails. Jim Cavanaugh, a "Law

---

[3] In fact, while Director Brandon apparently did go to ATF's National Training Center, there is no indication in the record what he did there, and, in any event Acting Director Brandon was not a firearms expert within FTB. (*See* AR, 686.).

Enforcement Analyst" for NBC and MSNBC, sent Acting Director Brandon an email outlining his "outside view" "on Bump Stocks," "recommend[ing] an overruling of the prior decision[s] and putting [bump stocks] under the NFA." (AR, 685.) Cavanaugh, who was not even an employee of ATF said, "Regardless of what Congress does or does not do ... You can do it fast and it is the right thing to do, don't let the technical experts take you down the rabbit hole[.]" (AR, 685.) Acting Director Brandon appeared to agree, writing back saying, "At FTB now. Came to shoot it myself. I'm very concerned about public safety and share your view. Have a nice day, Tom." (AR, 685.) ATF cannot have engaged in a meaningful decision based on factual analysis if its Acting Director has candidly acknowledged that he does not want to "let the technical experts" lead him to a decision. (*See id.*)

Agencies may fill appropriate gaps in statutes, but they cannot supplant Congress. *See Chevron*, 467 U.S. at 843. Congress *was* attempting to address what it viewed as a statutory lacuna concerning the legality of bump stocks, but ATF derailed those efforts by forcing through the Final Rule over opposition from Members. (*See* Complaint, ¶ 108; Answer, ¶ 108.) ATF therefore took the political decision away from Congress, which is the opposite of the agency's proper role.

Next, ATF's proffered explanation for the Final Rule runs counter to the evidence before the agency, and thus there was no "substantial evidence in the record to support it." *See Texas Oil & Gas Ass'n*, 161 F.3d at 934. As mentioned, FTB concluded at least 24 times that specific bump-stock devices were not machineguns after physically examining them. (*See* AR, 106, 111, 116, 126, 134, 138, 157, 160, 167, 171, 179, 191, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) Not only did the agency disregard that input when it issued the Final Rule, it ignored evidence submitted to it supporting the prior interpretation. For example, Former Assistant Chief Vasquez's letter to ATF explained the Slide Fire classification based on the testing officer's determination that it could not fire multiple rounds without also manually resetting the trigger mechanism. (AR, 706.) For another example, the ATF Association issued a public letter defending the prior classifications. (AR, 708-09.)

The Final Rule discarded this evidence, however, without any additional technical examination.

Neither the mechanism of bump stocks, nor the Slide Fire in particular, changed since their approval. The only thing that has changed is the agency's view that ATF's prior interpretation is politically undesirable. But politics are not evidence, and ATF's reconsideration of the legality of bump stocks was not based on any evidence put before the agency.

### G. As Set out in Count II of Plaintiff's Complaint, the Final Rule Is an Improper Exercise of Legislative Power

The Final Rule also represents an unlawful exercise of legislative power as set out in Plaintiff's Count II. Because it would involve a purely political determination of the scope of criminal liability, only Congress could pass a legislative rule that criminalized the possession of bump stock devices. ATF's purported exercise of that authority is therefore unconstitutional.

The President, acting through his agencies, may not exercise Congress's legislative power to declare entirely "what circumstances … should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418-19 (1935). Traditionally the Court has allowed agencies to exercise authority so long as Congress set out an "intelligible principle to which the person or body authorized to [exercise the authority] is directed to conform." *Mistretta*, 488 U.S. at 372. As Justice Gorsuch recently highlighted in his dissenting opinion in *Gundy v. United States*, though, the Court's precedents offer at least three limiting principles to consider in order "to decide whether Congress has unconstitutionally divested itself of its legislative responsibilities."139 S. Ct. at 2135 (Gorsuch, J., dissenting).

"First, we know that as long as Congress makes the policy decisions when regulating private conduct, it may authorize another branch to fill up the details." *Id.* at 2136. "Second, once Congress prescribes the rule governing private conduct, it may make the application of that rule depend on executive fact-finding." *Gundy*, 139 S.Ct. at 2136 (Gorsuch, J., dissenting). "Third, Congress may assign the executive and judicial branches certain non-legislative responsibilities." *Id.* at 2137.

24

The Final Rule violates these principles. First, as discussed, the Final Rule was a political decision by the agency. Intense political pressure on the agency led it to reverse course, notwithstanding its prior factual examinations. Acting Director Brandon essentially admitted as much, testifying that on October 1, 2017, he had consulted with "technical experts," "firearms experts" and "lawyers" within ATF, and the consensus within the agency was that "bump stocks" "didn't fall within" federal prohibitions but ATF's change in position had occurred after he had gone "outside and over to DOJ." (AR, 1094.) The decision as to what conduct is *criminal*, however, is precisely the kind of decision reserved for Congress, and not an agency like ATF. *See United States v. Eaton*, 144 U.S. 677, 688 (1892) ("[i]t would be a very dangerous principle" to allow an agency to issue regulations that carried criminal penalties under the general rubric of being "a needful regulation" to enforce a statute). Here, Congress did not make the policy decision, which in fact ATF took away from Congress.

Next, the exercise of authority cannot be justified as being dependent on the agency's fact-finding powers. The Final Rule was not spurred by any new factual analysis. On the contrary it was a rejection of the past technical examinations. (*See* AR, 106, 111, 116, 126, 134, 138, 157, 160, 167, 171, 179, 191, 201, 206, 218, 235, 238, 242, 250, 258, 263, 268, 272, 275.) Agency fact-finding certainly did not supply an intelligible limiting principle here.

The Final Rule cannot be justified based on any unique exercise of presidential powers. This is statutory question implicates criminal punishment, which is a uniquely *legislative* interest. *See Eaton*, 144 U.S. at 687-88.

## III. CONCLUSION

ATF's Final Rule, *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018), must be permanently enjoined, and ATF should be ordered to return Mr. Cargill's bump stocks to him. This Court should order that Mr. Cargill's possession of a Slide Fire bump stock did not violate the criminal prohibition in 18 U.S.C. § 922(o) because the device was not a "machinegun" as set out in the statute.

Respectfully Submitted,

August 28, 2020                                    */s/  Caleb Kruckenberg*
                                                  **Caleb Kruckenberg**
                                                  New Civil Liberties Alliance
                                                  1225 19th St. NW, Suite 450
                                                  Washington, DC 20036
                                                  (202) 869-5210
                                                  Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Counsel for Plaintiff