IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHAEL CARGILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 1:19-cv-349 |
| | ) | |
| WILLIAM P. BARR, | ) | |
| IN HIS OFFICIAL CAPACITY AS | ) | |
| ATTORNEY GENERAL | ) | |
| OF THE UNITED STATES, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' TRIAL BRIEF

Pursuant to the Court's instructions at the February 13, 2020 status conference, *see* ECF

No. 31, and subsequent scheduling instructions from the Court, Defendants submit this trial brief

summarizing the legal issues that may arise at trial.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.   STATUTORY FRAMEWORK FOR REGULATION OF FIREARMS ........................... 2

II.   PAST REGULATION OF BUMP STOCKS ................................................ 4

III.   DEVELOPMENT AND ISSUANCE OF THE RULE.................................... 7

ARGUMENT ................................................................................................... 9

I.   THE RULE SETS FORTH THE BEST INTERPRETATION OF THE STATUTORY
DEFINITION OF "MACHINEGUN" AS APPLIED TO BUMP STOCKS. ........................... 9

   A.   The Rule Gives the Terms "Single Function of the Trigger" and "Automatically"
Their Ordinary, Accepted Meaning. ..................................................................... 10

   B.   The Rule Correctly Applies Its Interpretations of "Single Function of the Trigger"
and "Automatically" To Classify Bump Stocks As Machine Guns. .................................... 14

   C.   The Rule Reasonably Distinguishes Between Bump Stocks, Other Weapons, and
Other Methods of Bump Firing a Weapon. ............................................................... 19

II.   PLAINTIFF'S CLAIMS REGARDING THE RULE'S PURPORTED EXERCISE OF
LEGISLATIVE AUTHORITY AND THE INAPPLICABILITY OF CHEVRON
DEFERENCE DO NOT CAST DOUBT ON THE RULE. ..................................................... 21

   A.   The Rule is Interpretive, Not Legislative, and Plaintiff's Challenges to Its Purported
Legislative Character Therefore Fail…………………………………………………21

   B.   Plaintiff's Arguments TRegarding Deference Are of No Moment…………………..23

III.   THE RULE IS NOT ARBITRARY OR CAPRICIOUS UNDER THE APA............... 26

   A.   The Rule Properly Reflects Input From Elected Officials. ................................. 26

   B.   The Rule Properly Explains the Department's Change in Course. ........................... 27

   C.   The Rule Properly Reflects Agency Expertise and Thoroughly Considers the
Relevant Evidence. ....................................................................................... 28

IV.   THE RULE IS PROMULGATED PURSUANT TO VALID AUTHORITY............... 30

   A.   Congress Has Provided Defendants With the Interpretive Authority to Issue the
Rule………………………………………………………………………………………31

   B.   The Rule Does Not Reflect an Improper Delegation of Legislative Authority or
Violate the Separation of Powers......................................................................... 34

V.   ARGUMENTS OMITTED FROM PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW ............................................................................. 35

CONCLUSION................................................................................................. 37

## INTRODUCTION

In 2018, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Department of Justice (collectively, "the Department" or "DOJ") determined that "bump-stock-type devices" or "bump stocks" are prohibited by the federal statute banning private possession of machine guns.[1]  The Department issued a rule, *Bump-Stock-Type Devices*, 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Rule"), explaining its interpretation of that statute and the manner in which bump stocks transform ordinary semiautomatic weapons into extremely dangerous machine guns. The factual underpinnings of this conclusion are set forth in the administrative record and will be highlighted in the factual presentation at trial.

Plaintiff asks the Court to permanently enjoin the Rule and order ATF to return his bump stocks to his possession. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ("FFCL") ¶¶ 325-27, ECF No. 39. Plaintiff asserts that bump stocks are not machine guns and challenges the Rule on a variety of overlapping grounds under the Administrative Procedure Act ("APA") and the Constitution. Plaintiff is mistaken on all grounds. Resolution of this case presents a straightforward set of legal issues regarding whether: (1) the Rule sets forth the best interpretation of the statutory definition of machine guns as applied to bump stocks; (2) the Rule and its adoption satisfy the requirements of the APA; and (3) the Rule is promulgated pursuant to valid authority. As this brief explains, the Court should find in Defendants' favor on all of these issues following the factual presentation at trial, and based on the administrative record ("AR") cited herein (cites to the AR are in the format AR#####, reflecting the AR's page-numbering).

---

[1] As the trial presentation will illustrate, a bump stock is a device that assists in increasing the speed of firing for a semi-automatic firearm by mounting at least the receiver, barrel, and trigger assembly of that firearm into a base so that they move as a single unit. This allows continuous forward pressure to help effect successive discharges after recoil moves the receiver, barrel, and trigger assembly rearward.

## BACKGROUND

## I.    STATUTORY FRAMEWORK FOR REGULATION OF FIREARMS

This trial is framed by three statutes that, in combination, strictly regulate machine guns: the National Firearms Act of 1934 ("NFA"), Pub. L. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. ch. 53) (June 26, 1934);[2] the Gun Control Act of 1968 ("GCA"), Pub. L. 90-351, 82 Stat. 197 (June 19, 1968) (codified as amended 18 U.S.C. ch. 44); and the Firearm Owners Protection Act of 1986, ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (May 19, 1986). Together, these statutes generally prohibit the possession by members of the public of newly manufactured machine guns and closely regulate the possession of machine guns manufactured prior to the effective date of the FOPA. *See* 18 U.S.C. § 922(o).

In 1934, Congress enacted the NFA to regulate the possession of machine guns and other firearms. *See United States v. Knutson*, 113 F.3d 27, 31 (5th Cir. 1997). Among other things, the NFA defined "machinegun." That definition, currently set forth in 26 U.S.C. § 5845(b) and the core of which is only modestly revised since 1934, reads:

> [A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); *compare* 48 Stat. 1236 ("The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without

---

[2] Although the NFA regulated machine guns pursuant to the federal government's taxation powers, it was widely understood as a restriction on private machine gun ownership. *See* Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. LEGAL STUDIES 133, 138 n.29 (1975) (explaining that, at the time of its enactment, the NFA was "popularly known as an 'anti-machine gun' law")

manual reloading, by a single function of the trigger").

In 1968, Congress passed the GCA to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, "assist the States and their political subdivisions to enforce their firearms control laws," and "help combat . . . the incidence of serious crime." *See* 18 U.S.C. § 921 *et seq.*; *Hollis v. Lynch*, 121 F. Supp. 3d 617, 625 (N.D. Tex. 2015) (citing S. Rep. No. 89-1866, at 1 (1966)). The GCA established the current framework under which firearms are regulated and limited the sale of machine guns to purchasers who could obtain a supportive, sworn statement from local law enforcement. *See* GCA, 82 Stat. 197, 230.

In 1986, Congress revisited machine gun regulation in the FOPA and imposed a direct prohibition on the transfer or possession of such weapons. In particular, FOPA banned the manufacture and sale to the public of new machine guns, 100 Stat. 453, and made it "unlawful for any person to transfer or possess a machinegun," subject to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State . . .; or (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2).

ATF is the law enforcement agency within the Department of Justice with, *inter alia*, the authority to administer and enforce federal firearms laws relating to firearms, including by regulating commerce in firearms. *See* 28 C.F.R. § 0.130. As part of its regulation, ATF permits firearm manufacturers and owners to seek ATF's view regarding the correct classification of a firearm, accessory, or other item. In response, the agency may provide a classification letter indicating its current position on a particular device. *See* ATF, NFA Handbook § 7.2.4 (2009), *available at*: https://go.usa.gov/xpwp5; *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599-600 (1st Cir. 2016). ATF classification letters "may generally be relied upon by their recipients as the

agency's official position concerning the status of the firearms under Federal firearms laws."

ATF Handbook § 7.2.4.1. Such classifications, however, "are subject to change if later

determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.*

## II.     PAST REGULATION OF BUMP STOCKS

After the FOPA barred the manufacture and sale to the public of new machine guns, the

price of machine guns lawfully possessed pursuant to 18 U.S.C. § 922(o)(2)(B) "steadily

increased over time" due to continuing interest by firearms owners in the automatic-fire

capability of such weapons and a static supply of machine guns lawfully-owned and

grandfathered in by FOPA. 83 FR 66515-16. This price increase led enthusiasts and inventors to

try to devise new ways to simulate automatic weapon fire while remaining compliant with 18

U.S.C. § 922(o). *See, e.g.*, AR002664 (Cmt. 31210). In 2002 and 2004, for example, one

prospective manufacturer asked ATF whether the "Akins Accelerator," a device that attaches to a

weapon and that uses an internal spring to harness the force of recoil so that the weapon shoots

more than one shot with a single pull of the trigger, would be classified as a machine gun under

the NFA. *Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009) (per curiam);

AR000007-AR000021. ATF tested a prototype of the device and, after initially concluding it did

not constitute a machine gun, reversed its view and classified the weapon as a machine gun.

*Akins*, 312 F. App'x at 198-99; *see also* AR000075-AR000077. ATF issued a policy statement

explaining that the Akins Accelerator and similar attachments that use an internal spring to

harness the force of recoil to enable a weapon to shoot more than one shot with a single pull of

the trigger are machine guns. *See* AR005599-AR005601; 83 FR 66516. ATF also determined

that the phrase "single function of the trigger" in the NFA should be interpreted to mean a

"single pull of the trigger" by the shooter, not a single motion of the trigger mechanism itself.

AR005599. ATF accordingly ordered the manufacturer "to register the devices he possessed or to surrender them," *Akins*, 312 F. App'x at 199, and instructed owners of Akins Accelerators to disable their devices by removing and disposing of the internal spring, *see* AR000090-AR000092. The inventor brought suit to challenge ATF's reclassification of the device and to seek compensation for ATF's changed position as a taking of property, but was unsuccessful. *See Akins*, 312 F. App'x at 198; *Akins v. United States*, 82 Fed. Cl. 619 (2008).

The Department soon received classification requests for other devices that, like the Akins Accelerator, harnessed the force of recoil to enable a weapon to shoot more than one shot with a single pull of the trigger, but that did not include internal springs. These devices came to be known as "bump stocks" because they assisted a longstanding technique of firing a semi-automatic firearm rapidly known as "bump-firing," and all "utilize essentially the same functional design." 83 FR 66516.[3] The trial presentation will showcase this design: bump stocks are generally made to be affixed to a semi-automatic long gun in place of a standard rifle stock.[4] *See id.*; AR000716 (describing an online graphic as a "great animation for understanding bump stocks") (citing https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html (last visited August 21, 2020)); AR000105-AR000113. A bump stock is configured

---

[3] Bump-firing "is a vernacular expression used in contemporary firearms culture and is not defined" by federal law. AR000134. ATF has generally described bump-firing without a bump stock "as meaning rapid manual trigger manipulation to simulate automatic fire." *Id.*

[4] "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." 18 U.S.C. § 921(a)(28). Bump stocks are made to fit numerous types of semi-automatic rifles, but the most common are for AR-type and AK-type rifles. *See* 83 FR 66516. The AR-15 is the semi-automatic version of the fully-automatic M-16 rifle familiar to millions of Americans from their military service, *see* Robert A. Sadowski, *Fifty Guns That Changed the World* 221 (2015), and it "remains today the most popular rifle in American history." *Duncan v. Becerra*, --- F.3d --, 2020 WL 4730668 at *9 (9th Cir. 2020) (internal quotation omitted). The trial presentation will compare the mechanical operation of an M-16 and an AR-15.

with a sliding shoulder stock molded or attached to a grip or handle that includes an extension ledge (also called a "finger rest" or "finger ledge") on which the shooter places the trigger finger while shooting the firearm. *See, e.g.*, AR000133; AR000126-AR000132. Bump stocks typically also include a detachable rectangular receiver module that is placed in the receiver well of the device's handle to assist in guiding and regulating the recoil of the firearm when fired. *See, e.g.*, AR000160-AR000166. When the trigger is pulled with the trigger finger stabilized on the extension ledge and forward pressure maintained with the non-trigger hand on the fore-stock or other portion of the rifle, the bump stock helps direct the firearm's recoil energy so that the rifle slides back and forth, and the trigger automatically re-engages by "bumping" the trigger finger. *See* AR000716.

In a series of classification decisions between 2008 and 2017, the Department concluded that some bump stocks should not be classified as machine guns as defined in 26 U.S.C. § 5845(b). *See* AR000103-AR000278. Under the analysis in these decisions, although the devices in question typically acted with a "single pull of the trigger," they did not fire "automatically" because they lacked internal springs or other mechanical parts built into the devices that channeled recoil energy. 83 FR 66517. The conclusion that some bump stocks were not machine guns placed those devices outside the scope of federal firearms regulations altogether, *see id.*, and such bump stocks became popular for recreation among firearms owners seeking inexpensive substitutes for machine guns grandfathered by the FOPA. *See, e.g.*, AR001664 (Cmt. 20294); AR001752 (Cmt. 24397); *see also* 83 FR at 66516 ("Shooters use [these devices] with semiautomatic firearms to accelerate the firearms' cyclic firing rate to mimic automatic fire.").

### III.     DEVELOPMENT AND ISSUANCE OF THE RULE

A tragic and deadly massacre in Las Vegas on October 1, 2017 focused attention on the shortcomings of the previous regulatory treatment of bump stocks. Fifty-eight concertgoers were killed and hundreds more wounded by shots fired by a single shooter from a hotel room window. When investigators entered the shooter's hotel room, they discovered that the majority of the shooter's rifles were equipped with bump stocks. AR000735-AR000743; AR001027-AR001043. The Las Vegas attack, and the public attention given to bump stocks in the wake of that deadly crime, led the Department to revisit its prior treatment of bump stocks, as well as to clarify its interpretation of "machinegun" in 26 U.S.C. § 5845(b). *See* 83 FR 66516-17. As an initial step, the Department published an advance notice of proposed rulemaking ("ANPRM") in the Federal Register. *See* AR000773 (*Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 FR 60929 (Dec. 26, 2017)). The ANPRM solicited comments concerning the market for bump stocks and asked a series of questions of manufacturers, consumers, and retailers regarding the cost of bump stocks, the number of sales, and the cost of manufacturing. *See* 83 FR 60929-31. It also asked for input on the potential effect of a rulemaking prohibiting bump stocks. *Id*. Public comment on the ANPRM concluded on January 25, 2018. *Id*. at 60929.

On February 20, 2018, the President issued a memorandum to the Attorney General concerning bump stocks. *See* AR000790 (*Definition of Machinegun*, 83 FR 7949). The memorandum instructed the Department, working "within established legal protocols," "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id*. Carrying out that directive,

DOJ published a notice of proposed rulemaking ("NPRM") setting forth changes to the regulations at 27 C.F.R. §§ 447.11, 478.11, and 479.11 to clarify the meaning of the terms "single function of the trigger" and "automatically" as used in the statutory definition of machine gun. *See* AR001297 *et seq.* (*Bump-Stock-Type Devices*, 83 FR 13442 (Mar. 29, 2018)). DOJ received "over 186,000 comments" in response to the NPRM, 83 FR 66519; *see also* AR002121, reviewed and considered those comments, and finalized the Rule. *See generally* 83 FR 66519-43.

DOJ published the Rule in its final form in the Federal Register on December 26, 2018. *See* 83 FR 66514.[5] The Rule sets forth DOJ's interpretations of the terms "single function of the trigger" and "automatically" in 26 U.S.C. § 5845(b). Consistent with ATF's position since 2006, the Rule explains that the Department interprets the phrase "single function of the trigger" to mean a "single pull of the trigger and analogous motions." 83 FR at 66515. As to "automatically," the Rule states that, in the context of the statutory definition of machine gun, the term means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id*. at 66554. The Rule states that these definitions "represent the best interpretation of the statute." *Id*. at 66521.

The Rule also clarifies for members of the public that "[t]he term 'machine gun' includes a [bump stock]." *Id*. at 66554. As the Rule describes, by pulling the trigger once, resting the trigger finger on the device's finger ledge, and maintaining pressure on the barrel-shroud or fore-grip of the rifle with the other hand, a shooter using a bump stock is able to harness the firearm's recoil energy in a continuous back-and-forth cycle that ends only when the shooter releases his

---

[5] The Rule amends the regulations of ATF, and was promulgated by the Attorney General and DOJ, who are responsible for overseeing ATF. *See* 28 C.F.R. § 0.130(a)(1). NFA provisions still refer to the "Secretary of the Treasury." *See* 26 U.S.C. Ch. 53. However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1).

pull, the weapon malfunctions, or ammunition is exhausted. *Id*. at 66532. This "self-regulating" or "self-acting" mechanism allows continuous firing after a single pull of the trigger and thus functions "automatically" after a "single function of the trigger." *Id*. Because bump stocks convert otherwise semiautomatic firearms into machine guns, the devices are prohibited under 18 U.S.C. § 922(o). The Rule instructed "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office." *Id*. at 66549. The Rule further stated that the Department would not take enforcement action for 90 days to give possessors of bump stocks time to destroy the devices or abandon them. *Id*. at 66530, 66549.

## ARGUMENT

### I.    THE RULE SETS FORTH THE BEST INTERPRETATION OF THE STATUTORY DEFINITION OF "MACHINEGUN" AND CORRECTLY APPLIES THAT DEFINITION TO BUMP STOCKS

Bump stocks enable their possessors to convert a semiautomatic weapon into one that can fire more than one shot by a self-acting mechanism after the shooter pulls the trigger one time. This means that bump stocks are machine guns under the plain meaning of the statutory definition of "machinegun." Federal law defines a "machinegun" as a weapon that shoots "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). A weapon shoots "automatically" when it operates by "a self-acting or self-regulating mechanism." 83 FR 66519. It is undisputed that by attaching a bump stock to a semiautomatic weapon, a shooter can fire repeatedly—indeed, at a rate of hundreds of rounds per minute—simply by pulling the trigger once, stabilizing the trigger finger on the trigger ledge, and maintaining pressure on the front of the weapon. All of these factual matters are demonstrated in the administrative record, and Defendants will illustrate these facts through their trial presentation from an experienced ATF Firearms Enforcement Officer ("FEO").

Such a weapon plainly falls within the statutory definition of machinegun, and therefore,

by classifying bump stocks as machine guns, the Rule correctly applies the statutory definition of machinegun to bump stocks.

**A.  The Rule Gives the Terms "Single Function of the Trigger" and "Automatically" Their Ordinary, Accepted Meaning**

Courts "interpret the words [of a statute] consistent with their ordinary meaning at the time Congress enacted the statute." *Wisc. Cent. Ltd. v. United States*, --- U.S. ---, 138 S. Ct. 2067, 2070 (2018); *see, e.g.*, *Brown v. Megg*, 857 F.3d 287, 290 (5th Cir. 2017); A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71 (1994).[6] The Rule represents the best interpretation of the statutory text because it correctly interprets and applies the text in accordance with ordinary, accepted meaning.

To start, the Rule interprets the phrase "single function of the trigger" to mean "a single pull of the trigger and analogous motions," an interpretation that "reflect[s] ATF's position since 2006." 83 FR 66518. This "shooter-focused interpretation" is not only reasonable, but is "the best interpretation" of the statute. *Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1151 (D. Utah 2019) (*Aposhian I*"), *aff'd Aposhian v. Barr*, 958 F. 3d 969 (10th Cir. 2020) (*Aposhian II*").

Given the longtime, commonsense understanding that a single pull of the trigger is the manner in which most personal guns are fired (by the shooter's pull on a curved metal trigger), courts have "instinctively reached for the word 'pull' when discussing the statutory definition of 'machinegun.'" *Guedes v. ATF*, 356 F. Supp. 3d 109, 130 (D.D.C. 2019) ("*Guedes I*"), (citing *Staples*, 511 U.S. 600, 602 & n.1 (1994), and *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977)), *aff'd* 920 F.3d 1 (D.C. Cir. 2019) ("*Guedes II*"), *cert denied* No. 19-296, 140 S. Ct. 789 (Mar. 2, 2020) ("*Guedes III*"). In *Staples*, for example, the Supreme Court described a

---

[6] *See also, e.g.*, *U.S. v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019); Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation,* 17 Harv. J.L. & Pub. Pol'y 61 (1994)

machine gun as "a weapon that fires repeatedly with a single pull of the trigger." 511 U.S. 600, 602 n.1. In *Oakes*, the Tenth Circuit explained that automatic fire is achieved "with a single trigger function" by means of "the shooter . . . fully pulling the trigger." 564 F.2d at 388. These statements accord with common usage in dictionaries and other sources both before and after enactment of the NFA, including during the time in which Congress incorporated the NFA's definition of machine gun into the GCA and the FOPA. *See, e.g.*, Dwight D. Eisenhower, Address to the American Society of Newspaper Editors (Apr. 17, 1958), *in* Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit the target than it is to haggle over who makes a weapon or who pulls a trigger"); Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); *Nightline: Biting the Bullet at the NRA [National Rifle Association]* (ABC television broadcast, June 8, 1990) (NRA President Joe Foss: "[semi-automatic] guns are like any other gun . . . they're a single-shot, every time you pull the trigger it shoots"); *see also* Oliver Wendell Holmes, Jr., The Common Law: Lecture IV (1881) (an ordinary person "would foresee the possibility of danger from pointing a gun which he had not inspected into a crowd, and pulling the trigger, although it was said to be unloaded").

The Rule's interpretation of "single function of the trigger" also reflects longstanding interpretations by ATF, dating back to the 2006 ruling that corrected the misclassification of the Akins Accelerator. *See* AR005599. In that ruling, ATF concluded that a device "activated by a single pull of the trigger, initiat[ing] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted" should be classified as a machine gun. The ruling further noted, as the Rule does, that this "determination is consistent with the legislative history of the NFA." AR005600. In particular, Congress received testimony in 1934

11

that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machine gun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns." AR004230 (reproducing *Nat'l Firearms Act: Hrg's Before the Comm. on Ways and Means*, House of Rep's, Second Session H.R. 9066, 73rd Cong., at 40 (1934)). And in explaining the definition of "machinegun" in the bill that ultimately became the NFA, *see* H.R. 9741, 73d Cong. (1934), the House Committee on Ways and Means report stated that bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger." H.R. Rep. No. 73-1780, at 2 (1934); *see* S. Rep. No. 73-1444 (1934) (reprinting House's "detailed explanation" of the provisions).

The Rule is also consistent with numerous cases recognizing that the definition of the phrase "single function of the trigger" is not limited either to a specific method of making the trigger function or to a specific kind of "trigger" mechanism. As the Ninth Circuit explained in *United States v. Evans*, "in § 5845(b), 'by a single function of the trigger' describes the action that enables the weapon to 'shoot ... automatically ... without manual reloading,' not the 'trigger' mechanism" itself. 978 F.2d 1112, 1113 & n.2 (9th Cir. 1992). This shooter-focused interpretation is necessary to ensure that the statutory definition applies to weapons that have "no mechanical trigger" at all. *United States v. Carter*, 465 F.3d 658, 665 (6th Cir. 2006) (per curiam). In *Carter*, the Sixth Circuit held that the statutory definition of "machinegun" applied to a modified weapon that, although lacking a traditional "trigger," fired automatically when a shooter put a magazine in the weapon, "held it at the magazine port, pulled the bolt back and released it." *Id*. Other courts have similarly recognized that a trigger is whatever mechanism serves "to initiate the firing sequence" of a weapon, thereby ensuring that creative or innovative

designs cannot be used to circumvent the definition of machinegun. *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam) (trigger not limited to "a small lever moved by a finger"); *see also United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002) (holding that a minigun fired by "an electronic switch" was a machinegun). The Rule reflects this longstanding interpretive approach by stating that a "single function of the trigger" encompasses "a single pull of the trigger and analogous motions" like pressing a button, flipping a switch, or otherwise initiating the firing sequence without pulling a traditional trigger. 83 FR 66553; s*ee also id.* at 66515 (noting that "there are other methods of initiating an automatic firing sequence that do not require a pull"); *id.* (observing that many machineguns "operate through a trigger activated by a push"); *accord* AR000658-AR000667 (documenting the classification as a machine gun the "AutoGlove," a device designed to be worn as a glove by a shooter, in which pushing a button inside the glove led to an electromechanical "finger" repeatedly pulling a firearm trigger).

Likewise, the Rule's interpretation of "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger" is "the best interpretation of the statute." *Aposhian I*, 374 F. Supp. 3d at 1153. Here, dictionary definitions are directly on point: "This interpretive language is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the NFA's enactment." [7] *Id.* at 1152 (citing 83 FR 66519); *see also* "automatic," *Webster's New International Dictionary, Second Edition* 187 (1934) ("having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation"); "automatic," 1 Oxford English Dict. 574 (1933) ("self-acting under conditions fixed for it, going of itself"). The Rule's interpretation of

---

[7] Courts "often look to dictionary definitions for help" in determining the ordinary meaning of a statutory term. *Cascabel Cattle Co. v. U.S.*, 955 F.3d 445, 451 (5th Cir. 2020); *see generally Nat'l Ass'n of Mfrs v. SEC*, 800 F.3d 518, 529 (D.C. Cir. 2015); Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71.

"automatically" is also consistent with the Seventh Circuit's decision in *U.S. v. Olofson*, in which the court, quoting the dictionary definitions noted above, concluded that "automatically . . . delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." 563 F.3d 652, 658 (7th Cir. 2009) (reproduced at AR004475 *et seq.*). As with the Rule's interpretation of "single function of the trigger," this reading of "automatically" represents the best interpretation of the statute.

Plaintiff contends otherwise by arguing that bump-firing involves "additional manipulation of the firearm's trigger between shots." FFCL ¶ 282 (emphasis omitted). But the movement of the weapon back and forth between shots while the trigger finger remains stationary on the trigger ledge *is* the result of an automatic, "self-acting or self-regulating mechanism." 83 FR 66553. That the trigger may be depressed and undepressed by the stationary trigger finger during the back-and-forth recoil movement does not render the mechanism non-automatic. Plaintiff further argues that the Rule's interpretation of "automatic" improperly "disregards" the actions of the "non-trigger hand," which must maintain "constant forward pressure" on the barrel-shroud or fore-grip for bump-firing to be effective. FFCL ¶ 283. This is little different, however, than what is required of the trigger finger on a traditional machine gun, which must maintain constant pressure on the trigger after the initial pull in order for firing to continue. Nor does it make the harnessing of the recoil movement any less "automatic."

### B. The Rule Correctly Applies Its Interpretations of "Single Function of the Trigger" and "Automatically" To Classify Bump Stocks As Machine Guns

The Rule correctly explains that its interpretations of "single function of the trigger" and "automatically," when applied to bump stocks, demonstrate that bump stocks are machineguns under federal law. As the presentation at trial will illustrate, the very purpose of a bump stock is

to translate a shooter's single decisive trigger pull into a continuous series of multiple shots, through the assistance of the stock itself, the recoil energy, and the continuing pressure on the trigger ledge and by the non-trigger hand. *See, e.g.*, AR000242-AR000249, AR000370-AR000390. A bump stock produces automatic fire by a "single function of the trigger," because when the shooter pulls on the trigger while operating the device as designed, the weapon can discharge more than one shot by a self-acting mechanism. *Cf. Staples*, 511 U.S. at 602 & n.1 ("[O]nce its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the [NFA]."). Thus, as recognized by the court in *Guedes I*, "[a] bump stock permits the shooter to discharge multiple rounds by, among other things, 'maintaining the trigger finger on the device's extension ledge with constant rearward pressure.'" 356 F. Supp. 3d at 132 (quoting 83 FR 66532).

The bump stock enables a continuous firing cycle operating with a self-acting mechanism because it replaces certain manual actions the shooter would have to take to bump fire without a bump stock. Specifically, it harnesses recoil energy in such a way as to enable a continuous firing cycle. *See, e.g.*, AR000716; 83 FR 66533. To be sure, this cycle requires certain "conditions [to be] fixed" to ensure that "a firing sequence that produces more than one shot" occurs. 83 FR 66519. For example, the shooter must maintain continuous forward pressure on the barrel-shroud or fore-grip of the firearm. But "the definition of 'automatically' does not mean that an automatic device must operate spontaneously without any manual input." *Guedes I*, 356 F. Supp. 3d at 132.[8]

---

[8] The Rule noted that commenters to the NPRM had also provided descriptions setting forth the self-regulating mechanism by which bump stocks provide assistance in bump-firing. *See, e.g.*, AR002273 (Cmt. 12748); AR002320 (Cmt. 14969) AR002664 (Cmt. 31210). Such comments, alongside the trial presentation, help confirm the definition and analysis in the Rule is correct.

Plaintiff contends that a firearm equipped with a bump stock is not "automatic" because it "requires separate physical input for each shot." FFCL ¶ 285. This is wrong. As the trial presentation will illustrate, once the trigger is pulled, so long as the shooter keeps his finger on the trigger ledge and maintains forward pressure with the other hand, firing will continue until the shooter releases his pull, the weapon malfunctions, or ammunition is exhausted. Because the bump stock automatically channels the recoil motion, there is no separate "physical input" required by the shooter to continue firing. The Department explained this in the Rule, stating that the "constrained linear rearward and forward paths" provided by a bump stock are what make such stocks "different from a traditional shoulder stock," allowing "shooters to fire . . . without repeated manual manipulation of the trigger by the shooter." 83 FR 66532; *see also* AR002240; AR002273 (Cmt. 12748); AR002484 (Cmt. 2270).

Nor does the Rule "improperly disregard[] 'the longstanding distinction between 'automatic' and 'semiautomatic' firearms.'" FFCL ¶ 286 (quoting *Guedes II*, 920 F.3d at 44-45 (Henderson, J., dissenting)). Once the shooter pulls the trigger, firing will automatically continue so long as the shooter maintains forward pressure while stabilizing his trigger finger on the trigger ledge. Although this forward pressure involves a greater "manual role" for the shooter in the "firing process" than with a traditional machine gun, *id.* (quoting *Guedes*, 920 F.3d at 45 (Henderson, J., dissenting)), this limited amount of manual involvement does not mean that a bump stock is not a self-regulating mechanism that assists in automatic fire.

Plaintiff also criticizes the Rule based on views set forth by former ATF official Rick Vasquez, who served in the past as Acting Chief of ATF's Firearms Technology Branch ("FTB").[9]  *See* FFCL ¶¶ 160-68. However, the Rule explains that its purpose is to correct the

---

[9] FTB has subsequently been renamed the Firearms and Ammunition Technology Division ("FATD").

classification decisions made under the prior interpretation of the statute set forth by Mr. Vasquez, because those "conclusions did not reflect the best interpretation" of the statute. 83 FR 66514. Plaintiff focuses in particular on two points Mr. Vasquez asserts: (1) that "pulling and releasing the trigger is two functions"; and (2) that after each shot, "the rifle will reciprocate sufficiently to recock and reset the trigger."  FFCL ¶¶ 167-68. Neither point establishes that the Rule is unlawful.[10]

First, it is factually inaccurate to say that bump-firing with a bump stock involves "pulling and releasing" the trigger with each shot. *See, e.g.*, AR000138; *Bump Stock Analytical Video FPC/FICG*, available at: https://www.youtube.com/watch?v= 1OyK2RdO63U &feature=youtu.be (contained in administrative record at AR003318, comment of Firearms Industry Consulting Group, https://www.regulations.gov/document?D=ATF-2018-0002-61778) ("FPC/FICG Comment Video"). Rather, the purpose of a bump stock is to allow the shooter "to initiate a continuous firing cycle with a single pull of the trigger . . . by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy . . . [by] allow[ing] the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter."  83 FR 66515. The word "pull" means:

> To exert upon (something) a force which tends to draw, drag, or snatch it towards oneself, or away from its present position (whether or not movement takes place as a result); to drag or tug at."

"Pull, v." OED Online. Oxford University Press, December 2018, http://www.oed.com/

---

[10] Mr. Vasquez's views as a former agency official, even one responsible for addressing the classification of bump stocks, are not entitled to special weight. *See Guedes I*, 356 F. Supp. 3d at 132 n.4  (rejecting argument that Mr. "Vasquez's views are entitled to special weight" (citing *Via Christi Regional Med. Ctr. v. Leavitt*, No. 04-1026-WEB, 2006 WL 2773006, at *13 & n.3 (D. Kan. Sept. 25, 2006), *aff'd* 509 F.3d 1259 (10th Cir. 2007)).

view/Entry/154317?rskey=QI8tWH (last visited Aug. 21, 2020). This definition makes clear that the relevant elements are the "exert[ion]" of the shooter and the direction of the "pull" with regard to the trigger's "present position." *Id*. That a shooter's finger is discontinuously touching the trigger during bump-firing does not mean that multiple "pulls" are occurring, because the bump-firing is part of a single "exert[ion]" by the shooter. That is, even though the trigger may lose (and then reengage) contact with the shooter's finger (which remains stationary on the trigger ledge), there is a single, constant exertion by the shooter on the bump stock that corresponds to an intent by the shooter to continue pulling on the trigger. *See* FPC/FICG Comment Video, AR003318. The automatic engagement and reengagement of the trigger with the shooter's stationary finger (without any intervening volitional "release") are thus properly classified as a "single pull of the trigger."

As to whether, during bump-firing, "the rifle will reciprocate sufficiently to recock and reset the trigger," *id*. at ¶ 167, Mr. Vasquez's position that this does not constitute "automatic" firing reflects ATF's previous interpretation of "single function of the trigger" as focusing on the mechanical operation of the firing mechanism rather than the actions of the shooter. *See Aposhian I*, 374 F. Supp. 3d at 1151 (stating that a "shooter-focused interpretation" of the statute is the "best" way to read the statute); *Guedes I* at 130 (recognizing that the Rule interprets machine guns from "the perspective of the shooter"); *Aposhian II*, 958 F.3d at 988 (rejecting argument that the Rule improperly adopts a "trigger finger" focus in its definition of the statute). Because a "single function" (i.e., pull) of the trigger is the action that initiates a firing sequence that continues automatically as long as forward pressure is maintained and the trigger finger remains on the trigger ledge, *see supra* Part I.A, the fact that the trigger may release and reset as the weapon moves back and forth automatically does not mean there is more than one "pull" of

the trigger. *See Staples*, 511 U.S. at 602 & n.1; *Guedes I*, 356 F. Supp. 3d at 132.[11]  Thus, as the evidence in the administrative record and will be illustrated at trial, a bump stock is designed so a shooter can easily pull the trigger once and release a continuous stream of automatic fire. This is what is required for a bump stock to be a machine gun.

C.  **The Rule Reasonably Distinguishes Between Bump Stocks, Other Weapons, and Other Methods of Bump-Firing a Weapon**

Plaintiff appears to take issue with the Rule's conclusion that bump stocks may be classified as machine guns even though ordinary semi-automatic rifles may lawfully be bump-fired using other methods. *See* FFCL ¶¶ 279-80. Commenters raised the same objection numerous times in response to the NPRM. *See, e.g.*, AR002200 (Cmt. 285); AR002622 (Cmt. 2922); AR002735 (Cmt. 3452). The Rule addressed these comments, stating that bump-firing without a bump stock is lawful because such action does not involve the use of a "self-acting or self-regulating" device to automate the process. *See* 83 FR 66532-33. The Rule also reasonably distinguished between bump-firing through use of a belt loop or a rubber band and bump-firing through use of a bump stock, because bump stocks are explicitly "designed to be affixed" to a semiautomatic firearm, unlike other commonplace household objects. 83 FR 66515; 83 FR 66533; *see also* 83 FR 66531-32 (describing how the linear space in a bump stock functions as a self-regulating mechanism to assist in resetting the trigger). Even if the Court would not reach the same conclusion coming to the matter on its own, the Department "'clearly thought about [these] objections and provided reasoned replies,' which is 'all the APA requires.'" *Guedes I*,

---

[11] The administrative record provides additional evidence that the Department reasonably credited over Plaintiff's reports in concluding that bump stocks should be classified as machine guns. For example, the record highlights the statements of a major bump stock manufacturer, Bump Fire Systems, that its device "uses a gun's recoil to shoot multiple rounds." AR000837; AR000840. Defendants anticipate presenting the animation noted above, *see* AR000716, and other such evidence at trial.

356 F. Supp. 3d at 135 (quoting *City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007));
*see also Guedes II*, 920 F.3d at 32 ("belt loops, unlike bump stocks, do not transform
semiautomatic weapons into statutory 'machineguns[,]' [o]r so [Defendants] reasonably
concluded in the Rule").

Plaintiff also notes that Congress deleted the phrase "or semiautomatically" from the
statutory definition of "machinegun" when it passed the GCA in 1968. *See* FFCL ¶¶ 271, 273.
According to Plaintiff, because Congress deleted this phrase, it eliminated the possibility that
semiautomatic weapons could *ever* be classified as machine guns. *Id.* at ¶ 273. This is plainly
wrong. At the same time Congress deleted the phrase "or semi-automatically" from the definition
of "machinegun," it also *added* to the definition any part or parts "designed and intended solely
and exclusively" to "convert[] a weapon into a machinegun," 26 U.S.C. § 5845(b). Congress thus
expressly defined as a "machinegun" any part or parts—such as a bump stock—that can convert
an otherwise semiautomatic weapon into a weapon capable of firing "automatically more than
one shot, without manual reloading, by a single function of the trigger." *Id.*; *see also* S. Rep. No.
90-1501, at 46 (1968) (describing the amendment as "an important addition to the definition of
'machinegun'"); H.R. Rep. No. 90-1956, at 34 (describing the amendment as part of the
"[e]xtension of the scope of the National Firearms Act").

Consistent with this clear statutory language, numerous courts have held that
semiautomatic weapons fitted with parts that enable them to fire automatically are
"machineguns." *See, e.g.*, *United States v. Camp*, 343 F.3d 743, 744-45 (5th Cir. 2003)
(concluding that a semiautomatic rifle fitted with a motor-operated device that pulled and
released the trigger was a machinegun); *United States v. Bishop*, 926 F.3d 621, 624-25 (10th Cir.
2019) (affirming convictions for machinegun possession and manufacturing where defendant

sold a "machinegun conversion device" for an AR-15 rifle). The same conclusion applies to semiautomatic weapons fitted with bump stocks.

## II. PLAINTIFF'S CLAIMS REGARDING THE RULE'S PURPORTED EXERCISE OF LEGISLATIVE AUTHORITY AND THE INAPPLICABILITY OF *CHEVRON* DEFERENCE DO NOT CAST DOUBT ON THE RULE

### A. The Rule is Interpretive, Not Legislative, and Plaintiff's Challenges to Its Purported Legislative Character Therefore Fail

Plaintiff contends that the Rule is an enactment of a new restriction, legislative in nature, and draws from this contention a variety of challenges to the Rule's validity.  *See* FFCL ¶¶ 251-272.  The APA distinguishes between legislative rules and interpretive rules: a legislative rule has the force and effect of law, whereas interpretive rules "advise the public of the agency's construction of [a] statute and rules which it administers."  *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995).  Because Plaintiff is wrong on the "threshold issue" of whether the "Rule is a legislative Rule," *id.* ¶ 251, and the Rule is interpretive, these claims necessarily fail.

Plaintiff relies heavily on the decisions of the Courts of Appeals for the District of Columbia Circuit and the Tenth Circuit in *Guedes II* and *Aposhian II*, respectively, which upheld the Rule and treated the Rule as legislative in character.  *See* FFCL ¶¶ 252-253. Although those courts correctly concluded the Rule valid, Defendants do not agree with the analysis in *Guedes II* and *Aposhian II* suggesting that the Rule is legislative: the Rule is self-evidently interpretive in nature. Indeed, (as Plaintiff notes, *see* FFCL ¶¶ 227-235), Defendants explained the error in the *Guedes II* court's analysis in their opposition to a petition for certiorari in that case, emphasizing the Rule's interpretive nature.  *See* Br. for the Respondents in Opp. at 20, 23-24, *Guedes v. ATF*, No. 19-296 (Dec. 4, 2019).

The reasons why the Rule is interpretive, not legislative, are straightforward.  The Rule relied on the Attorney General's authority to "prescribe only such rules and regulations as are

21

necessary to carry out" the GCA and NFA.  18 U.S.C. § 926(a); *see* 26 U.S.C. § 7805(a). The

touchstone of determining whether a Rule is legislative or interpretive is "whether *Congress*

would have intended, and expected, courts to treat [the] rule" as a legislative rule. *Long Island*

*Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007) (emphasis in original). Here, that is not

the case. As a general matter, "criminal laws are for courts, not for the Government, to construe."

*Abramski v. United States*, 573 U.S. 169, 191 (2014). And while Congress can delegate

substantial authority to Executive Branch agencies to engage in rulemaking that may lead to

criminal consequences, *see Loving v. United States*, 517 U.S. 748, 768 (1996) (discussing

"delegations whereby the Executive or an independent agency defines by regulation what

conduct will be criminal so long as Congress makes the violation of regulations a criminal

offense"), the narrow statutory delegation on which the Rule relied does not provide the Attorney

General the authority to do so. *Compare* 18 U.S.C. § 922(o) *and* 26 U.S.C. § 5845(b) *with, e,g,*,

16 U.S.C. § 1540(b)(1), (f) (specifically criminalizing the failure to comply with a regulation

issued pursuant to an agency's general rulemaking authority under the statute),. Further, in

contrast to provisions of the NFA and GCA where Congress has specifically attached criminal

consequences to the violation of the Attorney General's regulations, *see e.g.*, 18 U.S.C. §§

922(m), 923, Congress has not done so with respect to the general rulemaking authority relied on

here.  *Compare*, *e.g.*, *United States v. Grimaud*, 220 U.S. 506, 517-19 (1911) (statute

criminalizing "any violation of the provisions of this act or such rules and regulations" issued

under the act "indicated [the] will" of Congress to "give to those who were to act under such

general provisions 'power to fill up the details' by the establishment of administrative rules and

regulations, the violation of which could be punished" in the manner prescribed by Congress).

Nor does anything in the Rule itself indicate that the Department exercised delegated legislative authority in the Rule's adoption. To the contrary, the Rule repeatedly emphasizes that it is announcing the "best interpretation" of the statutory terms used to define a machinegun, *see* 83 FR 66517, 66518, 66521; *accord id*. at 66527 (stating the interpretations in the Rule "accord with the plain meaning" of the terms).  The published text of the Rule also expresses the Department's view "that bump-stock-type devices *must* be regulated because they satisfy the statutory definition of 'machinegun,'" *id*. at 66520 (emphasis added); *accord id*. at 66529.  The Rule also describes its modifications to the regulatory definition of "machinegun" as "clarify[ing]" amendments that make clear on the face of the regulation that bump stocks are within the statutory definition. *See* 83 FR at 66519, 66535.  All of these features are consistent with the Rule being interpretive in nature.

The fact that the Department chose to make these changes through a notice-and-comment rulemaking process does not, as some courts have suggested, make the Rule a legislative rule. *See Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 830 (W.D. Mich. 2019).  Instead, the use of the notice-and-comment process reflects the Department's recognition of the importance of notifying possessors of bump stocks of the Department's changed understanding of the relevant statutory terms and the need to explain appropriate methods for disposal within a specified timeframe so that bump stock possessors who had relied on the prior, erroneous classification letters would not find themselves unexpectedly subject to criminal liability.  *See* 83 FR 66523; *see generally Staples*, 511 U.S. at 614-19 (emphasizing importance of *mens rea* requirement for firearms converted from semi-automatic to automatic). Relatedly, the fact that the Rule mentions an "effective date" does not alter the analysis, as the D.C. Circuit wrongly concluded. *Guedes II*, 920 F.3d at 20. Before mentioning the "effective date," the Rule is explicit that the Rule is

"specifically designed to notify the public" about the changes in ATF's interpretation. 83 FR 66523. ATF could have revoked the prior classifications through a letter ruling and could have simply begun applying the regulatory requirements to bump stocks without altering the definitions—as it has done in the past, including with the Akins Accelerator, *see Akins*, 312 F. App'x at 200—but elected to make greater efforts to provide public notice. That the Department used a more public process to raise awareness of its corrected interpretation and to put the public on notice of the status of bump stocks does not alter the basic interpretive effect of the Rule.

**B. Plaintiff's Arguments That the Rule Is Not Entitled to Deference Are of No Moment**

Plaintiff also devotes significant effort to arguing that the Court should not defer to the Department's interpretations set forth in the Rule, but these arguments are beside the point. At the outset, because the Rule sets forth the best interpretation of the statutory text, deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is not required to resolve this case. As the Supreme Court has explained, "there is no occasion to defer and no point in asking what kind of deference, or how much" would apply where the agency has adopted "the position [the court] would adopt" when "interpreting the statute from scratch." *Edelman v. Lynchburg Coll*., 535 U.S. 106, 114 (2002); *see also id.* at 114 n.8 ("there is no need to resolve deference issues when there is no need for deference"). Based on the arguments set forth in Parts I.A. and I.B.*, supra*, this Court should conclude that the Rule is valid because it embodies the "best interpretation" of the statute. *Aposhian I*, 374 F. Supp. 3d 1151, 1153; *see* 83 FR 66518, 66521.

Moreover, deference is unwarranted because neither party contends that it should apply. As the Supreme Court recently reaffirmed, courts should reach only those arguments that the parties present to the court. *See United States v. Sineneng-Smith*, --- U.S. ---, 140 S. Ct. 1575,

1578-79 (May 7, 2020) (concluding it was "abuse of discretion" for the Ninth Circuit to fail to follow the principle of party presentation); *see also Guedes III*, 140 S. Ct. 789-90  (Gorsuch, J., statement regarding denial of certiorari). Because no party asks the Court to apply *Chevron*, the Court does not need to reach the issue. *Cf. Albanil v. Coast 2 Coast, Inc.*, 444 Fed. App'x 788, 796 (5th Cir. 2011) (party may waive *Chevron* argument (citing *CFTC v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008)); *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 379 n. 14 (5th Cir. 2018) (concluding that *Chevron* analysis must be undertaken because "parties vigorously disputed [its] applicability"); *accord U.S. v. Orellana*, 405 F.3d 360, 369 (5th Cir. 2005) (crediting "Government . . . reservations" about application of *Chevron*); *but see Mushtaq v. Holder*, 583 F.3d 875, 877 (5th Cir. 2009) (A "court . . . may reject even an agreed standard.").

Plaintiff also invokes the rule of lenity to argue that deference is inappropriate here, FFCL ¶¶ 297-98, but that doctrine applies only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013); *see also Staples*, 511 U.S. 619 n.17 (rule of lenity is a "maxim of construction . . .  reserved for cases where, after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute") (internal quotations and alterations omitted). The Rule's application of the terms used to define "machinegun" in the NFA is correct, and there is no ambiguity, let alone grievous ambiguity, in the statute. Lenity is thus a last resort—one that "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Maracich*, 570 U.S. at 76 (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)); *United States v. Arrieta*, 862 F.3d 512,

516 (5th Cir. 2017) (same).  In any event, as explained, Defendants agree that *Chevron* deference is inappropriate in this case, although not because of the rule of lenity. *See supra*.

## III.   THE RULE IS NOT ARBITRARY OR CAPRICIOUS UNDER THE APA

Plaintiffs' arguments that the Rule is "arbitrary and capricious" under the APA likewise fail. First, the Rule properly reflects input from elected officials. Second, the Rule properly explains the Department's change in position. Third, the Rule properly reflects agency expertise and thoroughly considers the relevant evidence.

### A.   The Rule Properly Reflects Input From Elected Officials

Plaintiff wrongly contends that the Department was required to disregard "political" factors, such as the views of the President, in adopting the Rule. *See* FFCL ¶¶ 303, 306, 309. "Presidential administrations are elected to make policy," *Guedes II*, 920 F.3d at 34, and so, as the Supreme Court has recognized, it is entirely proper for an agency to consider "Presidential oversight" in adopting policy changes. *See FCC v. Fox Television Stations*, 556 U.S. 502, 523 (2009) (rejecting dissenting view that independent agencies should be "sheltered" from political influence); *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, --- S. Ct. ----, 140 S. Ct. 2367, 2385 (July 8, 2020) (rejecting argument that challenged rules were invalid because the agency had failed to "maintain[] an open mind throughout" the administrative process). "[A]s long as [an] agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Guedes II*, 920 F.3d at 34 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012)). Plaintiff cites no case law to support the suggestion that presidential input in the policymaking process renders an otherwise-reasonable decision arbitrary and capricious.

Moreover, the President's direction to the Attorney General regarding the Rule explicitly instructed that the agency follow "the rule of law and . . . the procedures the law prescribes," recognizing the "established legal protocols" required by the APA. AR000790, *Definition of Machinegun*, 83 FR 7949. As the D.C. Circuit explained, "[a]ll would agree" that the Department adopted the Rule because of "the urging of the President, Members of Congress, and others, as part of an immediate and widespread [public] outcry." *Guedes II*, 920 F.3d at 34. Because the Rule is open in its acknowledgment that public attention, congressional interest, and Presidential input played a role in prompting review of the Department's past analyses and definitions, the Department's consideration of these factors did not contravene the APA. *See id*.; *ATX, Inc. v. U.S. Dep't of Transp*., 41 F.3d 1522, 1528 (D.C. Cir. 1994).

## B.  The Rule Properly Explains the Department's Change in Course

Plaintiff also argues that the Rule is arbitrary and capricious because it represents a departure from ATF's prior views. *See* FFCL ¶ 281 ("Despite this settled meaning and technical understanding, ATF has now discarded its prior understanding of the statute."). Agencies may and should change their views, however, particularly when confronted with experience or events that calls their prior positions into doubt, as the Las Vegas attack did here. *See Clean Water Action v. EPA*, 936 F.3d 308, 315-16 (5th Cir. 2019); *accord Springfield, Inc. v. Buckles*, 292 F.3d 813, 819 (D.C. Cir. 2002) (noting that "agency views may change"); *Gun Owners of America*, 363 F. Supp. 3d at 833 ("The standard for reviewing an agency's rule or interpretation of a statute does not change just because the agency reversed course and altered its prior interpretation.") (citing *Fox Television*, 556 U.S. at 515). When an agency changes positions, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that

there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *Fox Television*, 556 U.S. at 515; *see also Springfield*, 292 F.3d at 819 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)) ("The courts may require only 'a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'").

The Rule explicitly described the Department's prior treatment of bump stock devices, acknowledged the agency was changing course, and explained that the Rule adopted "the best interpretation of [the statute]." *Guedes I*, 356 F. Supp. 3d at 133-34; *see also* 83 FR 66514, 66516-517, 66520, 66527. Indeed, the Rule specifically identified the error in the Department's prior treatment of "some [bump stocks] as non-machineguns": the Department had "relied on the mistaken premise that the need for 'shooter input' . . . for firing with [bump stocks] means that such devices do not enable 'automatic' firing." 83 FR 66531. For these reasons, the Department's well-explained change in course satisfies the APA.

## C. The Rule Properly Reflects Agency Expertise and Thoroughly Considers the Relevant Evidence

Plaintiff also argues that the Rule violates the APA because it fails to reflect agency expertise or consider the relevant evidence. *See* FFCL ¶ 307 ("The [Rule's] change was plainly not spurred by any new factual analysis. Classification rulings can *only* be issued after a physical examination of a device."), ¶ 308 ("ATF cannot be said to have engaged in a meaningful decision based on factual analysis."), ¶ 310 ("ATF's proffered explanation for the Final Rule runs counter to the evidence before the agency, and thus there was no 'substantial evidence in the record to support it.'"). This too is wrong.

First, contrary to Plaintiff's suggestion, *see id.* FFCL ¶ 296, 306, the Rule falls well within the Department's areas of expertise. Although ATF, rather than DOJ, serves as the front-

line actor for most firearms regulation, the NFA and GCA vest ultimate rulemaking authority in

the Attorney General, and the ATF Director operates under the Attorney General's direction. The

NFA provides that "[t]he administration and enforcement" of the Act "shall be performed by or

under the supervision of the Attorney General." 26 U.S.C. § 7801(a)(2)(A). The GCA, in turn,

states that the Attorney General "may prescribe . . . such rules and regulations as are necessary to

carry out the provisions" of the Act. 18 U.S.C. § 926(a). And 28 C.F.R. § 0.130(a), which sets

forth the "General functions" of ATF, provides that "*Subject to the direction of the Attorney*

*General and the Deputy Attorney General*, the Director of ATF shall: (a) Investigate, administer,

and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and perform

other duties *as assigned by the Attorney General*." *Id.* (emphasis added). The applicable statutory

and regulatory authorities thus clearly contemplate issuance of firearms regulations, and other

policy decision regarding firearms regulation, by the Attorney General and DOJ, and the record

reflects that the Acting Director of ATF sought authorization from the Attorney General to issue

the Notice of Proposed Rulemaking. *See* AR001238 *et seq.*

      Contrary to Plaintiff's contention, there is also no requirement that the Department

conduct physical testing before reclassifying a particular device as a machinegun.[12] *Id.* at ¶ 307.

Plaintiff does not (and cannot) cite any statutory basis for this supposed requirement. And in any

event, as Plaintiff himself concedes, "neither the mechanism of bump stocks in general, nor the

Slide Fire in particular, changed since their [previous] approval." *Id.* at ¶ 311. Thus, the legal

---

[12] As part of Plaintiff's assertion that ATF did not engage in any new physical examination of
bump stocks, Plaintiff makes the puzzling statement that "there is no indication in the record
what [Acting ATF Director Brandon] did" while at "ATF's National Training Center in
Martinsburg, WV." FFCL ¶ 307. But elsewhere, Plaintiff quotes Acting Director Brandon's
statement that he was "[a]t FTB . . . [and] [c]ame to shoot [a bump stock] myself," FFCL ¶ 150
(quoting AR000685), along with an accompanying calendar entry "indicat[ing] his presence" at
Martinsburg, the location of FTB and its successor FATD. *Id.* ¶ 151.

analysis necessary to correct the Department's erroneous prior interpretation of "machinegun" did not require renewed testing by the ATF's firearms experts. The results of prior tests were available to the Department when it promulgated the Rule, as were all the pertinent facts regarding the mechanical operation of bump stocks. *See, e.g.*, AR000103-AR000278; AR000494-AR000511 (explaining ATF's reclassification of the "Akins Accelerator" as a machinegun after an earlier erroneous conclusion, following testing, that it was not a machinegun); AR000534-000538 (same).

Plaintiffs also contends that the contrary views of former ATF officials establish that the Rule is arbitrary and capricious. *See, e.g.*, FFCL ¶ 310 (referencing the opinion of Rick Vasquez, Former Assistant Chief and Acting Chief of FTB). As explained, *see supra* p. 17 n. 10, the views of former agency officials are entitled to no special weight, *Via Christi*, 2006 WL 2773006, at *13 & n.3, and Mr. Vasquez's views are wrong in any event, *see supra* at pp.17-19. The Rule also reasonably explains the difference between bump stocks and other common household items (such as belt loops and rubber bands) that can used to achieve more rapid fire with a semiautomatic weapon but are not regulated by ATF as "machineguns." *See supra* at pp.19-20. And it specifically references the Department's prior treatment of bump stocks and explains why that treatment was wrong. *See* 83 FR 66518; AR000756-AR000759. The Department's thorough response to comments and careful consideration of its prior statements confirm that the Department utilized its expertise in promulgating the Rule. The APA requires no more.

## IV.     THE RULE WAS PROMULGATED PURSUANT TO VALID AUTHORITY

Plaintiff also asserts that the rule was not promulgated pursuant to valid authority. Not so.

**A. Congress Has Provided Defendants With Interpretive Authority to Issue the Rule**

Plaintiff first alleges that the Department lacked the authority to promulgate the Rule and that the Rule is therefore *ultra vires*. FFCL ¶¶ 251-302. This argument largely overlaps with Plaintiff's APA claims and arguments that the Rule is legislative in nature, and fails for the same reasons. To the extent that Plaintiff's *ultra vires* claim challenges the Rule's *substance*, it fails for the same reasons as Plaintiff's arbitrary and capricious claims: the Rule reflects the best interpretation of "single function of the trigger" and "automatically" and correctly applies those terms to conclude that bump stocks are "machineguns." *See supra* Part I.A & I.B; *Guedes I*, 356 F. Supp. 3d at 130-33. *See generally Luminant Generation, LLC v. EPA*, 675 F.3d 917, 926 (5th Cir. 2012) (implying, without discussion, that the standards of review are the same for arbitrary and capricious and *ultra vires* claims). Far from "attempt[ing] to rewrite the statute," FFCL ¶ 273, the Rule instead "clarifies" that the statutory definition of machine gun includes bump stocks, 83 FR 66520, and does so by interpreting the terms "automatically" and "single function of the trigger." 83 FR 66528.[13]

To the extent Plaintiff's *ultra vires* claim challenges the Department's authority to define "machinegun" and its component terms in the first place, Plaintiff's claim also fails. As noted, the Rule sets forth the specific authorities under which the Department acted. *See* 83 FR 66515 (citing 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); and 28 CFR 0.130(a)(1)-(2)). These statutory and regulatory provisions provide the Department with the authority to interpret the relevant statutes and to make regulations to carry out their enforcement, but not the authority

---

[13] Plaintiff's reliance on a recent statement by Senator Feinstein about the scope of Defendants' authority to interpret the NFA, *see* Plaintiff FFCL ¶ 203, is of no moment: "It is settled that courts construing statutory language should give little weight to post-enactment statements by members of Congress." *Am. Fed'n of Gov't Employees, Locals 225, 1504, & 3723, AFL-CIO v. Fed. Labor Relations Auth.*, 712 F.2d 640, 647 (D.C. Cir. 1983); *see also Medical Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 401 n.39 (5th Cir. 2008).

to legislate new criminal violations. Accordingly, in the Rule, the Department exercised these authorities only to explain that bump stocks are machineguns and to notify the public of that classification. *See Guedes I*, 356 F. Supp. 3d at 128 (recognizing that the Rule relies on the Department's "general rulemaking authority under 18 U.S.C. § 926(a)"); 83 FR 66523 ("This rulemaking procedure is specifically designed to notify the public about changes in [the] interpretation of the NFA and GCA and to help the public avoid the unlawful possession of a machinegun").  The Rule thereby does not make a new crime, because that is an action that would be beyond the scope of the Department's authority.

Plaintiff also appears to contend that, because Congress has provided a definition of "machinegun," further interpretation of that definition by the Department is impermissible. *See, e.g.*, FFCL ¶ 266 (contending that if "agencies can . . . defin[e] every undefined term[,] Congress cannot control the law").  However, even definitions—whether in a dictionary or a statute—may require interpretation to determine their application to a particular circumstance.  As Judge Randolph explained: "Lexicographers define words with words. Words in the definition are defined by more words, as are those words. The trail may be endless; sometimes, it is circular. Using a dictionary definition simply pushes the [interpretive] problem back."  Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 72.  The Final Rule properly engaged in statutory interpretation to determine whether the definition of "machinegun" covers bump stocks.

The Rule is also consistent with ATF's well-established authority to provide guidance to members of the public regarding the treatment under the NFA of particular examples of firearms and firearms accessories. *See* ATF, NFA Handbook § 7.2.4 (2009), *available at*: https://go.usa.gov/xpwp5; *Sig Sauer*, 826 F.3d 599. Plaintiff acknowledges ATF's authority to

issue these letters, which, like the Rule, interpret whether devices such as bump stocks are lawful. *See* FFCL ¶¶ 39-118, 292-93. These letters "do not have the force and effect of law," and may be "change[d] if later determined to be erroneous." *McCutchen v. United States*, 145 Fed. Cl. 42, 47 (Fed. Cl. 2019) (internal quotations omitted). As the Rule explains, the Rule relies on this "authority to reconsider and rectify its past classifications," 83 FR 66530, *see* 83 FR 66526, an action well within the agency's authority. *See Akins*, 312 F. App'x at 200.

Courts have consistently recognized that ATF has authority to interpret the statutory definition of "machinegun" and its component terms to clarify what does and does not qualify as a machine gun. For example, in *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448 (D.C. Cir. 1994), the D.C. Circuit recognized ATF's authority to determine whether particular receivers[14] had been modified to fall within the statutory definition of machine gun, and thus, whether conversion kits paired with those receivers fell within ATF's "good faith" and "innocent buyer" exceptions to 18 U.S.C. § 922(o), *id.* at 450-51. Similarly, in *United States v. Dodson*, 519 Fed. App'x 344, 348 (6th Cir. 2013), the Sixth Circuit recognized ATF's authority to issue a ruling "clarif[ying] that . . . auto-sears"—a category of firearms parts —"were considered machineguns, subject to all the provisions" of the NFA." *id.* at 348. Prior to the ATF's ruling in *Dodson*, it had been unclear, "[h]istorically," whether "auto-sears were 'machineguns.'" *Id.* DOJ exercised the same authority here to remove "[h]istorical[]" confusion regarding whether bump stocks are machine guns by clarifying that bump stocks are in fact machine guns. Because the Rule falls well within the long-recognized authority of the Department to clarify the meaning and application of the definition of machine gun, Plaintiff's *ultra vires* challenge fails.

---

[14] A firearm "frame" or "receiver" is defined as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive a barrel." 27 CFR § 478.11.

Plaintiff also makes much of the fact that various members of Congress attempted to advance legislation criminalizing bump stock possession prior to the issuance of the Rule, *see, e.g.*, FFCL ¶¶ 135-37, 194-97. Failed legislative proposals, however, have little to no bearing on the meaning of existing statutory text (and are of limited interpretive value in any event). *See, e.g.*, *United States v. Craft*, 535 U.S. 274, 287 (2002); *CASA de Maryland v. Trump*, --- F.3d ---, 2020 WL 4664820 at *14 (4th Cir. Aug. 5, 2020). These unenacted laws do not demonstrate that existing law is insufficient to prohibit bump stocks.

**B.  The Rule Does Not Reflect an Improper Delegation of Legislative Authority or Violate the Separation of Powers**

Plaintiff also contends that Defendants lacked authority to promulgate the Rule because the Rule "represents[s] an unlawful divestment of Congressional lawmaking power," FFCL ¶ 320, but it does not. As explained above, the Rule is interpretive in character, not legislative, and what the Rule interprets is the detailed definition of the term "machinegun" that Congress provided in the NFA. *See* 26 U.S.C. § 5845(b). Congress has further attached criminal consequences to the unlawful possession of such a weapon, 18 U.S.C. § 922(o), and Defendants have merely explained "the best interpretation of the statute" that Congress itself enacted. 83 FR 66521. Applying the text as written in no sense "divests" Congress of its authority.

Moreover, Congress *can* delegate some authority to Executive Branch agencies to engage in rulemaking without transgressing constitutional limits, even where such rulemaking may lead to criminal consequences. For example, Congress has delegated to the Securities and Exchange Commission the authority to "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent" in connection with tender offers, where acts and practices deemed fraudulent in connection with tender offers carry criminal consequences. 15 U.S.C. § 78n(e); *see also Loving v. United States*, 517 U.S. 748, 768 (1996) (noting that the Supreme

Court has "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal"). The Rule, of course does not go that far, as it merely explains that a particularly type of firearms part falls within an existing statutory definition (and, as explained above, the Rule relies on 18 U.S.C. § 922(o) and 26 U.S.C. § 5845(b), authorities for which Congress has not delegated to the Department the ability to impose new criminal consequences). Whatever the constitutional limits of delegation to executive agencies in the criminal context are, the Rule comes nowhere close to those limits.

Plaintiff also asserts that the Rule violates the separation of powers, but, as with his *ultra vires* claim, this is merely a restatement of his statutory claims under the APA and fails for the same reasons. *Compare* Compl. ¶¶ 160-171 *with* FFCL ¶¶ 242-44, 297-99.[15] Plaintiffs' supposed "constitutional" argument is that "[t]he Attorney General may not define the scope of a criminal statute that he is tasked with enforcing, because that would combine the lawmaking and law-enforcing powers in the same person or entity." Compl. ¶ 170. As explained, that argument fails because the Rule validly exercises the Department's authority under the NFA and GCA to set forth the "best interpretation of the statute" enacted by Congress. 83 FR 66521. Plaintiff's attempt to recycle this claim under the separation of powers rubric should be rejected.

## V.   ARGUMENTS OMITTED FROM PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff advanced several arguments in his Complaint that do not appear in his Proposed Findings of Fact and Conclusions of Law. To the extent Plaintiff also omits these contentions arguments from his trial brief, he will have waived them. *See United States v. Indiana Bonding & Surety Co.*, 625 F.2d 26, 29 (5th Cir. 1980); *Spectrum Commc'n Specialists, LLC v. KMJ*

---

[15] As explained in Part IV, *infra*, to the extent Plaintiff has other separation-of-powers claims that he has not pursued in his briefing, such claims have been waived and Defendants are entitled to judgment on those claims.

*Servs. Inc.*, No. 9-cv-159, 2012 WL 138942, at *4 (E.D. La. Jan. 18, 2012). Even if these arguments are not waived, however, Defendants would still be entitled to judgment because these arguments are incorrect.

First, Plaintiff argued in the Complaint that the Rule violates the APA because "[a] 'rule' under the APA is forbidden to have retroactive effect." Compl. ¶ 249. But the Rule does not have retroactive effect. The language of the Rule specifies that individuals who comply with the Rule's instruction to destroy or abandon their bump stocks prior to the effective date of the Rule (March 26, 2019) will not face prosecution for their earlier possession of bump stocks. *See* 83 FR 66530. Plaintiff abandoned his bump stocks on March 25, 2019, prior to the Rule's effective date. Compl. ¶ 52. Thus, under the plain terms of the Rule, Plaintiff (like everyone else who surrendered or destroyed their bump stocks prior to the Rule's effective date) does not face potential consequences for his prior possession of bump stocks. Furthermore, agency rules are not be construed to have retroactive effect unless their language so requires. *See Landgraf v. USI Film Products*, 511 U.S. 244, 264 (1994); *Hernandez-Rodriguez v. Pasquarell*, 118 F.3d 1034, 1042 (5th Cir. 1997). Here, there is no language in the Rule that requires it to have retroactive effect.

Second, Plaintiff argued in the Complaint that the Secretary of the Treasury is the only official with substantive rulemaking authority under the NFA. Compl. ¶¶ 19-23. This is clearly wrong. As explained in the Defendants' Proposed Findings of Fact and Conclusions of Law, ECF No. 34, 26 U.S.C. § 7801(a)(2)(A) provides that "[t]he administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General and the term 'Secretary' or 'Secretary of the Treasury' shall, when applied to those provisions, mean the Attorney General[:] . . . (i) Chapter 53 . . . ." Defendants' FFCL ¶ 22.

The NFA is codified at Chapter 53 of title 26, and the definition of "machinegun" appears in Chapter 53 as well. Thus, for purposes of the NFA, "Secretary of the Treasury" means "Attorney General" and the Attorney General has authority to "prescribe all needful rules and regulations for the enforcement of this title." 26 U.S.C. § 7805(a); *see also Aposhian I*, 374 F. Supp. 3d 1150 & n.7; *McCutchen*, 145 Fed. Cl. 47.

## **CONCLUSION**

For the foregoing reasons, the Court should grant judgment to Defendants based on the administrative record, as will be further illustrated by the trial presentation.

Dated: August 28, 2020
Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

 */s/* Eric J. Soskin
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
MATTHEW J. GLOVER
CHRISTOPHER A. BATES
Counsels to the Assistant Attorney General
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Facsimile: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.


/s/ Eric Soskin_____
Senior Trial Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Facsimile: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*