```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   MICHAEL CARGILL,                 :
     Plaintiff,                       :
 4                                    :
     vs.                              : No. 1:19-CV-00349-DAE
 5                                    : Austin, Texas
     WILLIAM BARR,                    : September 9, 2020
 6   IN HIS OFFICIAL CAPACITY AS      :
     ATTORNEY GENERAL                 :
 7   OF THE UNITED STATES, ET AL,     :
     Defendants.                      :
 8   ********************************************************
                       TRANSCRIPT OF BENCH TRIAL
 9             BEFORE THE HONORABLE DAVID A. EZRA
                SENIOR UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11   FOR THE PLAINTIFF:
       Caleb Kruckenberg, Esquire
12     Mark Chenoweth, Esquire
       New Civil Liberties Alliance
13     1225 19th Street NW, Suite 450
       Washington, DC 20036
14     (202)869-5217; caleb.kruckenberg@ncla.legal

15   FOR THE DEFENDANTS:
       Eric J. Soskin, Esquire
16     Matthew James Glover, Esquire
       Christopher Alan Bates, Esquire
17     U.S. Department of Justice, Civil Division
       1100 L Street NW, Room 12002
18     Washington, DC  20003
       (202)353-0533; eric.soskin@usdoj.gov
19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas   78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

# I N D E X

**OPENING STATEMENTS**                                    **PAGE**

By Mr. Kruckenberg                                        12

By Mr. Glover                                             25

By Mr. Bates                                              27


**WITNESS:**

**David Smith**

By Mr. Glover                                             31

By Mr. Soskin                                     40, 89

By Mr. Kruckenberg                                       60

```
 1    (Wednesday, September 9, 2020, 9:07 a.m.)
 2                        *  *  *
 3            COURT SECURITY OFFICER:  All rise.
 4            COURTROOM DEPUTY CLERK:  Austin 19-CV-00349, Michael
 5    Cargill versus William Barr, et al.
 6            THE COURT:  Good morning to all of you.  I wish we had
 7    a nicer day for you here in Austin.  Are all of you from
 8    Austin?
 9            MR. KRUCKENBERG:  No, Your Honor.
10            THE COURT:  You're from where?
11            MR. KRUCKENBERG:  We are from Washington, D.C.
12            THE COURT:  Okay.
13            MR. SOSKIN:  We're also from Washington, D.C., Your
14    Honor.  Our witness, Mr. David Smith, is from Martinsburg, West
15    Virginia.
16            THE COURT:  Well, this isn't the best Austin has to
17    offer, I can promise you.  First of all, let's have appearances
18    by counsel, if we can.
19            MR. KRUCKENBERG:  Good morning, Your Honor.  Caleb
20    Kruckenberg from the New Civil Liberties Alliance for the
21    plaintiff, Michael Cargill.
22            MR. CHENOWETH:  Mark Chenoweth from the New Civil
23    Liberties Alliance, also for plaintiff, Michael Cargill.
24            THE COURT:  And the gentleman that's with you?
25            PLAINTIFF:  Michael Cargill, Your Honor.
```

1          THE COURT:  All right.  Good morning to you folks.

2          MR. SOSKIN:  Good morning, Your Honor.  Eric Soskin,

3    Civil Division, United States Department of Justice for the

4    defendants.  With me are my colleagues Christopher Bates and

5    Matthew Glover also from the Civil Division and today we'll be

6    joined by a witness, Mr. David Smith, of the Bureau of Alcohol,

7    Tobacco, Firearms and Explosives.

8          THE COURT:  Right.  Okay, very good.  Why don't you be

9    seated.  Let's go over a few preliminaries, if I can.  As you

10   know, this is not a hearing, this is the -- even though we only

11   have one live witness, this is a trial.  And because it's a

12   trial, rather than simply a hearing where I would file a

13   dispositive order, I'm not required to do findings of fact and

14   conclusions of law, I can do it in an area form, but I don't do

15   that.  I've been a federal judge for I guess now 33 and some

16   years and so it has always been my practice in nonjury

17   proceedings in trials to do findings of fact and conclusions of

18   law.  I think it's important for the parties, it's important so

19   that you know and understand where the Court is coming from and

20   why I made a decision and what basis that decision rests upon.

21   And as important, if not more important I guess from your

22   perspective, it's very important for the Court of Appeals.  A

23   lot of judges like to obfuscate and kind of hide their ruling

24   with these thin little orders on the theory that if you don't

25   lay it out there in detail it makes it harder for the Court of

1    Appeals to find fault with your ruling.  I don't ascribe to

2    that principle.  I've been very fortunate to have sat as a

3    visiting judge, a designated judge on the Ninth Circuit Court

4    of Appeals for 30 years.  I do so three times a year.  I'm very

5    proud that they continue to ask me back because they don't

6    always do that, for sure, and I hold the record actually which

7    I understand will never be broken for the most number of

8    designated sittings of any designated judge in the history of

9    the Ninth Circuit since its founding.  In fact, I just sat last

10   week virtually which was an experience.  Second time I've sat

11   with them virtually and it works, but in my view it isn't as

12   good.  I like to have the lawyers in front of me.  Speaking of

13   which, this was not easy to arrange.  I had to do a lot of

14   convincing that this wouldn't be the slippery slope, so to

15   speak, but I know that you have been waiting very patiently.

16   We only have one witness and as such I really didn't see that

17   the ends of justice could be further delayed.  I thought we

18   could do this safely and I think we are doing it very safely

19   here.  And it's really no different, practically speaking, than

20   having a hearing.  It would be a different story if we had a

21   jury, we wouldn't be here if we had a jury, or if we had

22   multiple witnesses over multiple days, that would be

23   troublesome, but with just one witness I was able to break the

24   ice.  Now, my head still hurts from doing it, but I was able to

25   break the ice, so here we are.

BENCH TRIAL PROCEEDING                        6

1          I have a practice, I think that Ms. Springs, my

2    courtroom deputy, might have talked to you a little bit about

3    it, I don't know, but I have -- you did or you didn't?

4          COURTROOM DEPUTY CLERK:  I only talked to them about

5    the exhibits.

6          THE COURT:  Okay.  I do not take oral closing argument

7    in a nonjury trial, okay.  Now, here is the reason.  I used to

8    be a trial lawyer, okay.  And if you stand up -- in a jury

9    trial it's a whole other story, you have to have closing

10   argument with a jury, but in a nonjury trial which almost

11   always tends to be a little more complex in some ways, they

12   frequently involve the government and there's a lot of

13   regulations and other issues going on and we have that here.

14   The lawyers are forced at the end of the trial to try to

15   remember and recall everything that's gone on in the case,

16   every paper that's been filed, everything that's important and

17   then try to give it to me in 20 minutes or half an hour, which

18   is more time than you're going to get at the Appellate Court.

19   You'll probably get 15 minutes, maybe 20.  I don't know what

20   the Fifth Circuit does.  But it's much better in my view and

21   much more productive for the lawyers to take stock of the

22   testimony that has been given, go back to their offices,

23   collaborate with their colleagues, call upon the earlier

24   admitted evidence, not call upon the stuff that's outside the

25   record, but call upon the admitted evidence that's in evidence

1    at the trial and to write a cohesive closing argument that

2    creates a true picture of what they are attempting to say with

3    appropriate backup.

4            I've never had a lawyer in the entire history of my

5    doing this, and I've done it since I began, who has told me

6    that they didn't think it was a better way to go.  I've tried

7    to convince my colleagues, some of them I've been successful in

8    convincing to do this and they've been very happy doing it, but

9    others I think they feel it's just a lot of extra work for them

10   actually because then they have to wade through this stuff,

11   it's just easier to have somebody talk to you.  But you will be

12   given 10 days, which is plenty of time, to get your closing

13   argument in.  And the closing argument can be no more than 20

14   pages, okay.  And that doesn't mean 20 pages and then 15 pages

15   of footnotes, okay.  That means 20 pages.  And that would be

16   the equivalent of an oral closing argument and you can make

17   your arguments there, you can cite to the record and make your

18   points and they will be, I can assure you, carefully read and

19   considered by me.  And it also is very helpful for me to when

20   I'm doing my findings of fact and conclusions of law to have in

21   front of me your closing argument so I can focus back and look

22   at them and say, well, let me remember, is this their position

23   or this isn't their position.  I can look back, then I know for

24   sure, I don't have to worry about it.  Now, are there any

25   objections to doing it that way?

1         MR. KRUCKENBERG:  No, Your Honor.

2         MR. SOSKIN:  No, Your Honor.  Although I would request

3    that we be permitted to consult our schedules.  I have another

4    one of your colleagues on the bench, I have previously asked to

5    reset a deadline that coincided with today's date.

6         THE COURT:  Judge Pitman?

7         MR. SOSKIN:  It was Judge O'Connor over in the

8    Northern District of Texas.

9         THE COURT:  Judge Reed O'Connor?

10        MR. SOSKIN:  Yes.

11        THE COURT:  He's a good judge, by the way.

12        MR. SOSKIN:  Absolutely.  After you scheduled this

13   date, he then set a briefing schedule that would also have

14   concluded on this date and I believe he set 10 days from now as

15   my new deadline.

16        THE COURT:  Brilliant minds think alike, 10 days.

17        MR. SOSKIN:  So if we could have --

18        THE COURT:  Here is what I'll do for you, all right,

19   it's not like we're all going someplace with COVID-19, I'll

20   give you 20 days.  That should give you -- whatever is going on

21   with Judge O'Connor you should be able -- and you're not by

22   yourself either, you have colleagues.

23        MR. SOSKIN:  Thank you, Your Honor.  This is not a

24   take-home exam where only you have to work on it.  You're

25   writing for your client, so anybody in your team is entitled to

1  chime in or write a part of it.  This is another reason why I

2  do this because you can consult with one another.  I want your

3  true position.  You know, it's not one of these things where

4  you're giving a closing argument and somebody is over there and

5  they're sweating bullets and they've got a piece of paper and

6  they run up to you and hand you the paper.  Who hasn't had that

7  happen?  Certainly happened to me more than once.  So you can

8  all collaborate.

9              COURTROOM DEPUTY CLERK:  September 29th.

10             THE COURT:  September 29th, so I'll give you until the

11  magic day of -- what is October 1st?  Is that a weekday?

12             COURTROOM DEPUTY CLERK:  October 1st is a weekday.

13             THE COURT:  October 1st.  Look how generous I am.

14  See?

15             MR. SOSKIN:  Thank you, Your Honor, I appreciate.

16             THE COURT:  I'm a real mensch, I'm telling you, in my

17  own mind of course.  All right, that's good for a Catholic boy.

18  All right, one thing I will allow you to do, however, is make a

19  short opening statement.  All right, you can make your opening

20  statement and make it short please, no more than five or ten

21  minutes and then we'll go right into the witnesses.  I'm going

22  to pre-admit exhibits.  Have you provided them all to

23  Ms. Springs?

24             MR. KRUCKENBERG:  Yes, Your Honor.

25             THE COURT:  Are there any objections to any of those

1   exhibits?

2           MR. SOSKIN:  No objections.

3           MR. KRUCKENBERG:  No objections.

4           THE COURT:  They'll all be pre-admitted at this time.

5           MR. GLOVER:  Your Honor, we would also move for our

6   exhibits to be admitted, but would caution that Exhibit Two is

7   demonstrative only.

8           THE COURT:  Okay.  I was admitting all the exhibits.

9           MR. GLOVER:  My apologies.

10          THE COURT:  I wasn't just admitting theirs.  So I'll

11  admit all of them for all purposes with the exception of

12  Government's Exhibit Number Two which will be received, not

13  admitted, for demonstrative purposes.  So it will be on the

14  record, but it won't be evidence.

15          MR. GLOVER:  Thank you, Your Honor.

16          THE COURT:  Except for the testimony that might flow

17  from it.  All right, I'll hear from the plaintiff please.

18          MR. KRUCKENBERG:  Thank you, Your Honor.

19          THE COURT:  Re-announce your name please.

20          MR. KRUCKENBERG:  Yes, Your Honor.  Good morning

21  again.  My name is Caleb Kruckenberg and I'm here from New

22  Civil Liberties Alliance for Mr. Cargill.  And Your Honor,

23  before I get into the details of the opening argument, I did

24  want to alert the Court there was a development in a similar

25  case, Aposhian versus Barr in the Tenth Circuit Court of

```
 1  Appeals.
 2             THE COURT:  I am aware of those cases.
 3             MR. KRUCKENBERG:  Just so Your Honor is aware, the
 4  Tenth Circuit granted en banc review of that case on Friday.
 5             THE COURT:  I did not know that.
 6             MR. KRUCKENBERG:  And so I wanted to make sure that
 7  Your Honor was aware.
 8             THE COURT:  I believe the Tenth Circuit case is the
 9  one that went up to the Supreme Court.
10             MR. SOSKIN:  That was the D.C. Circuit.
11             THE COURT:  Was that the D.C. Circuit one?  Where
12  Justice Gorsuch made kind of an ad hominem comment.
13             MR. KRUCKENBERG:  Your Honor, that was the D.C.
14  Circuit's case.  And the Tenth Circuit I'm letting you know on
15  Friday is now rehearing that case and, so you're aware, I'm
16  counsel in that case also.
17             THE COURT:  When are you going to rehear it?
18             MR. KRUCKENBERG:  We have 30 additional days to brief
19  it and then we'll see when the Court grants argument.
20             THE COURT:  Okay.  But there's no rehearing in the
21  D.C. case obviously.
22             MR. KRUCKENBERG:  Correct.  None that I'm aware of.
23             THE COURT:  Right.  All right.  You can proceed.
24             MR. KRUCKENBERG:  Thank you, Your Honor.  Your Honor,
25  ATF was correct when it determined after conducting a physical
```

1    examination and test firing of the Slide Fire bump-stock that

2    it was not a regulated firearm under the Gun Control Act or the

3    National Firearms Act and that is consistent with the statutory

4    definition that Congress set down, because a machine gun is a

5    weapon that fires multiple shots from a single function of the

6    trigger.  And a bump-stock simply doesn't operate in that

7    fashion.  A bump-stock requires an independent action of the

8    trigger for every shot.  And that's something that's not in

9    dispute and hopefully, Your Honor, today --

10            THE COURT:  Let me ask you this.  When you say an

11   independent action -- I'm not totally unfamiliar with firearms.

12   I was in the Marine Corps at one point, I was an Army officer,

13   I was in the Military Police Corps as a commissioned officer in

14   the Military Police Corps, so I've handled a lot of weapons,

15   I've fired a lot of weapons, I've fired semi-automatic weapons,

16   I've fired fully automatic weapons, M16 machine guns and so

17   forth which were the machine gun of choice in the day.  And my

18   understanding, and you and opposing counsel can correct me if

19   I'm wrong, I have never had any personal experience whatsoever

20   with bump-stocks.  I want to make that clear on the record,

21   none.  I don't own one, I don't know anybody who does, I've

22   never seen one personally.  I did see one on television after

23   the Las Vegas shooting, but I didn't pay a lot of attention to

24   it, the gun.  I was more concerned about the victims.  And so I

25   don't have a lot of personal experience with bump-stocks, I

BENCH TRIAL PROCEEDING                    13

1    don't know a lot about them except what I've read here in this

2    case.  At least my understanding -- obviously with a fully

3    automatic weapon like an M16 machine gun which was the Army's,

4    I don't know that they still have them, I presume they have

5    them in some form, you would take the gun, those were usually

6    on a tripod, and you would pull the trigger and just constantly

7    hold the trigger and it would feed a belt of rounds into the

8    chamber which would then automatically by operation of the gas,

9    and we don't need to get into the details, would fire at a

10   pretty significant rate round after round.  My understanding of

11   the bump-stock is that the finger is placed on the trigger and

12   you simply hold your finger on the trigger and that the stock

13   operates in some way or fashion because of the recoil to

14   accelerate a round -- another round into the chamber.  It's not

15   so much a feeding mechanism which is built into the weapon.  Am

16   I correct there or wrong?

17            MR. KRUCKENBERG:  Your Honor --

18            THE COURT:  You don't take your finger off and keep

19   pushing your finger, otherwise it would still be a

20   semi-automatic weapon.

21            MR. KRUCKENBERG:  Well, that's not exactly correct.

22            THE COURT:  You tell me, that's why I'm asking.

23            MR. KRUCKENBERG:  Yes, Your Honor.  We will show a

24   video and that's one of our exhibits that hopefully can shed

25   some light on this.  But the operation of a bump-stock is

 1   essentially what you do is you put your shooting finger, the

 2   trigger finger on a ledge on the bump-stock and it separates

 3   from the trigger mechanism itself.

 4          THE COURT:  It's not on the trigger itself.

 5          MR. KRUCKENBERG:  It is not on the trigger itself.

 6   And the shooter puts his non-shooting hand on the front of the

 7   weapon and pushes forward while also pulling backward with the

 8   trigger finger against the ledge.  And when the shooter pushes

 9   forward, the trigger touches the finger and the mechanism is

10   engaged.  Then it fires a round.  Then it chambers another

11   round.  And the recoil pushes it back into the shooter's arm,

12   it slides, the finger comes off the trigger and then pushes it

13   again into the trigger.  And so what happens is you create the

14   separation from the trigger finger, the actual trigger lever.

15          THE COURT:  The trigger finger doesn't move.

16          MR. KRUCKENBERG:  Correct.

17          THE COURT:  The trigger finger stays on the -- on this

18   holder.

19          MR. KRUCKENBERG:  Correct.

20          THE COURT:  I don't know what you would call it.  It's

21   not a trigger, but it's some sort of --

22          MR. KRUCKENBERG:  I think they refer to it as the

23   trigger ledge.

24          THE COURT:  Trigger ledge?

25          MR. KRUCKENBERG:  Yes.

1          THE COURT:  So it stays on the trigger ledge and the

2    left arm stays up and grips the underside of the barrel, the

3    barrel housing.

4          MR. KRUCKENBERG:  Yes.

5          THE COURT:  Whatever that might be, plastic, wood,

6    whatever it is, and pushes that forward and then rounds are

7    automatically fed into the chamber after the first shot.

8    What -- I hate to use the word "trigger", but what triggers the

9    first shot?

10         MR. KRUCKENBERG:  What triggers the first shot is that

11   the shooter pushes forward with the non-trigger hand, the left

12   hand.

13         THE COURT:  So the left hand becomes in effect the

14   substitute for the trigger finger.

15         MR. KRUCKENBERG:  In a sense because you push forward

16   until you make contact with the trigger level.

17         THE COURT:  And as long as the person is pushing

18   forward and as long as you have rounds in the magazine or in a

19   belt or whatever it happens to be, that weapon is going to fire

20   continuously.

21         MR. KRUCKENBERG:  Not exactly.  And the reason it

22   doesn't fire continuously is you have to push forward with the

23   non-shooting hand.  You also have to continuously pull back.

24   And the bump-stock itself has to slide back and forth because

25   the mechanism, the shooting mechanism doesn't change.  So you

1    have to create separation with your trigger finger and the

2    trigger ledge for every shot, so what happens is you sort of

3    push it forward, push it into the trigger finger, the recoil

4    pushes it backward so that then the trigger can reset.  That's

5    when the new round is chambered and then you push forward again

6    to hit the trigger again.  So it is very rapid, it's a rapid

7    movement, but what you're actually doing is pushing the stock

8    forward continuously to keep the trigger ledge hitting your

9    trigger finger.

10        THE COURT:  So you don't keep your hand forward

11   constantly and it just keeps firing, you have to pull it --

12   pull your hand back?  Is that what you're saying?  Is it like a

13   pump shotgun?

14        MR. KRUCKENBERG:  No, Your Honor, and it's more

15   like -- like I said, we can watch the video to see it in

16   action.

17        THE COURT:  All right.

18        MR. KRUCKENBERG:  But essentially you have to

19   continuously push forward and continuously pull back, but the

20   weapon moves a considerable amount.

21        THE COURT:  Right.

22        MR. KRUCKENBERG:  And that's why I say it's hard to

23   classify as either this one single movement or this one

24   deliberate movement.  What happens is the weapon bounces back

25   and forth and you have to keep pushing forward to keep

1   directing the weapon back into your trigger finger.

2           THE COURT:  Well, okay.  I fired a Thompson submachine

3   gun before while I was in the service actually and that

4   certainly is an automatic weapon.

5           MR. KRUCKENBERG:  Yes.

6           THE COURT:  I mean it can be fired semi-automatically,

7   but it's an automatic weapon, 45 caliber.  And there's a heck

8   of a lot of recoil and that thing moves back and forth too,

9   believe me, I had a sore shoulder.  I used to admire these

10  World War II soldiers who used to carry these things.  I don't

11  know how they did it.  I guess they developed -- I don't know

12  whether they developed a callous or what they developed, but it

13  was something to hold on to that Thompson for somebody who

14  wasn't familiar with it because there was a tremendous amount

15  of recoil from my remembrance and that was also true for

16  B.A.R., Browning Automatic Rifle which I also fired and that

17  had a capacity to fire automatically and that thing had a

18  tremendous amount of recoil and that weapon moved back and

19  forth a lot, although my finger remained on the trigger.

20          MR. KRUCKENBERG:  Right.

21          THE COURT:  Okay.  I understand what you're saying.

22  Why don't we go forward.  Thank you for the explanation.  If

23  there was any incorrect, I'm sure we'll hear from counsel to

24  tell me that that wasn't correct.

25          MR. KRUCKENBERG:  And Your Honor, just moving forward

1    to the arguments.  As we've laid out in our trial brief and

2    also our proposed findings of fact and conclusions of law --

3              THE COURT:  I've read all of those.  Everything is

4    here.

5              MR. KRUCKENBERG:  Yes, Your Honor.  And we believe

6    there's six reasons why the bump-stock regulation is invalid.

7    And the first I think is something that has been

8    underemphasized by the other courts that have considered this

9    issue and that's the fact that the ATF agrees that it lacks the

10   ability to issue any legislative rules in this space.  And this

11   once again was in the trial brief with the government here,

12   they agreed that ATF cannot publish a substantive regulation

13   that changes the definition of a bump-stock.  And that, Your

14   Honor, should really end the discussion regardless of how a

15   bump-stock operates, because as every court that's considered

16   this issue, the rule we're talking about here is a legislative

17   rule.  It speaks with the force of law, it is a substantive

18   amendment to the statute and the statutory definition.  But ATF

19   agrees they don't have that authority.  What the ATF has argued

20   instead is that this is merely an interpretive rule that

21   represents the best interpretation of what the statute has

22   always meant.  And Your Honor, we believe that that is

23   incorrect as the easiest example of that is ATF itself has said

24   for years that bump-stocks were not machine guns and it is very

25   inconsistent of the government to say now that bump-stocks have

1    always been machine guns, that is always the best

2    interpretation of the statute and we are merely repeating what

3    we all know to be true.  And Your Honor, that is the ATF's

4    position today.  Even moving on from that, even if we assume

5    that the ATF has legislative rule making authority, they don't

6    have any authority to issue this regulation here because this

7    statutory definition of a machine gun is not ambiguous.  This

8    is also a point that the other courts I think have sort of

9    skipped past.  And the ATF has argued and the United States

10   Department of Justice has argued for years in criminal

11   prosecutions that the statutory definition of a machine gun is

12   unambiguous, everyone knows what it means.  And specifically

13   they have argued that the terms we're discussing today,

14   "automatically" and "single function of a trigger" are so

15   readily understood and so unambiguous that they can criminally

16   prosecute people for violating them with innovative devices.

17   But what that means is if the statute is unambiguous, then the

18   agency has no authority to try to fill in a gap in the statute

19   because we all know what the statute means because the statute

20   is clear.  And for that reason as well, the regulation is

21   invalid because you can't fill a statute if it's already

22   unambiguous.

23           Now, third, we've argued that or the ATF has argued

24   that this is the best interpretation of the statute, that's

25   their position today.  But that cannot be right.  As I

1    mentioned, there are 24 different classification rulings from

2    the ATF, classification letters, that have considered

3    bump-stocks that are just like the Slide Fire which is at issue

4    today and have said those are not machine guns.  And

5    specifically they issued a classification letter for the Slide

6    Fire.  They said it is not a machine gun under the statutory

7    definition.  And clearly the ATF has not filed that it was

8    always a machine gun.

9              THE COURT:  What is a Slide Fire?  I'm sorry, I've

10   never heard that term.

11             MR. KRUCKENBERG:  That is the bump-stock that we're

12   discussing today.

13             THE COURT:  The commercial name of it.

14             MR. KRUCKENBERG:  Yes, sir.

15             THE COURT:  I thought you were talking about some

16   other type of weapon --

17             MR. KRUCKENBERG:  No, Your Honor.

18             THE COURT:  -- that the ATF passed on that was --

19   okay.

20             MR. KRUCKENBERG:  The Slide Fire is perhaps the best

21   known of the commercially available bump-stocks.

22             THE COURT:  I told you, I don't have any converse with

23   bump-stocks.

24             MR. KRUCKENBERG:  Yes, Your Honor.  And I'll also

25   point out that as we know from the administrative record, when

1  the ATF was considering this regulation they looked and there

2  had never been a criminal prosecution in the United States for

3  possession of a bump-stock under 922(o), which is the criminal

4  prohibition on machine guns.  And it's very clear at that point

5  in 2017 that no one thought that bump-stocks were machine guns

6  and certainly not the United States Department of Justice.  And

7  it is simply incredible and inconsistent for them to say -- to

8  come in today and say that was always the meaning of the term.

9  And I'll also point out there's a very serious complication if

10  their view of the statute is correct.  What that would mean is

11  that anyone who purchased a bump-stock, and they've estimated

12  there are about 500,000 different people who have done this,

13  anyone who purchased a bump-stock lawfully or with the ATF's

14  approval --

15          THE COURT:  You mean before this rule.

16          MR. KRUCKENBERG:  Before this rule went into effect,

17  still had violated section 922(o), because despite their advice

18  from the ATF, the device was still a machine gun, that's the

19  position they're taking today, and they would be subject to

20  criminal prosecution.  That includes my client, Mr. Cargill,

21  because he purchased the Slide Fire with the understanding that

22  it had been approved by the ATF in the classification letter.

23  But unfortunately, their position now is that it was still a

24  machine gun all along subject to criminal penalties.  And I

25  don't think that that is a theoretical concern.  I think there

BENCH TRIAL PROCEEDING                    22

1    is a real concern that some of that half million people out

2    there who bought these devices could be subject to prosecution.

3              THE COURT:  Have there been any prosecutions?

4              MR. KRUCKENBERG:  Not that I'm aware of.

5              THE COURT:  There's a Supreme Court case directly on

6    point talking about, you know, worrying about something where

7    nobody has been prosecuted and that was in the contraceptive

8    context.

9              MR. KRUCKENBERG:  Yes, Your Honor.  I think what I am

10   trying to get at is that the government's position here

11   today -- and I'm not saying that there isn't active threat of

12   prosecution.  What I am saying is their position today is that

13   my client committed a federal crime when he bought a bump-stock

14   despite the approval letter and that he should have known

15   better.  That's their position today and I think that is very

16   troubling and it's a troubling position for the Department of

17   Justice to take.

18             To our fourth point, I would say that even if we

19   consider that this is a valid agency action, valid rule making,

20   even under the deferential test for agency action, it's an

21   unreasonable interpretation and that goes back to the arguments

22   that I made before.

23             Switching slightly, this is also an arbitrary and

24   capricious action by the agency.  This was clearly a political

25   decision, not a technical decision.  And the acting director of

1    the ATF at the time this rule was issued said very clearly we

2    went outside or DOJ went out to us and they said it doesn't

3    matter what the technical experts within the Department say,

4    you need to change the interpretation of bump-stocks, you need

5    to make these unlawful.  And that is not what the agency should

6    be doing.  The agency should be relying on its own expertise

7    and the expertise of its technical experts, its firearms

8    examiners.

9          And finally, Your Honor, if the agency, if the agency

10   can do what it did here, if this bump-stock ruling is valid,

11   then it is a delegation issue, it violates the non-delegation

12   clause because this would allow the ATF, a criminal prosecutor,

13   to change the subsequent scope of criminal law and to declare

14   people into felons because they have followed the ATF's own

15   advice.  And for those six independent reasons, this regulation

16   is invalid.

17         And Your Honor, I would just like to -- we have sort

18   of an interesting presentation today because there aren't any

19   witnesses and we have a limited -- other than Mr. Smith, and we

20   have a limited number of exhibits and so I want to just walk

21   through our exhibits to show parts of the administrative record

22   that I think are very helpful and informative and also, as you

23   mentioned, to show the video so that we can all sort of get on

24   the same page and understand the way this device works.  So I'd

25   like to first turn to Plaintiff's Exhibit One.

BENCH TRIAL PROCEEDING                    24

1           THE COURT:  Are you going to go through every exhibit?

2    We'll be here all day.

3           MR. KRUCKENBERG:  There are 12 exhibits, Your Honor.

4           THE COURT:  Well, I'd rather have you go over the

5    exhibits as we go through them with the witnesses.

6           MR. KRUCKENBERG:  I certainly can do that.

7           THE COURT:  Let's do that because we only have a

8    limited amount of time.  That was my promise and my agreement

9    with counsel.

10          MR. KRUCKENBERG:  Yes, certainly.  So what we can do

11   then, Your Honor, given the time constraints, I think Mr. Smith

12   is probably the best witness to talk about -- I mean he's the

13   witness and he's the best person to talk about the way this

14   device functions which I think is really what you're most

15   concerned with.

16          THE COURT:  It's not what I'm most concerned with, but

17   I certainly am concerned about it because that makes a big

18   difference.

19          MR. KRUCKENBERG:  I understand, it's the premise for

20   why we're here, so I think perhaps the best thing for us to do

21   then is we can have the government call Mr. Smith.  I think

22   they have a presentation with him, I have a video that I'd like

23   to discuss with him as one of our exhibits and I think perhaps

24   we can go from there.

25          THE COURT:  I'm anticipating that we'll be done before

 1   noon and I would assume that would be the case.  Let me have

 2   opening statement if you'd like by the government.

 3              MR. GLOVER:  Good morning.  May it please the Court,

 4   Matthew Glover for the United States.

 5              THE COURT:  Good morning.

 6              MR. GLOVER:  Thank you for accommodating our schedule,

 7   Your Honor, we really appreciate that.  This morning I'm going

 8   to be calling Mr. Smith and going through his CV.  He's a

 9   firearms enforcement officer in the Firearms and Ammunition

10   Technology Division of the Bureau of Alcohol, Tobacco, Firearms

11   and explosives in Martinsburg, West Virginia.  We'll seek to

12   qualify him as an expert in the field of firearm mechanics and

13   operations.  Mr. Soskin is going to go through a presentation

14   with Mr. Smith about the mechanics and the operations of a

15   bump-stock of an automatic firearm and of a semi-automatic

16   firearm.  That presentation is going to underlie the

17   administrative record in this case and give you some technical

18   background and bring the administrative record to life for you,

19   we hope.

20              Following Mr. Soskin's testimony, we anticipated,

21   based on the scheduling discussion that we had, I believe it

22   was in February when Mr. Soskin and I were down here and

23   Mr. Kruckenberg, that there would be brief arguments by each

24   side after Mr. Kruckenberg has had an opportunity to go through

25   his exhibits with Mr. Smith.

BENCH TRIAL PROCEEDING                    26

1            THE COURT:  Brief argument about what?  Refresh me.

2            MR. GLOVER:  The legal questions.

3            THE COURT:  But that's what we're doing in -- that's

4    your closing argument.

5            MR. GLOVER:  Our understanding had been that given

6    that this was an administrative record case that we were having

7    sort of unique bump trial on, that there would be brief sort of

8    the equivalent of summary judgment argument, that's what we

9    prepared for, but I apologize --

10           THE COURT:  Well, I'll give you a few minutes at the

11   end, yes, if you want to hone the issues, but remember now your

12   closing argument is going to be in writing.

13           MR. GLOVER:  Absolutely.  Okay.  So I think what the

14   arguments are going to show is that the crux of the matter is

15   whether a bump-stock meets the definition for a machine gun in

16   the federal statute and that Mr. Smith's presentation and our

17   arguments about that are going to show that the rule correctly

18   defines and describes the statutory terms in machine gun

19   including automatically and single function of the trigger.  In

20   that context, the accurate rule finds that bump-stock is a

21   machine gun because in accordance with the plain meaning of

22   those terms, "automatically" and "single function of the

23   trigger", the bump-stock allows the shooter once it initiates

24   the firing sequence which my colleague was discussing with you

25   by placing the finger on the trigger ledge and applying forward

1   pressure, continual forward pressure will allow the gun, as the

2   Court said, to fire until you run out of ammunition or until

3   the shooter voluntarily ceases to place forward pressure on the

4   firearm.

5            As to a few of the other points that were made, the

6   bump-stock rule is an interpretive rule.  The rule says plainly

7   on its face that it is interpreting the definition of machine

8   gun in the statute, its sole goal is to give that

9   interpretation and to explain to the public that prior

10  classifications of bump-stocks were erroneous and withdraw

11  those classifications.

12           Similarly, Chevron deference has no place in this case

13  both because neither party suggested applies and because this

14  is an interpretive rule.  And my colleague, Mr. Bates, is going

15  to briefly give an opening on the arbitrary and capricious

16  comments if that's all right.

17           THE COURT:  Yes.

18           MR. BATES:  Thank you, Your Honor.  Christopher Bates

19  for defendants.  Just very briefly on the plaintiff's claims

20  the rule is arbitrary and capricious under the Administrative

21  Procedure Act.  Plaintiff basically identifies three reasons

22  why he claims the rule is arbitrary and capricious.  First,

23  because it reflects allegedly improper influence from elected

24  officials.  Second, that it fails to adequately explain the

25  agency's reasons for changing its view.  And third, that it

1    failed to consider the agency -- sorry, the evidence before the

2    agency.  Plaintiff is wrong on each of these counts.

3            As to influence from elected officials, agencies are

4    allowed to take into account the views of the President,

5    members of Congress and other administration officials.

6    Nothing requires ATF to wall itself off from the world.  And

7    ATF operates under delegation from the Attorney General.  The

8    statutes provide authority to administer these firearms

9    statutes to the Attorney General, which the Attorney General

10   has then delegated to ATF, so it's entirely proper for ATF to

11   consult with Department of Justice administering rules and

12   regulation related to enforcement of firearms statutes.

13           As to ATF's reasons for changing its views, the agency

14   set forth these reasons at length and the rule explained how

15   the prior classification decisions with regard to bump-stocks

16   did not provide consistent or extensive legal analysis of the

17   term "automatically" and contained inconsistent explanations

18   about why the devices were or were not bump-stocks.

19           And it also explained that the prior classification

20   decisions had relied on a mistaken premise that the need for

21   shooter input or making pressure with the non-shooting arm

22   rendered the firearm from bump-stock devices nonautomatic.

23           And as to the evidence before the agency, ATF had in

24   its possession the results of the tests that it had done in the

25   past as well as information regarding the device's mechanical

 1   operation.  There's no reason for ATF to have to redo the tests

 2   that it had previously performed when it had before it all the

 3   information it needed for classification decisions and what had

 4   changed was the agency's reading the statute or the agency's

 5   legal analysis.  Because the bump-stock rule presents the best

 6   interpretation of statutory text which is promulgated pursuant

 7   to valid authority and complies with procedural requirements,

 8   this Court should enter judgment for the government.

 9           THE COURT:  Okay.  We're going to take a very, very

10   short recess.  Anybody who needs to use the restroom do so, we

11   will come back and get right into our witness.

12           *(9:48 a.m.)*

13                           *   *   *

14           *(9:58 a.m.)*

15           THE COURT:  I was reminded during the recess that I

16   have an appointment at 11:45, so I don't want to rush counsel

17   through this, so if we aren't done by 11:45, then we'll just

18   break at that time and probably resume at 1:30.  I think we

19   should be done, but if we're not, I'm not going -- we're here,

20   let's finish it.

21           One thing I want defense counsel to be thinking of

22   which really is a little bit unclear in your briefing, I

23   noticed it and so did my law clerk when he was going through it

24   and that is what is your thought about what the consequences if

25   we found that this was a legislative rule and not an

1    interpretive rule, what would you ask the Court to do at that

2    point or what do you believe the remedy would be at that point?

3    You should be thinking about that as well.  All right.  I'm

4    talking to plaintiff's counsel.  So plaintiff has no witnesses

5    today, am I correct?

6              MR. KRUCKENBERG:  Yes, sir.

7              THE COURT:  In a normal trial I would call on you, so

8    you have no witnesses, so you pass to the defense.

9              MR. KRUCKENBERG:  That is correct, Your Honor.

10             THE COURT:  So counsel, you may call your witness.

11             MR. GLOVER:  Thank you, Your Honor.  The government

12   calls Mr. David Smith.

13             COURTROOM DEPUTY CLERK:  Please raise your right hand.

14                           *   *   *

15        *(DAVID SMITH, Government Witness, Sworn.)*

16                           *   *   *

17             THE WITNESS:  I do.

18             THE COURT:  Mr. Smith, you're sitting in the jury box

19   only because we're trying to protect you and everybody else.

20   We're doing appropriate social distancing.  Normally you

21   wouldn't be in the jury box, but I don't want you to think that

22   your testimony is somehow different or less important or that

23   your oath is any less important simply because you're sitting

24   there versus here.  We're only doing it because of COVID-19.

25             THE WITNESS:  Thank you, sir.

David Smith - By Mr. Glover                    31

```
 1              THE COURT:  You may proceed.
 2              MR. GLOVER:  Thank you, Your Honor.
 3                          EXAMINATION
 4   BY MR. GLOVER:
 5   Q.  Mr. Smith, good morning.  I'm going to show you a document
 6   that's been previously admitted as Government Exhibit One.
 7              MR. GLOVER:  Your Honor, does he have a screen there?
 8              THE COURT:  I think he does.  Can you see anything
 9   there, Mr. Smith?
10              COURTROOM DEPUTY CLERK:  They're not projecting
11   anything.
12              THE COURT:  Put something up so he can see it.  Now
13   can you see anything?
14              THE WITNESS:  Yes, sir.
15              THE COURT:  He's got it.
16   BY MR. GLOVER:
17   Q.  Mr. Smith, do you recognize the document that's just been
18   published to you?
19   A.  Yes, it is my curriculum vitae.
20   Q.  And did you create this document?
21   A.  Yes, I did.
22   Q.  And this is a true and accurate representation of that?
23   A.  Yes, it is.
24   Q.  Mr. Smith, what is your current occupation?
25   A.  I'm a firearms enforcement officer for the Bureau of
```

David Smith - By Mr. Glover                    32

1  Alcohol, Tobacco, Firearms and Explosives.

2  Q.  How long have you been with the Bureau of Alcohol, Tobacco,

3  Firearms and Explosive?

4  A.  A little over four years.

5          THE COURT:  Excuse me.  Are you an enrolled agent in

6  ATF?

7          THE WITNESS:  I am not a badged agent, sir.

8          THE COURT:  You're not, so Mr. Smith is the correct --

9          THE WITNESS:  That is correct.

10         THE COURT:  I wanted to be sure we weren't giving you

11 a misnomer.

12 BY MR. GLOVER:

13 Q.  Do you mind being referred to as Mr. Smith?

14 A.  No.

15 Q.  For formality that's all right?

16 A.  Yes, sir.

17 Q.  Mr. Smith, I'd like to step back from prior to your ATF

18 experience.  Were you in the military?

19 A.  Yes, I was in the United States Marine Corps.

20 Q.  And what years did you serve in the Marine Corps?

21 A.  I served from 1999 to 2007.

22 Q.  And what rank did you exit active duty service?

23 A.  I left active duty service as an E5 Sergeant.

24 Q.  What jobs I believe they're referred to as military

25 occupation specialties did you have in the Marine Corps?

David Smith - By Mr. Glover                    33

1   A.   I served as a 2111, which is an armorer, and as a 2112,

2   which is a precision weapons technician.

3   Q.   Could you describe the role of a 2111 armorer?

4   A.   As a 2111 armorer, I was responsible for maintaining all

5   the weapon systems of the United States Marine Corps, also

6   doing training as far as new armorers coming to the battalions

7   that I was working with and performing all the QC checks, etc.,

8   on those weapons.

9   Q.   What type of checks was that?

10  A.   Quality control checks.

11  Q.   And could you describe your work as a precision weapons

12  specialist, a 2112?

13  A.   As a 2112 precision weapon specialist, I performed the same

14  maintenance and quality checks on match weapons for the United

15  States Marine Corps.   In particular I ended up working in

16  Sniper Section where I did prototype and development of sniper

17  systems for the United States Marine Corps.

18  Q.   And what types of firearms did you work with in those

19  positions?

20  A.   I worked with everything in the inventory of man portable

21  firearms for the United States Marine Corps.

22  Q.   Did you assemble and disassemble firearms from those

23  positions?

24  A.   Yes, I did.

25  Q.   What types of firearms?

1  A.  M9 pistols, MP5 submachine guns, M4s, M16s, 240 machine

2  guns, 249 machine guns, small rocket launchers, dragon rocket

3  launchers, small artillery, Howitzer pieces.

4  Q.  For those of us that are not as familiar with military

5  weaponry, that includes, among the things you listed,

6  semi-automatic firearms and automatic firearms?

7  A.  Yes, it does.

8  Q.  Did you repair firearms in your time in the Marine Corps?

9  A.  Yes, I did.

10  Q.  What types of firearms did you repair?

11  A.  I repaired semi-automatic and full automatic firearms,

12  everything again from the M9 pistol up to small Howitzers and

13  artillery pieces.

14  Q.  What size military unit were you responsible for repairing

15  firearms.

16  A.  As armory chief for First Battalion 8th Marines, I was

17  responsible for all the weapons under First Battalion 8th

18  Marines.  As armory chief for second amphibious assault

19  vehicles, I was responsible for not only first -- sorry, the

20  amphibious assault vehicle battalion, but I ended up being

21  responsible during Operation Iraqi Freedom for two other

22  battalions as well.

23  Q.  Did you construct or modify firearms or their components?

24  A.  Yes.  While I was stationed at weapons training battalion

25  as a 2112, I actually built prototype firearms from blocks of

David Smith - By Mr. Glover                    35

1    steel and aluminum from the scratch up.

2    Q.  What did you do after you left the Marine Corps?

3    A.  When I left the Marine Corps, I went to work for Bill

4    Wiseman and Company.

5    Q.  What is Bill Wiseman and Company?

6    A.  He is a private firearm manufacturer who makes ammunition

7    test pictures and barrels for the ammunition industry and also

8    produces high-end safari guns.

9    Q.  And could you describe your personal work, what work you

10   were doing at Bill Wiseman?

11   A.  My personal work was managing the shop floor, running the

12   machines for manufacturing barrels, manufacturing fixtures,

13   receivers for firearms, repairing firearms brought in by

14   customers and doing any fabrication necessary for his custom

15   firearms.

16   Q.  And for the layman, when you talk about manufacturing

17   components and you've talked about repairing them, you were

18   constructing firearms as well as repairing them, is that an

19   accurate --

20   A.  Yes, we were actually building and machining our own

21   receivers as well as barrels and assembling those on custom-fit

22   stocks.

23   Q.  And as part of that, you had to assemble and disassemble

24   firearms?

25   A.  Yes, I did.

David Smith - By Mr. Glover                    36

```
1    Q.   How long were you with Bill Wiseman and Company?

2    A.   I was there for a little over six months.

3    Q.   And what did you do after leaving Bill Wiseman and Company?

4    A.   I went back to school and got a computer aided drafting and

5    design degree.

6    Q.   And then did you join the Department of Homeland Security

7    Immigrations and Custom Enforcement?

8    A.   Yes, I did.

9    Q.   And what was your job position with ICE or DHS?

10   A.   I was an ordinance equipment expert.

11   Q.   What period of service did you have with ICE?

12   A.   From 2010 until 2016.

13   Q.   And can you describe the role of an equipment specialist

14   ordinance, is that correct?

15   A.   Ordinance equipment specialist.  That's fine.  My role

16   there was multifaceted.  I was initially stationed out at the

17   Firearms Law Enforcement Training Center in Artesia, New

18   Mexico.  Part of my duties was instruction on firearms to

19   students coming through the Academy.  I was also responsible

20   for maintaining all the firearms there at the Academy.  And I

21   was responsible for working on prototype and development

22   firearms for BORTAC which was down in El Paso at that point in

23   time.

24   Q.   Is it fair to say that in ordinance equipment specialist,

25   the equipment you were working with was firearms?
```

1   A.   Yes.

2   Q.   What types of firearms did you work with in that position?

3   A.   I worked with everything from personal duty firearms,

4   handguns, shotguns, semi-automatic rifles, full automatic

5   rifles to competition weapons and sniper rifles.

6   Q.   In an average week at ICE, how many firearms would you have

7   been working with?

8   A.   Normally over 100.

9   Q.   And did you analyze the mechanics and operations of the

10  firearms in your job at ICE?

11  A.   Yes, I did.

12  Q.   Did you assemble and disassemble firearms?

13  A.   Yes, I did.

14  Q.   And did you repair them?

15  A.   Yes, I did.

16  Q.   And I think you already said this, so just to make sure

17  I've got the testimony correct, but you also constructed them

18  or would it be fair to say built them from scratch?

19  A.   Yes, I also built prototypes.

20  Q.   And after completing your time with ICE, that's when you

21  joined your Alcohol, Tobacco, Firearms, Explosives in your

22  current position?

23  A.   Yes, I joined ATF in 2016.

24  Q.   What are your primary responsibilities at ATF?

25  A.   My primary responsibility under ATF is to classify firearms

David Smith - By Mr. Glover                    38

1   devices submitted to ATF under the federal rules and

2   regulations.

3   Q.   What goes into classifying firearms?

4   A.   When a device is submitted to me for classification, I do

5   research first to find out a history of similar types of

6   devices.  I search the U.S. Patent website to see if there are

7   any patents associated with this device.  I look at firearms

8   history of similar mechanical operating systems.  And then, of

9   course, I apply the rules, laws and regulations to how that

10  device fits under federal law.

11  Q.   Do you assemble or disassemble firearms when you're

12  classifying?

13  A.   Yes, as part of understanding the mechanical operation of

14  the devices submitted, I will disassemble and reassemble the

15  device.

16  Q.   And do you also do firearms instruction in your current

17  job?

18  A.   Yes, I do.  I have taught down at the Firearms Law

19  Enforcement Training Center in Glencoe and I have taught at the

20  National Firearms Examiner Academy up in Maryland.

21  Q.   And have you ever worked with bump-stock devices in your

22  current position?

23  A.   Yes, I have.

24  Q.   And have you fired them?

25  A.   Yes, I have.

David Smith - By Mr. Glover                    39

1   Q.  And have you taken them apart?

2   A.  Yes, I have.

3   Q.  And reassembled them?

4   A.  Yes.

5   Q.  And I guess as an estimate, how many classifications

6   roughly would you say you've done?

7   A.  In the neighborhood of 400.

8   Q.  And Mr. Smith, have you testified as an expert witness

9   before?

10  A.  Yes, I have.

11  Q.  Do you remember what courts you testified in?  And if not,

12  I think we've got that part of your CV available.

13  A.  Yes, Northern District of Georgia, District of Arizona and

14  the Southern District of New York.

15  Q.  And those were criminal cases that you testified in?

16  A.  That is correct.

17       MR. GLOVER:  Your Honor, the defendant moves to

18  qualify Mr. David Smith as an expert in the field of firearm

19  mechanics and operations.

20       THE COURT:  Any objection?

21       MR. KRUCKENBERG:  No objection.

22       THE COURT:  His testimony will be received as such.

23       MR. GLOVER:  Thank you, Your Honor.  My colleague,

24  Mr. Soskin, is going to go through the presentation that has

25  been not admitted, but I've forgotten the other term, I

```
 1    apologize, as Exhibit Two.
 2              COURTROOM DEPUTY CLERK:  Identified.
 3              MR. GLOVER:  Identified.  Thank you.
 4              THE COURT:  That's okay.  By the way, I do have an
 5    iPad up here, I have some of my materials that I scan onto my
 6    iPad.  I learned this from Court of Appeals judges, it's a good
 7    thing.  I don't have to be flipping over here, like I'm
 8    flipping burgers looking through here.  That's the old style.
 9    So I'm not surfing the Internet up here, I'm paying very
10    careful attention.
11              MR. SOSKIN:  Good morning, Mr. Smith.  Good morning,
12    Your Honor.
13              THE COURT:  Good morning.
14                         DIRECT EXAMINATION
15    BY MR. SOSKIN:
16    Q.  Mr. Smith, why are you here today?
17    A.  I am here to give a technical explanation of how bump fire
18    systems work and bump-stocks compared to also technical
19    explanation of how semi-automatic firearms and automatic
20    firearms work.
21    Q.  I understand you prepared a presentation for today, is that
22    correct?
23    A.  Yes, that is correct.
24    Q.  And Mr. Smith, what kind of materials does your
25    presentation contain?
```

David Smith - By Mr. Soskin                    41

1    A.  My presentation contains videos, animations and texts that

2    explains what I will be talking about.

3    Q.  And did you draw your presentation from the administrative

4    record in this matter?

5    A.  No, I did not.

6    Q.  The videos and bump-stocks, are the videos that you

7    mentioned in the presentation are those fair and accurate

8    representations of the firearms they portray?

9    A.  Yes, they are.

10   Q.  And the diagrams and animations that you mentioned were in

11   your presentation, those are fair and accurate representations

12   of what they portray?

13   A.  Yes, they are.

14   Q.  You mentioned that there are patents in your presentation?

15   A.  Yes, there are.

16   Q.  Where did you obtain those patents from?

17   A.  I obtained those patents from the U.S. Patent website.

18   Q.  And you mentioned that there are descriptions of how

19   firearms work in your presentation?

20   A.  That is correct.

21   Q.  Who wrote those descriptions?

22   A.  I wrote those descriptions.

23   Q.  Those descriptions are fair and accurate depictions of the

24   firearms that they're describing?

25   A.  Yes, they are.

1          MR. SOSKIN:  Your Honor, Mr. Smith's account explains

2    why this is a demonstrative exhibit and not an exhibit we seek

3    to submit into evidence, it is not part of the administrative

4    record.  However, Mr. Smith has just testified that the

5    materials in it are fair and accurate representations.

6          THE COURT:  You may proceed.  I'm sure if there's some

7    objection, I'll hear it.

8    BY MR. SOSKIN:

9    Q.  Mr. Smith, what did you do to understand bump-stocks in

10   preparation for today?

11   A.  To understand bump-stocks I originally went to the National

12   Firearms Collection and found a bump-stock in the National

13   Firearms Collection which I then disassembled, reassembled and

14   installed on an AR15 type firearm.  I did test firing, then I

15   went through the administration record for ATF and pulled what

16   correspondence I could find on bump fire type devices.  I also

17   went through the United States Patent website and found all the

18   patents I could on bump fire type devices.

19         THE COURT:  Just so the record will be clear and make

20   sure I understand, the AR15 is loosely the civilian version of

21   the military's M16, am I right?

22         THE WITNESS:  Yes, sir, the AR15 is the semi-automatic

23   version of the M16 or M4.

24         THE COURT:  Which is switchable between semi-automatic

25   and full automatic.

1            THE WITNESS:  The M4 and M16, yes, the military

2   versions are switchable from semi-automatic to full automatic.

3            THE COURT:  I just wanted the record to be clear.

4   BY MR. SOSKIN:

5   Q.  Mr. Smith, were you involved in the issuance of the rule

6   describing how bump-stocks are machine guns?

7   A.  No, sir, I was not.

8   Q.  And are you here to give us a legal judgment about whether

9   a bump-stock is a machine gun?

10  A.  I am not.

11  Q.  Mr. Smith, is the presentation also on the screen in front

12  of you?

13  A.  Yes, it is.

14  Q.  Is this a presentation you prepared for today?

15  A.  Yes, it is.

16  Q.  Could you demonstrate -- sorry, what does this first slide

17  depict?

18  A.  This first slide is a short video of me test firing a bump

19  fired type stock on an AR15 type rifle.

20  Q.  What model bump fire stock is that?

21  A.  This is actually a Slide Fire type bump fire stock.

22  Q.  Could you demonstrate this for us?

23  A.  If you can hit play.

24       (Video playing.)

25  Q.  Mr. Smith, describe for us what a bump-stock is?

1  A.  A bump-stock is an accessory attached to a firearm to

2  increase its rate of fire, to make it easier for somebody to

3  fire a weapon faster.

4  Q.  And what parts of a semi-automatic firearm get attached to

5  a bump-stock device?

6  A.  You would attach the receiver and the upper assembly on an

7  AR type firearm to a pistol grip and chassis system of a bump

8  fire stock.

9  Q.  Do you remove a portion of the original rifle before you do

10 that?

11 A.  On an AR15 type rifle you would have to remove the pistol

12 grip and the stock assembly.

13 Q.  Which are then replaced by the new bump-stock piece, is

14 that right?

15 A.  Yes, that is correct.  They are then replaced by the bump

16 fire system.

17        THE COURT:  Would it take an armorer to do that or

18 could the individual weapon owner make that conversion?

19        THE WITNESS:  A weapon owner should be able to, it's

20 fairly simple, sir.

21        THE COURT:  Okay.

22 BY MR. SOSKIN:

23 Q.  Mr. Smith, what are all these on this slide?

24 A.  These are the front pages from several different patents

25 that I found while I was doing my patent research and it

David Smith - By Mr. Soskin                    45

1  demonstrates that all these different devices work under the
2  same mechanical principles.
3  Q.  Where you wrote that the previous patent is just one of
4  numerous patents for similar devices, what did you mean by
5  similar?
6  A.  I mean that they all operate under the same mechanical
7  function and principles.
8  Q.  When you did your research did you find more patents than
9  just these?
10 A.  I did.  I found around 25 patents.
11 Q.  Mr. Smith, what happens when you initiate firing on a
12 semi-automatic firearm equipped with a bump-stock, can you
13 describe that for us?
14 A.  Yes.  I have a small video that would assist.
15     *(Video playing.)*
16     The shooter will place the stock in their shoulder, as you
17 can see the shooter's finger the through the trigger guard.
18 I'll go into the patent a little later on a Slide Fire type
19 device like this one.  Shooter's finger is resting on a finger
20 rest, so they're holding it in place.  As you can see with the
21 left hand, the shooter is pressing forward and as long as that
22 shooter is pressing forward, the weapon will bring the trigger
23 into contact with the shooter's finger and it will fire, recoil
24 will cause the weapon to move back and slide inside the bump
25 fire stock.  And while the shooter is continuing to press

David Smith - By Mr. Soskin                    46

1    forward, it will overcome that recoil impulse allowing it to

2    fire again.

3    Q.  When does it stop?

4    A.  It stops when the shooter stops pressing forward, removes

5    their trigger finger or when it runs out of ammunition.

6    Q.  What happens when you initiate fire on a semi-automatic

7    firearm without a bump-stock?

8    A.  Semi-automatic firearm without a bump-stock goes through

9    the cycle of operations.  Once the firing is initiated, whether

10   that's a trigger pull, pressing of a button, switch, however

11   you initiate the firing sequence, it has a self-regulating

12   mechanism that allows it to extract the spent cartridge, eject

13   it, load the new cartridge and either cock the hammer or charge

14   the firing pin system and then it stops.

15   Q.  How many shots does it fire before it stops?

16   A.  It will fire one shot.

17   Q.  Mr. Smith, you used the term "cycle of operations" to

18   describe what a firearm is doing in your last answer.  What

19   does that mean?

20   A.  I have an animation here, it was actually created by the

21   FBI, to assist me.  If you can put it on Colt LE semi, press

22   the semi, and then take the X-ray controls on the left-hand

23   side all the way up.

24       As you can see in this animation, the weapon is currently

25   loaded, the cycle of operations is what happens when you pull

1  the trigger which is the red part, it releases the yellow

2  hammer, strikes the firing pin, ignites the primer, bullet is

3  expelled.  This is a gas impingement type weapon, so the gases

4  force the bolt and bolt carrier back, extracting, ejecting the

5  cartridge, loading the next round, and in the process it cocks

6  the hammer.

7      Now, in this semi-automatic you'll notice there is a yellow

8  hammer, a blue disconnecter and a red trigger.  When it cocks

9  the hammer, the hammer is caught on the disconnecter.  Almost

10  all semi-automatic firearms have some sort of disconnecter in

11  them to keep them from having hammer follow or from running

12  automatically.

13  Q.  You mentioned some of the colored parts in there.  Could

14  you describe for us again what the colored parts of the fire

15  control group are here?

16  A.  Yes.  The red part is the trigger, the blue is the

17  disconnecter and the yellow is the hammer.

18          MR. SOSKIN:  Can we have the next slide please?

19  BY MR. SOSKIN:

20  Q.  What rate of fire does a semi-automatic rifle have?

21  A.  A semi-automatic rifle can typically fire as fast as the

22  shooter can pull with their trigger finger.  Jerry Miculek --

23  and I probably pronounced the name wrong -- is known for having

24  one of the fastest trigger fingers in the world.  I have a

25  short video here of him firing semi-automatic firearms to

 1  demonstrate just how fast somebody can fire a semi-automatic

 2  weapon.

 3      *(Video playing.)*

 4      In this next little section, you'll have a good view from

 5  the side.  And if you watch his trigger finger, his trigger

 6  finger is going back and forth for every single shot, but that

 7  is quite fast.

 8          MR. SOSKIN:  I would note for the record at this point

 9  that although Mr. Smith's exhibit is demonstrative, there is in

10  the administrative record comments that were submitted by

11  various commenters on the notice of proposed rule making

12  directing the government's attention to Mr. Miculek, whose name

13  I'm also butchering, and videos such as the one --

14          THE COURT:  Quite frankly, maybe there's a reason for

15  this, but it seems to me -- now, I happen to be familiar with

16  semi-automatic, automatic weapons because of my military

17  background in both the Marine Corps and the Army, but there may

18  well be some judges and I say this with respect because, you

19  know, there's a lot of professional -- some of the most highly

20  qualified professional people in the world who aren't carefully

21  familiar with firearms who may not be.  I don't see why these

22  undisputed videos for both the defense and the government

23  shouldn't be admitted.

24          MR. SOSKIN:  Your Honor, that goes to the government's

25  position that this is a matter for review on an administrative

David Smith - By Mr. Soskin                    49

1   record and so that the appropriate actual matters in evidence

2   should be either the contents of that administrative record,

3   otherwise they are simply background information that the

4   agency was familiar with.

5          THE COURT:  Well, my concern is that I would love to

6   have the Appellate Court be in a position to view these videos

7   for -- I mean, is there any objection to the Appeals Court

8   looking at these for familiarity purposes, if nothing else?  I

9   have no authority to admit something or tell the Appeals Court

10  what to look at or what not to look at, that's for sure, but

11  for instance, the difference between a semi-automatic and how

12  the bump-stock fires semi-automatic verses automatic.  These

13  videos would be very instructive for someone who may be a

14  hunter and use a hunting rifle, but I don't know many people

15  who hunt with automatic weapons, at least not legally in the

16  United States, so --

17         MR. SOSKIN:  Your Honor, as a jurist who is familiar

18  with firearms, we believe the Court could take judicial notice

19  that a video such as the one linked here is illustrative of the

20  background principles that Mr. Smith described, but we would

21  hew to our position that the appropriate way of reviewing

22  plaintiff's challenge in this case --

23         THE COURT:  I don't deny that, I understand what your

24  position is.  I'm just saying that I would like to see these

25  videos be made available for the Court of Appeals to look at.

David Smith - By Mr. Soskin                    50

1    And so I don't see any objection for background information of

2    them looking at these videos should they choose to do so.  This

3    will be their decision.  Does anybody have any objection to

4    that?

5              MR. SOSKIN:  No, Your Honor.

6              MR. KRUCKENBERG:  No, Your Honor.

7              THE COURT:  So we'll send those up to the Court of

8    Appeals so they can look at them if they want without objection

9    from the parties, understanding that these are not evidence,

10   but they are in order to possibly familiarize them with the

11   operation of a bump-stock, a semi-automatic weapon, automatic

12   weapon, how they operate, okay.

13             MR. SOSKIN:  Yes, Your Honor.

14             THE COURT:  But I want to emphasize that I am not

15   suggesting for a second that I don't need it but the Court of

16   Appeals needs it or something of that kind.  It just so happens

17   that I happen to have a military background and I've operated

18   these weapons in my capacity in the Marine Corps and in the

19   Military Police Corps as a commissioned officer and there may

20   be Court of Appeals judges have tons more experience with these

21   weapons than I do, but there also may be a few Court of Appeals

22   judges who have not had a lot of familiarity with these kinds

23   of firearms even though they may be hunters and excellent

24   hunters.  As I said, you don't hunt with an automatic weapon,

25   so, you know -- and my son-in-law, by the way, who is over in

David Smith - By Mr. Soskin                   51

1   Iraq and was a machine gun operator over there in Afghanistan
2   as well knows a lot more about these weapons than I do, so I
3   mean everybody has a different level with them, so I do not
4   under any circumstances want to make that suggestion, but there
5   just may be somebody who would say to themselves, yeah, I'd
6   like to see what this looks like in operation.
7           MR. SOSKIN:  Your Honor, we can attach to our closing
8   argument submission an exhibit that lists the web addresses of
9   the publicly available videos.
10          THE COURT:  That would be a good way of doing it and
11  we'll do that, I guess.  You can do that with your videos as
12  well.  All right?
13          MR. KRUCKENBERG:  Yes, Your Honor.
14          COURTROOM DEPUTY CLERK:  Because they're not evidence,
15  right?
16          THE COURT:  They're not evidence.  And I think the
17  Court of Appeals -- look, these are very fine judges.  They
18  understand the difference between a demonstrative exhibit,
19  which we show to the jury all the time, and an exhibit which is
20  in evidence, they understand that difference, but sometimes
21  it's good to be able to see it so you understand what you're
22  reading and what you're hearing so you understand the arguments
23  of both sides and this is not, to be honest with you, a totally
24  uncomplex matter.  I mean, I had a mistaken belief, I had a
25  misunderstanding of how bump-stocks worked because I didn't

David Smith - By Mr. Soskin                    52

```
 1   have a familiarity with them and I have more than the average
 2   person's understanding of -- I was an enlisted Marine and,
 3   believe me, I had a lot of different weapons, but I never had
 4   one with a bump-stock.  I don't think they had bump-stocks back
 5   then.  Believe me, they didn't.  I was in the old days where
 6   the toughest thing we had to fire was one of these crack the
 7   barrel -- what are these things called?
 8            THE WITNESS:  M79, sir.
 9            THE COURT:  M79 grenade launcher.  I fired expert with
10   the M79 grenade launcher.  I thought it was a magnificent
11   weapon.  I could put one through a window, but I'm going to
12   tell you something, that was certainly no machine gun and it
13   certainly didn't have a bump-stock.  Looked like a shotgun
14   shell, big shotgun shell.  All right.
15            MR. SOSKIN:  Your Honor, just to clarify a statement
16   that I believe I heard the Court make a moment ago, I believe
17   there is evidence in the record that at least some commenters
18   asserted that they used bump-stock devices actually here in
19   Texas to hunt Feral hogs.  So there may on occasion be a
20   situation where these would be used for hunting.
21            THE COURT:  Okay, well, I assume that if anybody was
22   running around using a bump-stock for hunting Feral hogs, they
23   were taking the position they weren't machine guns because you
24   can't take a Thompson machine gun out at full automatic or an
25   M16 military rifle and go hunt hogs, even though we all
```

David Smith - By Mr. Soskin                    53

1   probably would like to see fewer hogs, Feral hogs running

2   around.  I don't think there's a state limit on hogs or even a

3   season for hogs.

4            MR. SOSKIN:  Can I have the next slide please?

5            THE COURT:  I have a neighbor that would like to take

6   a machine gun to hogs, darn things tear up his backyard all the

7   time.

8   BY MR. SOSKIN:

9   Q.  So if an automatic firearm isn't one that shoots at a

10  higher rate, because some people like Mr. Miculek can move

11  their finger really, really fast, what is an automatic firearm?

12  A.  An automatic firearm is a weapon which when the firing

13  cycle of operations is initiated, again that can be a

14  mechanical trigger, a button, a switch, however that cycle of

15  operations is initiated, has some self-regulating mechanism to

16  assist with that cycle of operation.  That may be a motor or it

17  may actually use energy in the cartridge through flowback,

18  recoil, short recoil, any one of those operations to extract a

19  cartridge, eject a cartridge, load the next cartridge, cock the

20  firing mechanism, whatever that may be, and actually fire

21  another cartridge and continue that cycle of operation until

22  something changes, either that initiation sequence is stopped

23  or the weapon malfunctions or runs out of ammunition.

24  Q.  What does that look like?

25  A.  I have a short video of an M16 automatic rifle being fired.

David Smith - By Mr. Soskin                    54

1      *(Video playing.)*

2          The shooter is loading ammunition, just loaded a round to

3      the chamber, you notice he pulls the trigger and holds it and

4      it fires until it's out of ammunition.  Again he's loading a

5      magazine full of ammunition, round to chamber, pulling the

6      trigger and as long as he holds it, it fires until it runs out

7      of ammunition.

8              MR. SOSKIN:  Go to the next slide please.

9      BY MR. SOSKIN:

10     Q.  What is the mechanical difference between semi-automatic

11     firearm you showed us earlier and the automatic firearm that we

12     just saw?

13     A.  If we can put back up the FBI animation, I will go through

14     that process on a AR15/M16 type firearm.  If you can change it

15     to the Colt full auto and switch it to auto.

16         You'll notice there's a green part on here, that is the

17     auto sear for an M16 type firearm.  That is what allows you to

18     fire an M16 full automatic.  Again the cycle of operation, I'll

19     let the video catch up here in a second.  As you have a loaded

20     round, you pull the trigger, the yellow hammer will fall, this

21     is a gas impingement type, it will drive the bolt carrier and

22     bolt back cocking the hammer.  Notice the hammer catches on the

23     auto sear, not on the disconnecter.  As the bolt carrier comes

24     forward and locks, it trips the auto sear allowing the hammer

25     to fall, so that as long as the trigger is held to the rear,

1   the weapon will continue to fire as long as it has ammunition

2   and does not malfunction.

3   Q.  So the principle mechanical differences between the AR15

4   and the M16, I believe the question the Court asked earlier,

5   what are those different parts?

6   A.  The mechanical difference is the auto sear, auto sear

7   spring and safety.

8   Q.  Only three significant parts that change from one to the

9   other?

10  A.  Yes.

11         MR. SOSKIN:  Next slide please.

12  BY MR. SOSKIN:

13  Q.  How does a bump-stock relate to an AR15 or semi-automatic

14  firearm?

15  A.  A bump-stock -- in this case a Slide Fire type bump-stock

16  is installed on an AR15 type firearm.  Part number 34, and this

17  is from one of the Slide Fire patents, it is called a bearing

18  surface, it is used to replace the traditional pistol grip.

19  Part number 72 is the bearing slideway which is part of the

20  chassis.  You see there it's the pistol grip and the part that

21  goes over the buffer tube.  Part 60 is the shoulder stock that

22  goes on the chassis.  And part number 82 is that U piece you

23  see behind the chassis and that actually contains the finger

24  rest.

25  Q.  When the receiver and upper assembly are installed on the

David Smith - By Mr. Soskin                    56

1   bump-stock, what part here do they rest on?

2   A.   They rest on the bearing surface and the upper assembly and

3   the buffer tube will actually go inside the chassis, the rear

4   of the chassis there.

5   Q.   When a Slide Fire slides, what is it that is sliding?

6   A.   It's actually the bearing surface on the bearing slide,

7   that part that goes onto the pistol grip actually slides inside

8   on the bearing surface part of that chassis.

9   Q.   Next slide.  So you have a bump-stock, how do you as the

10  shooter make use of it?

11  A.   With a bump-stock installed on an AR type firearm, you

12  would load the weapon, place the weapon on fire and as you put

13  the weapon up to your shoulder, you would need to press the

14  firearm all the way back into the bump-stock.  Once you have it

15  securely against your shoulder with the weapon all the way back

16  inside the bump-stock, you can then take your trigger finger,

17  put it into the trigger guard all the way across and you're

18  going to rest your finger on that trigger rest.  At this point

19  your trigger finger is operating basically as a post, it could

20  be replaced by a post and would function the same way.

21       With your off hand you're going to take a secondary grip,

22  whether that's the fore end, vertical grip, whatever it may be

23  and you're going to press the firearm forward.

24       While holding the shoulder stock end of your shoulder with

25  your right hand and your finger on the trigger rest -- sorry,

1   finger rest.

2      As you push the firearm forward with that secondary grip,

3   the mechanical trigger of the AR will actually come in contact

4   with your finger and the trigger will be pulled to the rear and

5   initiate the first fire.  Recoil impulse from actually firing

6   the cartridge, basic physics, you're sending a projectile in

7   one direction, you have an equal and opposite force will

8   actually move the receiver and upper assembly back along the

9   slideway inside the slide stock.  And while the shooter is

10  continuing to press forward, the shooter will eventually

11  overcome that recoil impulse pressing it back forward.  While

12  the receiver in upper assembly have slid back inside the slide

13  stock, it has performed its cycle of operations and the trigger

14  has reset because it has come out of contact with the shooter's

15  trigger finger.  At which point, as I said, when the shooter

16  can overcome that recoil impulse while continuing to press

17  forward will bring that trigger back in contact and fire the

18  next round.

19  Q.  Next slide please.  Does this show us what you just

20  described?

21  A.  Yes, this is a New York Times animation that shows this.

22  You can see the trigger finger is already across and on a

23  finger rest.  The shooter is pressing forward on that secondary

24  grip and you can see recoil impulse brings the receiver and

25  upper assembly back inside the Slide Fire bump fire stock

1    device bringing that mechanical trigger away from the shooter's

2    finger and then by continuing to press forward, it brings it

3    back in contact firing the next round.

4              MR. SOSKIN:  Your Honor, I note that this animation

5    appears in the administrative record as AR page 716.

6              THE COURT:  Thank you.

7    BY MR. SOSKIN:

8    Q.  Could you also describe the mechanical operation that is

9    going on and is reflected in this animation?

10   A.  The mechanical operation of the actual firearm itself, the

11   initiation sequence is actually pressing forward on that

12   secondary grip, that brings the trigger into contact with the

13   finger, mechanically that releases the hammer which hits the

14   firing pin, firing pin ignites the primer expelling a

15   projectile by the action of explosive from the powder inside

16   the cartridge.  AR type firearms are gas impingement, gas is

17   reported off into the gas key and inside the bolt carrier which

18   is then driven back unlocking the bolt and extracting,

19   ejecting, chambering the next cartridge and cocking the hammer.

20       During this time, recoil has moved the firearm back inside

21   the slide bump fire stock moving the mechanical trigger away

22   from the shooter's finger so that it can reset.  Continuing

23   pressure from the secondary grip pressing forward overcomes

24   that recoil impulse bringing the trigger back in contact with

25   the shooter's finger, releasing the hammer and starting the

David Smith - By Mr. Soskin                        59

1   cycle of operations over again.

2   Q.  When does it stop shooting?

3   A.  When the shooter stops pressing forward, removes their

4   finger or it runs out of ammunition.

5            MR. SOSKIN:  Can we advance to slide 17 please?

6   BY MR. SOSKIN:

7   Q.  Mr. Smith, earlier the Court asked whether it took an

8   experienced armorer to assemble a bump-stock and semi-automatic

9   firearm.  Could you tell us what this slide shows?

10  A.  This shows an AR15 type receiver and upper assembly and it

11  shows a slide fired type bump fire device.

12      As you can see, you have the small square which is what

13  replaces the traditional pistol grip.  And then the chassis

14  system goes onto that square and over the receiver extension or

15  buffer tube when you install it.  All it really takes is being

16  careful not to lose the safety detent and safety detent spring

17  and the ability to either use a screw or an Allen wrench to

18  install that small block in place of an AR15 pistol grip.

19  Q.  This slide depicts a Slide Fire device that ATF owns?

20  A.  It does.  This is the Slide Fire device I examined out of

21  the National Firearms Collection.

22  Q.  How long did it take you to put together this Slide Fire

23  with an AR15 receiver?

24  A.  It took me less than two minutes.

25  Q.  How long would it take an ordinary AR15 owner?

1    A.   I would expect that they could do it in five minutes or

2    less.

3    Q.   Next slide.  Once you put it together, this is the result?

4    A.   Yes, this is me actually firing the Slide Fire stock on an

5    AR15 out of the Natural Firearms Collection.

6    Q.   Show the video one more time.

7         *(Video playing.)*

8    A.   As you can see, I have it back in my shoulder, I have my

9    finger on the trigger rest, I press forward, and it fires until

10   I run out of ammunition.  That was 25 rounds.

11             MR. SOSKIN:  Thank you, Mr. Smith.  Nothing further.

12             THE COURT:  Cross-examination.

13             MR. SOSKIN:  Your Honor, if I could clarify one thing.

14             THE COURT:  Yes.

15             MR. SOSKIN:  The exhibit that we will submit with the

16   web links, that is in addition to our 20 pages of briefing?

17             THE COURT:  That's in addition to it.

18             MR. SOSKIN:  Thank you.

19                          CROSS-EXAMINATION

20   BY MR. KRUCKENBERG:

21   Q.   Good morning, Mr. Smith.

22   A.   Good morning, sir.

23   Q.   You testified on direct examination a little bit about your

24   background in your CV, right?

25   A.   Yes, sir.

David Smith - By Mr. Kruckenberg                    61

1   Q.  One thing that you and I discussed when we met was that

2   you're also a target shooter, isn't that right?

3   A.  That is correct.

4   Q.  And you actually compete in contests, right?

5   A.  Yes, I do.

6   Q.  You would consider yourself an expert marksman, is that

7   fair?

8   A.  I don't know if anyone ever really becomes an expert.

9   They're always trying to be better, but yes, I am a good

10  marksman.

11  Q.  Okay.  And I'm going to take your answer here as evidence

12  that you are an expert because you're being humble there about

13  your shooting ability.

14  A.  Thank you, sir.

15  Q.  Now, Mr. Smith --

16        THE COURT:  Let me ask you this question, Mr. Smith.

17  When you were in the Marine Corps, did you ever fire expert?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  There's your answer.

20  BY MR. KRUCKENBERG:

21  Q.  I know you testified about this on direct, you're very

22  familiar with all different types of firearms, correct?

23  A.  Yes, sir.

24  Q.  And you said you had done ATF classifications approximately

25  400 times in your career, is that fair?

David Smith – By Mr. Kruckenberg                    62

1   A.   Yes, sir.

2   Q.   And most of those classifications dealt with imported

3   firearms, right?

4   A.   Yes, the majority of ATF classifications are either on

5   criminal side for criminal prosecution or on the import side

6   for approving for importation.

7   Q.   And the process is basically the same for importation,

8   right, you get a firearm and then you're asked to test fire it

9   to see how it's classified under the laws, correct?

10  A.   Yes.

11  Q.   Now, you also test prototypes, right?

12  A.   That is correct.  Industry also submits prototypes for us

13  to examine and figure out where they fit under the law of rules

14  and regulations.

15  Q.   And when the ATF previously classified the Slide Fire

16  device, it was submitted as a prototype, right?

17  A.   I believe that is correct.

18  Q.   Okay.  And there is a standard operating procedure that the

19  ATF follows when it receives a prototype requesting a

20  classification, right?

21  A.   Yes.

22  Q.   And one of the requirements for ATF to be able to issue a

23  classification is that they actually have to receive the device

24  itself, right?

25  A.   That is correct.

David Smith - By Mr. Kruckenberg                    63

1   Q.  ATF cannot issue a classification based on just a drawing
2   or a description of the device, is that right?
3   A.  Correct.  Firearms enforcement officers must receive a
4   physical sample to actually give a formal classification.
5   Q.  And that process requires the examining officer, the
6   examining member of the ATF to take the prototype and test fire
7   it, right?
8   A.  That is part of the process, yes.
9   Q.  And when you say that you have done that, you've done that
10  say more than a hundred times, right?
11  A.  Yes, for different devices.
12  Q.  I'm going to show you what has been previously admitted as
13  Plaintiff's Exhibit Four.  And Mr. Smith, can you see that
14  document in front of you?
15  A.  Well, I can see the header, yes.
16  Q.  And I will just describe this briefly for you.  This is a
17  classification letter addressed to Mr. Rhodes from the ATF, is
18  that correct?
19  A.  That's what it appears to be.
20  Q.  Have you seen this document before?
21  A.  Yes, sir.  I don't remember all the details of it, but yes,
22  I have seen this document.
23  Q.  And this document is stamped at the top April 5th, 2007, is
24  that right?
25  A.  Yes, it says it was sent on April 5th of 2007.

David Smith - By Mr. Kruckenberg                64

1    Q.  And just going down to the bottom of the page of this

2    document, you might see an asterisk next to a paragraph that

3    starts "We caution", do you see that?

4    A.  Yes, sir.

5    Q.  And this classification letter memorializes what you were

6    talking about, it says that "We caution that FTB cannot make

7    classification of pictures, diagrams or theory", right?

8    A.  Yes, sir.

9    Q.  And that is consistent with your understanding of ATF's

10   process?

11   A.  That is correct.

12   Q.  Now, you testified on direct examination you've fired a

13   Slide Fire bump-stock, correct?

14   A.  That is correct, sir.

15   Q.  Have you fired any other types of bump-stocks?

16   A.  I have fired an Akins type device.

17   Q.  So let's talk about the Akins device.  That device has a

18   spring inside, doesn't it?

19   A.  The one I fired actually had two springs.

20   Q.  So an Akins type device, that is a form of a bump-stock,

21   isn't that right?

22   A.  Yes, it uses that bump fire principle as part of its

23   mechanical operation.

24   Q.  But the primary distinction between an Akins device and a

25   Slide Fire device is that it has those two springs you just

David Smith - By Mr. Kruckenberg                65

1  mentioned, isn't that right?

2  A.  Yes, it has two springs that press the fire control

3  mechanism and receiver back forward inside the stock.

4  Q.  And so when you're using an Akins device on a -- and you

5  mount it the same way, don't you, you mount it on a

6  semi-automatic firearm like an AR15?

7  A.  Yes, the one that I examined was actually mounted on a

8  Ruger 1022.

9  Q.  And so the device, Akins device is mounted on the

10  semi-automatic and it's a shoulder stock just like the Slide

11  Fire, right?

12  A.  Yes, sir.

13  Q.  And when the shooter fires it, the recoil of the firearm

14  drives it back towards the shooter's arm, right?

15  A.  Yes.  When the shooter pulls the trigger, the way the Akins

16  type device works is the stock is pressed into the shoulder,

17  pull on the trigger, that will actually initiate the firing

18  sequence.  The receiver and fire control mechanism will under

19  recoil slide back into the stock and the two springs will

20  actually drive the trigger mechanism and receiver back forward

21  into the shooter's trigger finger.  So you actually only need

22  one hand to fire and it will continue to fire until you remove

23  your trigger finger from the trigger guard or it runs out of

24  ammunition.

25  Q.  So instead of having to push forward with the non-shooting

David Smith - By Mr. Kruckenberg                    66

1   hand, the springs drive the device -- the weapon forward, isn't
2   that right?
3   A.   That is correct.
4   Q.   The Slide Fire obviously does not have a spring, right?
5   A.   That is correct.
6   Q.   And so that's what you mentioned about the pushing forward
7   with the non-shooting hand, right?
8   A.   Correct.
9   Q.   That is the primary distinction between those two devices?
10  A.   Yes.
11  Q.   Okay.  You testified earlier about the operation of a
12  machine gun, right?
13  A.   Yes.
14  Q.   And what we normally think of as a machine gun are things
15  like what Judge Ezra mentioned, Browning automatic rifle,
16  Thompson submachine gun, right?
17  A.   Those are types of machine guns, yes, sir.
18  Q.   Now, you understand that a weapon's trigger can be
19  initiated in more than one way, right, not just pulling the
20  trigger, is that fair?
21  A.   Yes, there are multiple ways of initiating that cycle of
22  operations.  Like an aircraft, it's a trigger on a joystick,
23  for some long-range precision firearms you enter a key on a
24  keyboard, for artillery pieces it's similar, there's an enter
25  key or lanyard, it may not necessarily be a physical trigger

David Smith - By Mr. Kruckenberg                    67

1    that you're pulling.

2    Q.  And when you say -- when you understand the term "single

3    function of a trigger", that's what you're referencing, the way

4    the trigger mechanism is initiated, is that fair?

5    A.  Yes.

6    Q.  Now, a machine gun is a device that will require once

7    there's an initial input it will fire until it's out of

8    ammunition without an additional input, isn't that right?

9    A.  It may require continued input.  As I showed in the M16

10   video, the shooter has to continue to pull the trigger.  Of

11   course, if they release the trigger, that would be another

12   input to stop the cycle of operation.

13   Q.  There are some machine guns, though, that don't require any

14   additional input, right?

15   A.  That is correct.

16   Q.  Like you mentioned, there are some that are button

17   operated, you hit the button and they just fire?

18   A.  Correct.  You hit the button, it will fire until you either

19   run it out of ammunition, it malfunctions or you do another

20   input, another press of a button to stop it from firing.

21   Q.  And the semi-automatic firearm is one that needs additional

22   input between rounds, isn't that right?

23   A.  Correct.  As I mentioned and as I showed with the AR15,

24   most semi-automatic firearms have some sort of disconnect so

25   that they will not continue to fire until the shooter does some

1   sort of secondary input.

2   Q.  And so when you were looking earlier at the AR15 when it

3   was semi-automatic firearm, if the shooter pulls back on the

4   trigger lever --

5   A.  Yes.

6   Q.  -- it will fire once, right?

7   A.  Correct, because the hammer will catch on the disconnecter.

8   Q.  And if the shooter continues to hold the trigger, doesn't

9   release it, it will not fire again, right?

10  A.  Correct, it should not.

11  Q.  And that it does so mechanically and that's the animation

12  you showed us, right?

13  A.  That is correct.

14  Q.  Now, I noticed on your CV the course where you received

15  training on historic firearms.  Do you recall that course?

16  A.  Yes.

17  Q.  And one of the firearms you received training on is

18  actually the Gatling gun, right?

19  A.  Correct.

20  Q.  Gatling gun is a weapon, and correct me if I'm wrong here,

21  where the shooter turns a crank basically and it fires

22  repeatedly, is that accurate?

23  A.  It depends on the type of Gatling gun.  For some types that

24  is correct.

25  Q.  Okay.  And a Gatling gun is not a machine gun, isn't that

David Smith - By Mr. Kruckenberg                    69

1   right?

2   A.  I don't believe I'm here to testify as far as actual

3   classifications.

4   Q.  Well, are you aware of what the ATF has classified a

5   Gatling gun?

6   A.  Some Gatling guns are not classified as machine guns, they

7   are classified as firearms.

8   Q.  And the reason they're not classified as machine guns is

9   because -- and I'm talking about the mechanical crank here, you

10  have to turn the crank and every time you turn the crank it

11  advances another round, isn't that right?

12  A.  Yes.

13          THE COURT:  Gatling gun covers a huge range of

14  weapons.

15          MR. KRUCKENBERG:  Yes.

16          THE COURT:  Are you talking about the kind of Gatling

17  gun they had in the 1860s and '70s where it was on a big wheel

18  cart and you would turn the crank or are you talking about a

19  modern Gatling gun you can find in the Army arsenal, the

20  Marines, the Air Force has them on jets?  They can fire

21  thousands of rounds a minute.  There's even something called a

22  mini gun.

23          MR. KRUCKENBERG:  Yes, Your Honor.  And I think I'm

24  making that distinction.

25  Q.  Mr. Smith, so we're clear, when I reference the Gatling gun

David Smith - By Mr. Kruckenberg                    70

1   that's what I'm talking about, the old trigger crank with the

2   entire barrel -- that has multiple barrels and they turn.

3          THE COURT:  Because the old Gatling gun didn't fire

4   actually very fast.

5          MR. KRUCKENBERG:  Yes, Your Honor.

6          THE COURT:  It just didn't.  I'm not offering evidence

7   here, but I think I can take judicial notice, I don't think

8   anybody would object.  I mean when you were cranking, that

9   thing was dut-dut-dut-dut-dut-dut-dut.  You could fire faster

10  with a Spencer repeating rifle.

11         MR. KRUCKENBERG:  I think we saw, Your Honor, you can

12  fire faster with a pistol if you're Mr. Jerry Miculek.

13         THE COURT:  I think the witness would agree with me

14  that an old style 1850 or 1860s Gatling gun --

15         THE WITNESS:  Yes, the way those operate is as you

16  turn the crank, it actually rotates the barrel and in rotating

17  the barrel the bolt actually runs on a slide within the

18  receiver.  So what actually happens is as you rotate the

19  barrel, the bolt comes back, extracts ejects the current

20  cartridge.  As it continues to rotate, it will strip the next

21  cartridge out of the magazine and as it goes all the way

22  forward it has a trip already set in the receiver so that as it

23  locks it will fire that next round.

24     Again as you rotate, turn the crank, it will remove that

25  bolt, pull it back, extract, ejects and as it goes forward it

David Smith - By Mr. Kruckenberg          71

```
1   will strip the next cartridge and when it gets forward and is
2   locked into place it will trip the firing mechanism and fire
3   the next round.
4   BY MR. KRUCKENBERG:
5   Q.  You mentioned something on your direct examination called
6   on auto sear, isn't that right?
7   A.  Yes, sir.  M16 has an auto sear in it.
8   Q.  That is a mechanical part of a machine gun, some machine
9   guns, that allows the weapon to continuously fire, isn't that
10  right?
11  A.  Correct.  It is the mechanical piece that allows it to
12  continue to fire automatically without further input from the
13  shooter.
14  Q.  And what it allows is when the shooter pulls back on the
15  trigger mechanism, engages the trigger, it allows the firing
16  pin to continuously strike another round, isn't that right?
17  A.  Mechanically what it does is it allows the hammer to
18  interact with the auto sear instead of interacting with the
19  disconnecter.  The disconnecter would keep it from shooting a
20  second round without the actual red part, the mechanical
21  trigger being released and then pulled again.  What it does, it
22  allows that hammer to be caught on an auto sear and as the bolt
23  comes home and locks, the rear of the bolt carrier trips it so
24  that the hammer falls, hits the firing pin, ignites the primer
25  and repeat the cycle of operation.
```

David Smith - By Mr. Kruckenberg                72

1  Q.  You agree that the rate of fire of a weapon does not

2  determine whether or not it is a machine gun, isn't that right?

3  A.  That is correct.

4  Q.  And that's why we watched the video earlier of the shooter

5  who can fire a semi-automatic very quickly, right?

6  A.  That is correct.

7  Q.  Now, just talking about the Slide Fire itself, it's a

8  basically a piece of plastic, isn't that right?

9  A.  It's several pieces of plastic and rubber yes, sir.

10 Q.  And as you mentioned, there are no internal springs in the

11 Slide Fire, right?

12 A.  Not in the one I examined and not described in any of the

13 patents I examined.

14 Q.  And it has no other mechanical components to it, does it?

15 A.  It has the slideway that attaches where the pistol grip

16 would go and then the chassis system to which everything else

17 attaches.

18 Q.  And you'll agree with me that when you install a Slide Fire

19 on a semi-automatic firearm, you don't change any of the

20 trigger mechanisms, the auto sear or the hammer or anything

21 like that, is that correct?

22 A.  Correct.

23 Q.  And so it doesn't remove a semi-automatic firearm's

24 disconnecter, right?

25 A.  Correct, it does not.

David Smith - By Mr. Kruckenberg          73

1  Q.  And it doesn't add an auto sear, right?

2  A.  No, it does not.

3  Q.  And so -- I'll move on.

4     Now, you agree with me also that the ATF previously

5  examined the Slide Fire device and issued a classification,

6  right?

7  A.  Yes, it did.

8  Q.  And the original classification was that a Slide Fire was

9  not a machine gun, right?

10  A.  The original classification I believe was that it was an

11  accessory.

12  Q.  Now, the ATF's current understanding is that the Slide Fire

13  device itself is a machine gun, isn't that right?

14  A.  I'm not here again to give technical classifications.

15  Under the current rules and regulations as I understand them,

16  yes, it would be.

17  Q.  And that's independent of whether it's attached to another

18  firearm, isn't that right?

19  A.  Correct.  Under my current understanding of the rules and

20  regulations, it's an accessory designed and intended to convert

21  a semi-automatic weapon to fire automatically.

22  Q.  Mr. Smith, I'm going to show you a video that's been

23  admitted as Plaintiff's Exhibit Two.  And before we get into

24  it, Mr. Smith, have you seen this video before?

25  A.  From that screen, I don't know if I have or not.

David Smith - By Mr. Kruckenberg                74

1  Q.  Can you see the video in front of you?

2  A.  Yes, I can.

3     *(Video playing.)*

4  Q.  So Mr. Smith, I'm going to stop the video here for about 12

5  seconds in and we're looking at an AR15 type rifle, isn't that

6  right?

7  A.  It would appear so.

8  Q.  And looking at this video, it also appears that there is a

9  Slide Fire bump-stock attached to that rifle, isn't that right?

10 A.  Yes, sir.

11 Q.  And if you look at the stock itself, if you look at the

12 shooter's cheek here, if you look down, you can see what's

13 called the selector knob, isn't that right?

14 A.  Yes, sir.

15 Q.  One of the features of the Slide Fire is that it has a knob

16 on the stock that allows the shooter to either lock it in place

17 or unlock it, isn't that right?

18 A.  On some of the later versions, yes, sir.

19 Q.  And when you lock it in place, the stock operates just like

20 a normal semi-automatic firearm, isn't that right?

21 A.  Yes, as long as you do not engage the finger rest.

22 Q.  And when you unlock it, the Slide Fire slides back and

23 forth, right?

24 A.  The receiver and upper assembly slide back and forth inside

25 the Slide Fire chassis system, yes.

1    Q.  And that is essentially how a bump-stock works is it allows

2    this sliding back and forth while they're shooting, isn't that

3    right?

4    A.  Yes.

5    Q.  Hence the name Slide Fire, right?

6    A.  I believe so, I don't have any evidence as to exactly how

7    they came up with the name.

8    Q.  Fair enough.  So if we look at this video, this is a

9    high-speed video showing the stock in the locked position.  And

10   you'll agree with me looking at this video this is a normal

11   semi-automatic fire, isn't that right?

12       *(Video playing.)*

13   A.  Yes, sir, you can see that he has to move his trigger

14   finger forward to allow the trigger to reset before he fires

15   again.

16   Q.  So we're at about 36 seconds into this video and there's a

17   close-up here on what's happening with the trigger finger, do

18   you see that?

19   A.  Yes, sir.

20   Q.  So you'll agree with me that the shooter here is he's

21   pulling the trigger and when he pulls the trigger it -- the gun

22   fires a round, right?

23   A.  Yes, sir.

24   Q.  And just as that's happening, you can actually see the

25   magazine is transparent, you can see another round coming up,

David Smith - By Mr. Kruckenberg                76

```
 1   isn't that right?
 2   A.  Yes.  You can see the bolt go to the rear, you can see it
 3   extract, eject, you can see it chambering the next round.
 4   Q.  And if you look at his trigger finger, we can see he's
 5   pulling back on the trigger and then we see at some point his
 6   finger coming forward and the trigger mechanism reset.  And if
 7   you look at I think it was 104, again this is a high-speed
 8   camera, you actually see his finger bounce, can't we?  I'll
 9   play it again.
10       (Video playing.)
11       Did you see his finger bounce when it came back?
12   A.  Yes, as he released it, you can see that his trigger finger
13   moved.
14   Q.  And that would be what happens when the trigger mechanism
15   is resetting, isn't that right?
16   A.  Yes, the trigger actually has to pivot on the trigger pin
17   and actually move forward to reset onto the sear surface with
18   the hammer.
19   Q.  And for the firearm to reset like that, his finger has to
20   come out of contact or he has to release the trigger, doesn't
21   he?
22   A.  He has to allow the trigger to move forward a certain
23   amount.
24   Q.  Because if he just holds it back, it won't reset?
25   A.  Correct, if he continues to hold it back, the hammer will
```

David Smith - By Mr. Kruckenberg                77

1   stay on the disconnecter until he allows the trigger to rotate
2   forward a certain amount.
3   Q.   I'm going to fast forward this video a little bit.
4        *(Video playing.)*
5        I'm going to stop the video here, we're at about three
6   minutes and 19 seconds into the video.  This shows, according
7   to the video, bump fire intended use, do you see that?
8   A.   Yes, sir, I see it on the left-hand corner.
9   Q.   And we just watched a very brief clip that appeared to be
10  bump fire, isn't that right?
11  A.   I honestly didn't catch enough of it.
12  Q.   Let me go back slightly so that you can see it.  Looking at
13  the video, we're about 2:20 now and it's again high-speed
14  image, you'll agree with me that that is bumped firing that
15  we're seeing?
16  A.   Yes, sir.
17  Q.   And this is what happens when the shooter now has unlocked
18  the stock and allows it to operate as a bump-stock, right?
19  A.   Yes, sir.
20  Q.   And if we're looking at the mechanism here, this is
21  somewhat similar to the video you showed of yourself firing a
22  Slide Fire, right?
23  A.   Yes, sir.
24  Q.   So we look at his non-shooting hand, in this case his left
25  hand, it's on the barrel, right?

David Smith - By Mr. Kruckenberg                    78

1   A.   It's on the fore grip, yes.

2   Q.   On the fore grip.  And you'll agree with me he's pushing

3   forward with his hand on the fore grip, right?

4   A.   Yes, sir.

5   Q.   And as we watch the video, here is a close-up at 3:35, we

6   can see the trigger mechanism, right?

7   A.   Yes, sir.  You can see the trigger.

8   Q.   So let me play the video briefly.

9        (Video playing.)

10       So at 3:47 we have another angle and I'm going to stop it

11  here.  Here in this video, we can see the trigger ledge, right?

12  A.   Yes, the finger rest.

13  Q.   The finger rest.  And we see the shooter's trigger finger

14  is resting on that rest, right?

15  A.   Yes, sir.

16  Q.   That's one of the parts of the Slide Fire?

17  A.   That is correct.

18  Q.   When the weapon fires and the recoil drives the weapon back

19  and slides back into the shooter's shoulder, his trigger finger

20  loses contact with the trigger lever, doesn't it?

21  A.   Yes, it does.

22  Q.   And that creates some amount of space between the trigger

23  lever and the shooter's trigger finger, right?

24  A.   Correct.

25  Q.   And that is what allows the trigger mechanism to reset,

1  right?

2  A.  Yes.  As I said, the firing sequence is initiated by

3  pressing forward on the secondary grip with the shooter's

4  trigger finger as you can see on the trigger rest, that brings

5  the mechanical trigger in contact with the shooter's finger.

6  The recoil impulse, basically the physics of firing a round

7  will drive the receiver and upper assembly back inside the

8  Slide Fire or bump fire type device far enough to allow the

9  mechanical trigger to reset and eventually the shooter will be

10  able to overcome that recoil impulse by continuing to press

11  forward bringing it back into -- that mechanical trigger back

12  in contact with the trigger finger firing the next round.

13  Q.  I'm going to back up slightly.  I'm going to show you just

14  a brief portion of this video starting at three minutes 45

15  seconds.  And I'll ask you to just look at the trigger finger

16  here.

17      *(Video playing.)*

18      It was pretty quick there, but it was about three minutes

19  47 seconds.  Looking at the trigger mechanism, the lever coming

20  down from the trigger, you actually see that bounce as it

21  resets, don't we?

22  A.  You see it move forward.

23  Q.  Move forward.

24  A.  Yes, it rotates forward on that pivot pin.

25  Q.  And it locks into place, right?

David Smith - By Mr. Kruckenberg                    80

1   A.  Yes.  What you're actually seeing is when it's pulled to

2   the rear, of course that releases the hammer off the front sear

3   surface, hammer catches on the disconnecter.  As the trigger,

4   the body itself moves forward, that moves the disconnecter out

5   of contact with the hammer and the hammer resets on that front

6   sear surface of the trigger.

7   Q.  You'll agree with me that you cannot shoot a Slide Fire --

8   a weapon equipped with a Slide Fire bump stock with one hand,

9   isn't that right?

10  A.  Without the more modern Slide Fire type devices locked in

11  place, it would move back in the stock and the way the trigger

12  area is formed, you can't reach far enough to pull the trigger.

13  Q.  And I guess what I mean is when we're talking about bump

14  firing, what you showed in your video, right, you could only do

15  that using both hands, right?

16  A.  Yes.

17  Q.  And I think you testified when you're bump firing, if you

18  stopped doing one of three things it stopped shooting.  You

19  said if you stopped pressing forward, you stopped pulling

20  rearward or the weapon runs out of ammunition, right?

21  A.  I said you can call it pulling rearward, but you're just

22  typical holding the stock in your shoulder, you really don't

23  have to pull to the rear.  Pressing forward which is your

24  initiator, if you stop pressing forward, if you remove your

25  trigger finger or if it runs out of ammunition.

David Smith - By Mr. Kruckenberg                81

1   Q.  And if you stopped any of those things, it stops firing,

2   right?

3   A.  Correct.

4   Q.  You said you don't have to pull rearward, right, but you do

5   have to hold your finger on the trigger ledge, right?

6   A.  Yes, you do.

7   Q.  You also have to hold the weapon, don't you?

8   A.  Yes.

9   Q.  So you would have to hold it against your shoulder?

10  A.  A little bit, yes.

11  Q.  Otherwise it would sort of go all over the place, right?

12  A.  It would, but the Slide Fire type device as long as you

13  hold your finger on the trigger ledge and are pressing forward,

14  you would still bump fire the weapon.

15          THE COURT:  Let me ask you a question.  Let's say that

16  you're comparing an AR15 with a bump-stock --

17          THE WITNESS:  Yes, sir.

18          THE COURT:  -- properly installed to what we've

19  described as the equivalent which is an M16 switched on to full

20  automatic.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Are there any operational -- I mean I

23  understand the mechanics are different as to how, but let's say

24  if you're firing an M16 on full automatic, in order to continue

25  to fire full automatic you have to continue to keep your finger

David Smith - By Mr. Kruckenberg                  82

1    down on the trigger, is that right?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  If you take your finger off, you're going

4    to stop firing.

5              THE WITNESS:  Yes.  On M16 as long as you pull the

6    trigger to the rear and the selector is in the automatic

7    position and you have ammunition, it will continue to fire.

8              THE COURT:  Right.  So the difference between the

9    bump-stock is that you wouldn't have your hand on the trigger,

10   you'd have your hand on what we call the finger rest or the

11   trigger ledge or something?

12             THE WITNESS:  Yes, sir.  As I said --

13             THE COURT:  And you would just have to keep your --

14   instead of keeping the trigger pulled, you would pull back

15   the -- what do you call it?

16             THE WITNESS:  The secondary grip, sir.

17             THE COURT:  The secondary grip.

18             THE WITNESS:  Whether that be fore end secondary grip.

19             THE COURT:  And then it would fire continuously until

20   you let that go.

21             THE WITNESS:  You're actually pushing forward.

22             THE COURT:  Pushing forward, and that would continue

23   to fire continuously until you either released it or let it

24   fall back.

25             THE WITNESS:  Yes, sir.  Mechanically, as I said, you

David Smith - By Mr. Kruckenberg                83

1    could replace your trigger finger on a Slide Fire bump fire

2    type device with a post and it would operate the same.  What

3    starts the firing sequence is that pressing forward.

4            THE COURT:  So basically the pressing forward on the

5    bump-stock AR15 is the equivalent of pulling the trigger on the

6    military version of that rifle, the M16 in full automatic.

7            THE WITNESS:  That is correct, sir.

8            THE COURT:  Okay.  You can continue.  Just wanted to

9    make sure I clarified that in my own mind.

10           MR. KRUCKENBERG:  Yes, Your Honor.

11   BY MR. KRUCKENBERG:

12   Q.  And when you're talking about pushing forward with a

13   bump-stock, M16 with a bump-stock, when the shooter is

14   continuously pushing forward, the trigger mechanism still

15   resets between each round, doesn't it?

16   A.  The physical trigger mechanism, yes, it is actually going

17   through the full cycle operation of pressing against the

18   trigger finger, at which point it is pivoted back, releasing

19   the hammer, connecting with the disconnecter as, you know, the

20   receiver and everything is sliding back.  As the physical

21   trigger comes out of contact with the trigger finger, that

22   allows it to pivot forward, the hammer resets on the sear

23   surface.

24   Q.  And with the hand that's pushing forward, you'll agree with

25   me looking at the video of you firing, your hand isn't

David Smith - By Mr. Kruckenberg                84

1   stationary, is it?

2   A.  No.  As I mentioned, it's physics, when you fire a round

3   the weapon recoils.  The weapon recoils faster than you can

4   react.  That is part of how the bump fire system works is that

5   you are attempting to continually press forward, but the recoil

6   impulse overcomes your ability to press forward, moves the

7   firearm back inside the stock and mentally you're doing nothing

8   but pressing forward and so it brings it back in contact with

9   your trigger finger and fires again.

10  Q.  So the action when we're looking at it because of the

11  recoil, the firearm goes back against the shoulder and then we

12  see the forward hand, the non-shooting hand pushing it forward?

13  A.  Yes.

14  Q.  And that continuous pushing forward, that's the mechanism

15  that allows it to be fired again?

16  A.  Yes.

17  Q.  Because you're pushing the trigger into your stationary

18  finger?

19  A.  Yes, in effect you have moved the initiation of the firing

20  sequence from the mechanical trigger to that pushing forward

21  motion.

22  Q.  You will agree with me that a bump-stock Slide Fire doesn't

23  change the distance forward that the trigger lever has to move

24  to be reset, right?

25  A.  No, it does not.

David Smith - By Mr. Kruckenberg                      85

1    Q.  You'll also agree with me that firing a bump-stock, it's

2    difficult, right?

3    A.  For --

4            MR. SOSKIN:  Objection.

5            THE COURT:  I'm going to sustain that objection.

6    That's too vague.

7    BY MR. KRUCKENBERG:

8    Q.  Let's put it this way.  You're an expert marksman, right?

9    And you've fired a bump-stock?

10   A.  Yes, sir.

11   Q.  And the first time you ever fired a bump-stock, did it come

12   naturally?

13   A.  No, it did not.  My natural shooting position, you're

14   pulling everything into your body and locking your bone

15   structure for support.

16   Q.  And you'll agree with me that it is not a very accurate way

17   to fire, isn't it?

18   A.  Not particularly.

19   Q.  Essentially you have to learn how to use a bump-stock in

20   this fashion, don't you?

21   A.  Yes, as you would learn any mechanical device.

22   Q.  But it's not natural when -- at least according to what

23   you're used to when you fire a weapon, isn't that fair?

24   A.  Compared to most of the weapons I fire, that is correct.

25   Q.  Okay.  You're familiar with bump firing as a shooting

David Smith - By Mr. Kruckenberg                86

1    technique, right?

2    A.  Yes, I am.

3    Q.  And that's where someone is firing a semi-automatic weapon

4    without a bump-stock, but they're simulating this kind of fire,

5    right?

6    A.  That is correct.

7    Q.  Sometimes people use belt loops to do it, right?

8    A.  Yes, sir.

9    Q.  Where they'll hook their finger through a belt loop and

10   then put the gun into the finger?

11   A.  Yes, sir, typically when an individual is bump firing

12   without some sort of accessory, they're finding some way to

13   lock or hold their hand into a particular position, whether

14   it's using a belt loop, whether they can just physically lock

15   their arm enough and then by pressing forward on a secondary

16   grip they're doing the same thing, they're allowing that weapon

17   to bounce back and forth.  They just don't have a stock for it

18   to slide in.  It's more difficult than using a bump-stock, but

19   it can be done.

20   Q.  And you can do it with no accessories, right?  Some people

21   can just fire a semi-automatic weapon like that?

22   A.  Yes, sir.

23   Q.  And they hold it loosely and they create the same

24   separation with their finger and the trigger mechanism, right?

25   A.  Yes, sir, typically they hold it away from their shoulder,

David Smith - By Mr. Kruckenberg                    87

1    that way the weapon can recoil and not contact anything.  As I
2    said, you fix your trigger finger in place.  You can do it
3    physically if you've practiced it enough, just lock your arm
4    and trigger finger in place and then again press forward on
5    secondary grip.  It will move the firearm into your trigger
6    finger far enough that the trigger is pulled and it initiates
7    the firing sequence.  At which point again just like with the
8    bump-stock recoil will move the entire receiver firearm
9    assembly back.  And by continuing to press forward, you get
10   that bump back and forth allowing the mechanical trigger to
11   reset continuing the firing sequence by pressing forward.
12   Q.  And you'll agree with me that when someone is bump firing
13   by hand, they're not pulling the trigger between each shot,
14   right?
15   A.  Correct.  As I said, they're locking their finger in place,
16   basically turning their finger into a post.
17   Q.  Are you aware if the ATF has classified the act of bump
18   firing as being a machine gun?
19   A.  As far as I know, they have not.
20   Q.  Mr. Smith, I have no further questions for you.  Thank you
21   very much.
22           THE COURT:  Any redirect?
23           MR. SOSKIN:  Your Honor, can I confer with opposing
24   counsel?
25           THE COURT:  Sure, of course.

1        *(Discussion off the record.)*

2        MR. SOSKIN:  Your Honor, I just have a couple more

3   questions for Mr. Smith.  Before I make those questions, I did

4   want to highlight for the Court that Plaintiff's Exhibit Two

5   is, in fact, a part of the administrative record as described

6   at page 17 of the brief we filed before trial.  It is in the

7   administrative record through a link at administrative record

8   3318.  So that video, Plaintiff's Exhibit Two, is properly a

9   part of the administrative record in the case should the Court

10  wish to refer to it.

11       THE COURT:  All right.  Thank you.

12       MR. SOSKIN:  In addition, my colleague, Mr. Glover,

13  had flagged for Your Honor the possibility that the parties

14  might want to provide some argument on legal issues not covered

15  by the testimony here.  In light of what we have covered in

16  today's testimony, plaintiff counsel and I discussed and we

17  believe that if the Court has questions about any of those

18  other legal issues, it might be appropriate to address those in

19  another proceeding somewhere down the road rather than having

20  disconnected argument today.  And instead we would embrace your

21  suggestion that we proceed to written closing argument.

22       THE COURT:  All right.  Are you happy with that?

23       MR. KRUCKENBERG:  Yes, Your Honor.

24       THE COURT:  I don't want to force anybody.  I'm

25  willing to come back after lunch.

1          MR. KRUCKENBERG:  No, Your Honor, I think what

2    Mr. Soskin said makes a lot of sense.  We certainly have the

3    factual arguments that I think are amenable to the written

4    closing.

5          THE COURT:  Right.

6          MR. KRUCKENBERG:  But then --

7          THE COURT:  I would agree with you.  I mean I don't

8    see that there's a huge benefit to doing it, but I'm willing to

9    allow you to.

10         MR. KRUCKENBERG:  I agree.

11         THE COURT:  He agrees.  That's the bottom line.

12                        REDIRECT EXAMINATION

13   BY MR. SOSKIN:

14   Q.  Mr. Smith, I just have a couple more questions for you.

15   Mr. Kruckenberg talked to you about the difficulty involved in

16   firing a bump-stock, firing a semi-automatic equipped with a

17   bump-stock.  Do you recall that testimony?

18   A.  Yes, sir.

19   Q.  And he also asked you if you're familiar with bump fire

20   without a bump-stock?

21   A.  Yes, sir.

22   Q.  Is firing a bump fire without a bump-stock something that

23   you have also performed?

24   A.  Yes, I have.

25   Q.  And in your experience, how would you compare the level of

David Smith - By Mr. Soskin                    90

1   difficulty for bump firing with and without a bump-stock?

2   A.   It is much more difficult to bump fire a weapon without a

3   stock or without some sort of additional accessory compared to

4   firing with a bump-stock.

5   Q.   In Plaintiff's Exhibit Two, we looked at a Slide Fire model

6   in which you could select to shoot semi-automatic fire as well

7   as to bump fire.  Do you recall looking at that in the video?

8   A.   Yes, I do.

9   Q.   What is the current model of M16 used by the military?

10  A.   I know we're past the M16 A4, I don't know exactly which

11  version they're using currently and it also depends on the

12  service.

13  Q.   There are various models of M16s the military has used over

14  time, M16 A2, M16 A3, M16 A4, is that right?

15  A.   Yes, sir.

16  Q.   On those models is there a way to fire those models just as

17  semi-automatic rifles?

18  A.   Yes, the selector on M16 M4s allows you to have a safe

19  function, a semi and a full auto or three-round verse depending

20  on the model.

21  Q.   So although an M16 of those models, an M16 A2, an M16 A4 is

22  an automatic rifle, it has a semi-automatic firing mode, is

23  that right?

24  A.   Yes, it does.

25          MR. SOSKIN:  Thank you, Mr. Smith.  That's all I have.

 1          MR. KRUCKENBERG:  Nothing further, Your Honor.

 2          THE COURT:  All right.  Thank you very much,

 3   Mr. Smith.  You can step down.

 4          THE WITNESS:  Thank you, sir.

 5          THE COURT:  All right.  I don't know that we ever got

 6   an answer from you about what you would like the Court to do or

 7   what your position is with respect to the matter of finding,

 8   legislative rather than regulatory, but I'm sure we'll hear

 9   about that in closing argument, okay, so remember it's due

10   October the 1st.  It will be simultaneously filed.  We're not

11   going to do a ping-pong thing here.  There's no need for it in

12   this case at all.  Everybody knows what the issues are, you've

13   all litigated this before extensively.  I'm just one in a line

14   of judges you've been before with this matter in different

15   forums.  If in going through the matter and after I have

16   received your closing argument I am still concerned that I

17   don't have all of -- I don't have complete clarity on what your

18   various arguments are, I may, I may call you back for brief

19   question and answer oral argument, if you will.  I don't think

20   I'm going to need to do that, but I just wanted to alert you to

21   it.  I am the last person in the world to think that I have all

22   the answers.  You have been working on these cases for a long

23   time and you know them inside and out and I think any trial

24   judge who tells you that they know your case better than you do

25   either is delusional or there are really terrible lawyers in

1    the case.  I'd like to think I'm not delusional and I know that

2    the latter is not correct, you're all very good lawyers and

3    I've enjoyed having you here.  So there may be some issues here

4    that I may need some further clarification on, I don't know.  I

5    have to read your closing argument.  I think I pretty much

6    understand where you're coming from, each of you.  This is by

7    no means an easy case.  I mean, it isn't an easy case.  It's

8    one of these cases where when you first look at it you think,

9    oh, I think I know how this should come out.  Let's see.  And

10   then you get into it and you go wait a minute.  It's like

11   walking into a hall of mirrors, there's just a lot of facets to

12   it and every time you look down one, you think you found your

13   way out, you run into a wall and you've got to look over here.

14   There are some cases that I've had where it's been pretty clear

15   to me what the right answer was after I looked at the parties'

16   documents.  This is not one of those cases.

17            This is one of those cases where the legal issues

18   and -- I mean, I understand how the bump-stock works, I

19   understand how it works.  That's not the problem.  The problem

20   is how does the bump-stock interplay with the definition of a

21   machine gun.  That's the crux of this case I think we would all

22   agree, and that isn't so easy.  Now, each side, of course,

23   thinks, What is he talking about?  Of course it's easy.  We

24   know what the answer is.

25            I once had a conversation with my late friend, Justice

1    Scalia, who used to come to Hawaii and he would come for the

2    jurist residence program and he and I were on panels together

3    and he had a great sense of humor and he used to say all the

4    time, Yeah, everything is easy until you look at it and then

5    maybe it isn't so easy.

6            So this is not an entirely easy case, I've got to look

7    at it very carefully.  I'll tell you my statement now will show

8    you that I'm not delusional, all right.  Unless between the

9    time that I make my decision and the time for you to appeal,

10   the Supreme Court issues a definitive ruling on this, this case

11   will be appealed, okay, and I fully understand that.  So I

12   definitely need to make sure that I do the right thing here

13   from my perspective, I always try to do that, but also do it in

14   a way that makes it very clear to the Court of Appeals where I

15   was coming from and why I ruled the way I did.  And if they

16   disagree with me, that's the system.  That's the way it's

17   supposed to work.  I hope they would agree with me, but they

18   may not, you know.  And I don't think it means I'm a terrible

19   judge.  It means that they just disagree with me, I mean, what

20   can I say?  Okay, I think we can close the record.

21           *(11:36 a.m.)*

22                        *    *    *

23

24

25

BENCH TRIAL PROCEEDING                          94

1                          *   *   *   *   *

2  UNITED STATES DISTRICT COURT

3  WESTERN DISTRICT OF TEXAS

4

5       I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.  I

7  further certify that the transcript fees and format comply with

8  those prescribed by the Court and the Judicial Conference of

9  the United States.

10

11  Date signed:  September 23, 2020

12

13  /s/ Angela M. Hailey

14  Angela M. Hailey, CSR, CRR, RPR, RMR
    Official Court Reporter
15  655 East Cesar E. Chavez Blvd., Third Floor
    San Antonio, Texas  78206
16  (210)244-5048

17

18

19

20

21

22

23

24

25