IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHAEL CARGILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 1:19-cv-349 |
| | ) | |
| WILLIAM P. BARR, | ) | |
| IN HIS OFFICIAL CAPACITY AS | ) | |
| ATTORNEY GENERAL | ) | |
| OF THE UNITED STATES, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>DEFENDANTS' CLOSING ARGUMENT BRIEF</u>**

Pursuant to the Court's instructions at the September 9, 2020 bench trial in this matter,

Defendants submit this brief providing their closing argument on the matters in this case.

## <u>TABLE OF CONTENTS</u>

OVERVIEW ........................................................................................................................... 1

I.   A BUMP STOCK IS A MACHINE GUN. ..................................................................... 2

A.   A Bump Stock Fires More Than One Shot By a Self-Acting Mechanism After the
Shooter Initiates Fire By Pulling the Trigger Once. ............................................................. 2
B.   The Rule Gives the Terms "Single Function of the Trigger" and "Automatically"
Their Ordinary, Accepted Meaning. ..................................................................................... 3
1.   "Single Function of the Trigger" Means "Single Pull of the Trigger". ........................... 3
2.   "Automatically" Means Resulting From "A Self-Acting or Self-Regulating
Mechanism.................................................................................................... ……………….....6
C.   Plaintiff's Arguments That a Bump Stock is Not a Machine Gun Should Be
Rejected……………….................................................................................................. …...8

D.   The Rule Reasonably Distinguishes Between Bump Stocks, Other Weapons, and
Other Methods of Bump-Firing a Weapon……………………………….…...…...11

II.   THE RULE IS INTERPRETIVE, NOT LEGISLATIVE, AND IS THEREFORE NOT
UNLAWFUL. ....................................................................................................................... 13

A.   The Rule is Interpretive …………………………………………………...……13
B.   If The Court Concludes The Rule Is Legislative, Not Interpretive, It Should Determine
Whether the Agency Has Legislative Authority to Issue The Rule ……. ..………...16
C.   Deference Under *Chevron* Is Not Needed Because the Rule Sets Forth The Best
Interpretation of the Statute. ............................................................................................... 17

III.   THE RULE IS NOT ARBITRARY OR CAPRICIOUS UNDER THE APA. .............. 17

A.   The Rule Properly Reflects Input From Elected Officials. ........................................ 18
B.   The Rule Properly Explains the Department's Change in Course. ............................. 18
C.   The Rule Properly Reflects Agency Expertise and Thoroughly Considers the Relevant
Evidence............................................................................................................................... 19

CONCLUSION....................................................................................................................... 20

## OVERVIEW

A bump stock transforms an ordinary semiautomatic weapon into a machine gun by enabling a shooter to initiate fire by pressing forward on the fore-grip or barrel shroud with the non-trigger hand, while affixing the trigger finger to a "trigger ledge" that immobilizes that trigger finger while it activates the trigger repeatedly.  Once this firing process is initiated, the firearm will continue to fire until its ammunition is exhausted or the shooter chooses to cease firing by releasing the forward pressure.  This makes a bump stock a machine gun, as illustrated in the administrative record and the videos, animations, diagrams, and descriptions presented at trial through the expert testimony of David Smith, a Firearms Enforcement Officer ("FEO") at the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

The Rule challenged here, *Bump-Stock-Type Devices*, 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Rule"), correctly categorizes a bump stock as a machine gun.  The Rule correctly interprets the phrase "single function of the trigger" in 26 U.S.C. § 5845(b)—the statutory definition of "machinegun"—to mean a "single pull of the trigger or analogous motions."  The Rule also correctly interprets "automatically" in the statutory definition to mean "as the result of a self-acting or self-regulating mechanism."  And the Rule accurately explains how a bump stock supplies a self-acting or self-regulating mechanism that enables a firearm to fire continuously, more than one shot, once the shooter initiates fire through a single pull of the trigger.

This is the core of what is at issue in this case.  Because Defendants correctly interpreted the statutory definition to conclude that a bump stock is a machine gun, the Court can readily dispense with the remaining legal arguments set forth in Plaintiff's Complaint and briefing, and proceed to enter judgment in favor of Defendants.

## I.      A BUMP STOCK IS A MACHINE GUN

### A.      A Bump Stock Fires More Than One Shot Through a Self-Acting Mechanism After the Shooter Initiates Fire With a Single Pull of the Trigger.

The very purpose of a bump stock is to translate a single pull of the trigger into a continuous series of shots, through the assistance of the stock itself, the firearm's recoil energy, and the shooter's continuing pressure on the trigger ledge and fore-grip or barrel shroud.  During the trial, Mr. Smith illustrated this action in describing Exhibit G-02, an animation described in the administrative record as a "great animation for understanding bump-stocks."  AR000716, Ex. G-02 at slide 13; Tr. at 57-58.



(linking to https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html, last visited Sep. 23, 2020).  As this and other elements of Mr. Smith's presentation demonstrate, a bump stock produces automatic fire by a "single function of the trigger," because when the shooter applies forward pressure to cause a pull of the trigger, operating the device as designed, the weapon discharges more than one shot through a self-acting mechanism that does not cease until ammunition is exhausted or the shooter chooses to release the forward pressure.

Mr. Smith's testimony complements the description provided in the Rule itself:

> when a shooter who has affixed a bump stock to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot. And that firing sequence is ''automatic'' because the device helps the shooter harness the firearm's recoil energy in a continuous back-and-forth cycle

that allows the shooter to attain continuous firing after a single pull of the trigger, so long as the trigger finger remains stationary on the device's ledge (as designed) [and the shooter maintains continuous forward pressure on the device].

83 FR 66519; *see* Tr. at 45-46; 56-57.  The patent application of Slide Fire Systems, the manufacturer of Plaintiff's bump stock device, reinforces this account.  *See* Exhibit G-13, AR000388.  Slide Fire's patent application explained that the company's bump stocks "attach[] to the firing unit portion of a semi-automatic firearm so that the firing unit longitudinally reciprocates within [the slide-action handle] when in a rapid-mode of operation, said handle including a finger rest configured to stabilize the end of a user's trigger finger stretched in front of the trigger." *Id.*

Every other court to review challenges to the Rule has concluded that a bump stock is a machine gun.  In the words of one district court, "[a] bump stock permits the shooter to discharge multiple rounds by, among other things, 'maintaining the trigger finger on the device's extension ledge with constant rearward pressure.'"  *Guedes v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019) ("*Guedes I*")  (quoting 83 FR 66532), *aff'd* 920 F.3d 1 (D.C. Cir. 2019) ("*Guedes II*"), *cert denied* No. 19-296, 140 S. Ct. 789 (Mar. 2, 2020) ("*Guedes III*"); *see also Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1151 (D. Utah 2019) ("*Aposhian I*"), *aff'd Aposhian v. Barr*, 958 F. 3d 969 (10th Cir. 2020) ("*Aposhian II*"). These decisions find support in *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994), where the Supreme Court explained that a prohibited machine gun "within the meaning of the" National Firearms Act, is a weapon that, "once its trigger is depressed, . . . will automatically continue to fire until its trigger is released or the ammunition is exhausted."  This Court should likewise conclude that a bump stock is a machine gun, based on the plain text of the statute and the factual presentation at trial.

**B.  The Rule Gives the Terms "Single Function of the Trigger" and "Automatically" Their Ordinary, Accepted Meanings**

**1. "Single Function of the Trigger" Means "Single Pull of the Trigger"**

Courts "interpret the words [of a statute] consistent with their ordinary meaning at the

time Congress enacted the statute." *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018); *see also Brown v. Megg*, 857 F.3d 287, 290 (5th Cir. 2017); A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71 (1994).[1] Here, the Rule represents the best interpretation of the statutory text because it correctly interprets and applies the text in accordance with ordinary, accepted meaning.

To start, the Rule interprets the phrase "single function of the trigger" to mean "a single pull of the trigger and analogous motions," an interpretation that "reflect[s] ATF's position since 2006." 83 FR 66518. This "shooter-focused interpretation," which focuses on the actions of the shooter in initiating fire, is not only reasonable, but is "the best interpretation" of the statute. *Aposhian I*, 374 F. Supp. 3d at 1151.

Given the longstanding, commonsense view that a single pull of the trigger is the manner in which most personal guns are fired (through the shooter's pull on a curved metal trigger), courts have "instinctively reached for the word 'pull' when discussing the statutory definition of 'machinegun.'" *Guedes I*, (citing *Staples*, 511 U.S. at 602 & n.1, and *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977)). In *Staples*, for example, the Supreme Court described a machine gun as "a weapon that fires repeatedly with a single pull of the trigger." 511 U.S. 600, 602 n.1. In *Oakes*, the Tenth Circuit explained that automatic fire is achieved when multiple shots are fired "with a single trigger function" by "the shooter . . . fully pulling the trigger." 564 F.2d at 388. These statements accord with common usage in dictionaries and other sources both before and after enactment of the National Firearms Act (NFA), including at the times Congress incorporated the NFA's definition of machine gun into the Gun Control Act (GCA) and the Firearm Owners Protection Act (FOPA). *See, e.g.*, Exhibit G-32 (reproducing Dwight D. Eisenhower, Address to the American Society of Newspaper Editors (Apr. 17, 1958), *in* Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit the

---

[1] *See also, e.g.*, *U.S. v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019); Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation,* 17 Harv. J.L. & Pub. Pol'y 61 (1994).

target than it is to haggle over who makes a weapon or who pulls a trigger")); Exhibit G-33 (reproducing Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger")); Exhibit G-34 (reproducing Oliver Wendell Holmes, Jr., *The Common Law: Lecture IV* (1881) (an ordinary person "would foresee the possibility of danger from pointing a gun which he had not inspected into a crowd, and pulling the trigger, although it was said to be unloaded")).

The Rule's interpretation of "single function of the trigger" also reflects ATF's longstanding interpretation, dating back to 2006.  In a 2006 ruling, ATF concluded that a device "activated by a single pull of the trigger, initiat[ing] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted," should be classified as a machine gun.  Exhibit G-4 (reproducing ATF Ruling 2006-2, AR005599-AR005601).  The ruling further noted, as the Rule does, that this "determination is consistent with the legislative history of the NFA."  Exhibit G-4, AR005600.

In particular, when Congress initially drafted the NFA in 1934, it sought testimony from a noted firearms expert, Olympic shooting champion Karl Frederick, regarding how the term "machinegun" should be defined for purposes of federal regulation.  *See* Exhibit G-4, AR004238 *et seq.* (reproducing *Nat'l Firearms Act: Hrg's Before the Comm. on Ways and Means*, House of Rep's, Second Session H.R. 9066, 73rd Cong., at 40 (1934)).  Mr. Frederick proposed a definition that closely paralleled the statutory definition Congress ultimately adopted: "machine gun or submachine gun as used in this act means any firearm by whatever name known, loaded or unloaded, which shoots automatically more than one shot without manual reloading, by a single function of the trigger."  *Id.* at AR004230.  The legislative history—which indicates that Congress also considered (but rejected) defining "machinegun" based on the number of rounds fired without reloading, *see id.* at AR004197 (describing draft definition of "a machine gun as any weapon designed to shoot . . . 12 or more shots without reloading")—demonstrates that Mr.

Frederick's definition served as the foundation of the ultimate statutory definition. Mr. Frederick made clear that the term "single function of the trigger" means a "single pull of the trigger" by juxtaposing the two terms next to each other.  He explained that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machine gun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns."  Exhibit G-4, AR004230. The House Committee on Ways and Means understood "single function of the trigger" in the same way, stating in its committee report that the bill which became the NFA "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger."  Exhibit G-5 at 2, H.R. Rep. No. 73-1780, at 2 (1934); *see also* S. Rep. No. 73-1444 (1934) (reprinting House's "detailed explanation" of the provisions).

As numerous courts have recognized, the phrase "single function of the trigger" is not limited either to a specific method of causing the trigger to function or to a specific kind of "trigger" mechanism.  Rather, "'a single function of the trigger' describes the action that enables the weapon to 'shoot . . .  automatically . . . without manual reloading,' not the 'trigger' mechanism" itself.  *United States v. Evans*, 978 F.2d 1112, 1113 & n.2 (9th Cir. 1992).  This shooter-focused interpretation is necessary to avoid permitting easy circumvention of the statutory definition.  For example, in *United States v. Carter*, the Sixth Circuit considered whether a weapon that lacked a traditional trigger altogether, and instead fired automatically when a shooter put a magazine in the weapon, "held it at the magazine port, pulled the bolt back and released it," was a machine gun.  *See* 465 F.3d 658, 665 (6th Cir. 2006) (per curiam).  Rather than adopt the absurd result that such a weapon was not a machine gun (and thus would be entirely unregulated), the Sixth Circuit held that the trigger is whatever causes the weapon to fire.  *See id.* Similarly, in *United States v. Fleischli*, the Seventh Circuit held that a minigun—an aircraft-mounted, electrically-driven, rotary weapon initiated by "an electronic switch"—is a

machine gun, rejecting the argument that a "switch" is not a trigger.  305 F.3d 643, 655-56 (7th Cir. 2002). Indeed, there is no end to the possible mischief that could result from an improperly crabbed interpretation of machine gun: Exhibit G-6, for example, documents the effort by a clever firearms designer to obtain ATF approval for the "Auto-Glove," a device that envelops the shooter's hand and provides a "plunger" inside the glove's middle finger, which, once depressed, electro-mechanically operates the trigger as fast as possible.  Exhibit G-6, AR000658-AR000667.  The Rule properly interprets the statutory definition to avoid such absurd results.

### 2. "Automatically" Means Resulting From "A Self-Acting or Self-Regulating Mechanism"

The Rule interprets "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger," a definition that is also "the best interpretation of the statute."  *Aposhian I*, 374 F. Supp. 3d at 1153.  As one district court explained, "[t]his interpretive language is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the NFA's enactment." [2]  *Id*. at 1152 (citing 83 FR 66519). These contemporaneous dictionary definitions are excerpted in the Rule. *See* 83 FR 66519.  These definitions also appear among the Government's trial exhibits. *See* Exhibit G-41 (reproducing "automatically," *Webster's New International Dictionary, Second Edition* 187 (1934)); Exhibit G-42 (reproducing "automatic," 1 *Oxford English Dict.* 574 (1933)).  *Webster's*, for example, explains that "automatically" means "having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation." Exhibit G-41. The *Oxford English Dictionary*, in turn, defines "automatic" as "self-acting under conditions fixed for it, going of itself." Exhibit G-42. The *Webster's* definition is particularly on point: it does not say that the whole operation needs to be automatic, but rather only that some

---

[2] Courts "often look to dictionary definitions for help" in determining the ordinary meaning of a statutory term.  *Cascabel Cattle Co. v. U.S.*, 955 F.3d 445, 451 (5th Cir. 2020).  *See generally Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 529 (D.C. Cir. 2015); A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71.

"required act"—some *part* of the process—needs to be automated. Exhibit G-41. That is what a bump stock does. As demonstrated in Mr. Smith's demonstrative videos, once the firing process



begins, the bump stock controls the movement and recoil of the weapon so that firing continues without additional input by the shooter. *See, e.g.*, Exhibit G-02 at Slide 24 (linking https://www.youtube.com/ watch?v=hCCT8JtwQeI ) (still frame reproduced at left).

The Rule also drew support for this interpretation of "automatically" from *U.S. v. Olofson*, a Seventh Circuit case reproduced in both the administrative record and the Government's trial exhibits. *See* Exhibit G-7, AR004475 (reproducing *Olofson*, 563 F.3d 652 (7th Cir. 2009). There, the Seventh Circuit, quoting *Webster's* and the *Oxford English Dictionary*, concluded that "automatically . . . delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." 563 F.3d at 658. This automatic action of a bump-stock-equipped firearm is visible in all of the video exhibits Mr. Smith presented, but is particularly clear in the video from which a still frame is reproduced above. *See* Exhibit G-02 at Slide 17. Thus, as with the Rule's interpretation of "single function of the trigger," the Rule's reading of "automatically" represents the best interpretation of the statute.

### C.  Plaintiff's Arguments That a Bump Stock is Not a Machine Gun Should Be Rejected

Plaintiff takes issue in several ways with the Rule's conclusion that bump stocks are machine guns, but none of the arguments is persuasive. Plaintiff first argues that the Court should adopt a

mechanically focused interpretation of "single function of the trigger," contending that, because the operation of a bump stock purportedly involves "additional manipulation of the firearm's trigger between shots," FFCL ¶ 282 (emphasis omitted), a bump stock is not a machine gun. But as Mr. Smith explained, the action that initiates the firing sequence is the application of forward pressure on the fore-grip or barrel shroud. *See* Transcript at 79, ECF No. 57 ("Tr.").  Once the shooter initiates this forward pressure, firing will continue until ammunition is exhausted, the weapon malfunctions, or the shooter releases the pressure. *See id.* at 45-46.  There is thus no "additional manipulation" required between shots. Accordingly, under a proper, "shooter-focused" interpretation of the statute, the Rule correctly determines that a bump stock fires automatically with a "single function of the trigger." *Aposhian I*, 374 F. Supp. 3d at 1151; *see also Guedes I* at 130 (recognizing that the Rule interprets machine guns from "the perspective of the shooter").

Plaintiff also contends that the fact that two hands are required to operate a bump-stock-equipped firearm means that a bump stock does not fire "automatically." *See* Tr. at 80, FFCL ¶ 283, 285. As Mr. Smith's presentation showed, however, this is no different than what is required with a traditional machine gun, where both hands are employed in the firing process. *See* Ex. G-02 at Slide 9 (still frame reproduced at right), *available at* https://www.youtube.com/watch?v=BSizVpfqFtw; *see also Guedes I*,  356 F. Supp. 3d at 132 ("the definition of 'automatically' does not mean that an automatic device must operate spontaneously without any manual input").

Mr. Smith's testimony also illustrated how a bump stock causes the parts of a trigger

mechanism to function "automatically" by reference to animated illustrations of the mechanisms



by which firearm triggers operate. In the semi-automatic trigger shown at left, for example, *see* Ex. G-02 Slide 6, the disconnector (in blue) disengages the connection between the trigger (red) and the hammer (yellow) after each shot so that, once a single shot is fired, the firing sequence stops. Tr. at 4.

By supporting the rest of the firearm on the bearing surface and bearing slideway, as Mr.

Smith illustrated with the figure at left from Slide Fire patent 9,612,083 B2, *see* Ex. G-02 at

Slide 11; Tr. at 55-56, however, a bump stock harnesses recoil energy after each shot so that the

firearm travels just enough after each shot to release the disconnector, thereby permitting the

hammer to strike the firing pin and discharge another round. This cycle repeats continuously

until forward pressure is released or the ammunition is exhausted. Tr. at 58-59.; Ex. G-02 at

Slide 14 (below left). This cycle of operation is directly comparable to the way that the auto-sear

on a conventional machine gun with a semi-automatic selector switch functions to ensure that the

disconnector stops in a position that permits the hammer to strike the firing pin to discharge

another round. Ex. G-02 at Slide 10 (below right). In short, because the bump stock

automatically channels the recoil motion, there is no separate "physical input," FFCL ¶ 285,





required by the shooter to continue firing. *See* 83 FR 66532 (the "constrained linear rearward and forward paths" created by a bump stock are what make bump stocks "different from a traditional shoulder stock," allowing "shooters to fire . . . without repeated manual manipulation of the trigger by the shooter").

Nor does the Rule "improperly disregard[] 'the longstanding distinction between 'automatic' and 'semiautomatic' firearms.'" FFCL ¶ 286 (quoting *Guedes II*, 920 F.3d at 44-45 (Henderson, J., dissenting)).  As Mr. Smith demonstrated with photos of a Slide Fire bump stock like Plaintiff's and an AR-15, using a semi-automatic rifle with a bump stock requires assembling the two devices together into a new unit that differs substantially from the original semi-automatic firearm.  *See* Tr. at 59-60; Ex. G-02, Slide 17 (images reproduced at right).  Only then does the combined unit constitute a self-regulating mechanism that produces automatic fire.[3]



### D.     The Rule Reasonably Distinguishes Between Bump Stocks, Other Weapons, and Other Methods of Bump-Firing a Weapon

Plaintiff takes issue with the Rule's conclusion that bump stocks may be classified as machine guns even though ordinary semi-automatic rifles may lawfully be bump-fired using other methods.  *See* Tr. at 85-87, FFCL ¶¶ 279-80.  Commenters raised the same objection numerous times in response to the Notice of Proposed Rulemaking (NPRM). *See, e.g.*, AR002200 (Cmt. 285); AR002622 (Cmt. 2922); AR002735 (Cmt. 3452).  The Rule addressed these comments at length, explaining that bump-firing without a bump stock is lawful because such action does not involve the use of a "self-acting or self-regulating" device to automate the

---

[3] Contrary to Plaintiff's suggestion, *see* Tr. at 72-73, nothing in the text of the statute requires that a device that "convert[s] a weapon into a machinegun," 26 U.S.C. § 5845(b), modify internal mechanisms such as the hammer or disconnector.

process. *See* 83 FR 66532-33.  The Rule also reasonably distinguished between bump-firing

through use of a belt loop or a rubber band and bump-firing through use of a bump stock,

because bump stocks are explicitly "designed to be affixed" to a semiautomatic firearm, unlike

other commonplace household objects. 83 FR 66515; 83 FR 66533; *see also* 83 FR 66531-32

(describing how the linear space in a bump stock functions as a self-regulating mechanism to

assist in resetting the trigger).  Even if the Court would not reach the same conclusion coming to

the matter on its own, the Department "'clearly thought about [these] objections and provided

reasoned replies,' which is 'all the APA requires.'" *Guedes I*, 356 F. Supp. 3d at 135 (quoting

*City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007)); *see also Guedes II*, 920 F.3d at 32

("belt loops, unlike bump stocks, do not transform semiautomatic weapons into statutory

'machineguns[,]' [o]r so [Defendants] reasonably concluded in the Rule").

Plaintiff also asserts that because Congress deleted the phrase "or semiautomatically"

from the statutory definition of "machinegun" when it passed the GCA in 1968, it eliminated the

possibility that semiautomatic weapons could *ever* be classified as machine guns.  *See* FFCL ¶¶

271, 273.  This is plainly wrong. At the same time Congress deleted the phrase "or semi-

automatically," it also *added* to the definition any part or parts "designed and intended solely and

exclusively" to "convert[] a weapon into a machinegun." 26 U.S.C. § 5845(b).  Congress thus

expressly defined as a "machinegun" any part or parts—such as a bump stock—that can convert

an otherwise semiautomatic weapon into a weapon capable of firing "automatically more than

one shot, without manual reloading, by a single function of the trigger."  *Id*.; *see also* S. Rep. No.

90-1501, at 46 (1968) (describing the amendment as "an important addition to the definition of

'machinegun'"); H.R. Rep. No. 90-1956, at 34 (describing the amendment as part of the

"[e]xtension of the scope of the National Firearms Act").

Consistent with this clear statutory language, numerous courts have held that

semiautomatic weapons fitted with parts that enable them to fire automatically are "machineguns."

*See, e.g.*, *United States v. Camp*, 343 F.3d 743, 744-45 (5th Cir. 2003) (concluding that a semiautomatic rifle fitted with a motor-operated device that pulled and released the trigger was a machinegun); *United States v. Bishop*, 926 F.3d 621, 624-25 (10th Cir. 2019) (affirming convictions for machinegun possession and manufacturing where defendant sold a "machinegun conversion device" for an AR-15 rifle).  The same conclusion applies to semiautomatic weapons fitted with bump stocks.

## II.      THE RULE IS INTERPRETIVE AND IS NOT UNLAWFUL.

### A.  The Rule is Interpretive.

Plaintiff contends that the Rule is an enactment of a new restriction that is legislative in nature, and draws from this contention a variety of challenges to the Rule's validity.  *See* FFCL ¶¶ 251-272.  The APA distinguishes between legislative rules and interpretive rules: a legislative rules have the force and effect of law, whereas interpretive rules "advise the public of the agency's construction of [a] statute and rules which it administers."  *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995).  Plaintiff is wrong on the "threshold issue" whether the "Rule is a legislative Rule," *id.* ¶ 251—because the Rule is interpretive—so these challenges necessarily fail.[4]

The reasons why the Rule is interpretive, not legislative, are straightforward.  First, the Rule was issued under the Attorney General's authority to "prescribe only such rules and regulations as are necessary to carry out" the GCA and NFA.  18 U.S.C. § 926(a); *see* 26 U.S.C. § 7805(a).  The touchstone of determining whether a Rule is legislative or interpretive is "whether *Congress* would have intended, and expected, courts to treat [the] rule" as a legislative

---

[4] In making this argument, Plaintiff relies principally on the decision of the D.C. Circuit in *Guedes II* and the decision of the Tenth Circuit in *Aposhian II*.  *See* FFCL ¶¶ 252-253. *Aposhian II* has since been vacated by the Tenth Circuit, which granted *en banc* rehearing. *See* Order, No. 19-4036 (10th Cir. Sept. 4, 2020).  Defendants explained the error in the *Guedes II* court's analysis in their opposition to a petition for certiorari in that case, emphasizing the Rule's interpretive nature.  *See* Br. for the Respondents in Opp. at 20, 23-24, *Guedes v. ATF*, No. 19-296 (Dec. 4, 2019).

rule.  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007) (emphasis in original).

As a general matter, "criminal laws are for courts, not for the Government, to construe."

*Abramski v. United States*, 573 U.S. 169, 191 (2014).  And while Congress can delegate

significant authority to Executive Branch agencies to engage in rulemaking that may lead to

criminal consequences, *see Loving v. United States*, 517 U.S. 748, 768 (1996), the narrow

statutory delegation on which the Rule relies does not provide the Attorney General the authority

to do so. *Compare* 18 U.S.C. § 922(o) *and* 26 U.S.C. § 5845(b) *with, e,g,*, 16 U.S.C.

§ 1540(b)(1), (f) (expressly criminalizing the failure to comply with a regulation issued pursuant

to the agency's general rulemaking authority under the statute).  Further, in contrast to other

provisions of the NFA and GCA where Congress has expressly attached criminal consequences

to violations of the Attorney General's regulations, *see, e.g.*, 18 U.S.C. §§ 922(m), 923, Congress

has not done so with respect to the general rulemaking authority that the Department relied upon

in issuing the Rule—18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a).  *See, e.g.*, *United States v.*

*Grimaud*, 220 U.S. 506, 517-19 (1911) (statute criminalizing "any violation of the provisions of

this act or such rules and regulations" issued under the act "indicated [the] will" of Congress to

"give to those who were to act under such general provisions 'power to fill up the details' by the

establishment of administrative rules and regulations, the violation of which could be punished"

in the manner prescribed by Congress).

     Nor does anything in the Rule itself indicate that the Department exercised delegated

legislative authority in issuing the Rule.  To the contrary, the Rule repeatedly emphasizes that it

is announcing the "best interpretation" of the terms used in the statutory definition, *see* 83 FR

66517, 66518, 66521; *accord id*. at 66527 (stating the interpretations in the Rule "accord with

the plain meaning" of the terms).  The Rule also expresses the Department's view "that bump-

stock-type devices *must* be regulated because they satisfy the statutory definition of

'machinegun,'" *id*. at 66520 (emphasis added); *accord id*. at 66529.  A rule that announces an

interpretation compelled by the statute is not legislative.  *See Am. Postal Workers Union v. U.S. Postal Serv.*, 707 F.2d 548, 559 (D.C. Cir. 1983) (holding agency's new method of calculating the civil service retirement benefits was an interpretive rule because it turned solely on the agency's construction of the statutory term "average pay").  The Rule also describes its amendments to the regulatory definitions of "machinegun" as "clarify[ing]" amendments that make clear what is already apparent from the text of the statute, namely, that bump stocks qualify as machine guns.  *See* 83 FR at 66519, 66535.  All of these features reinforce the conclusion that the Rule is interpretive, not legislative.  *See Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) (finding rule interpretive in part because "EPA's entire justification for the rule is comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history of" the statute).

        The fact that the Department chose to make these amendments to the regulations through notice-and-comment rulemaking does not make the Rule legislative.  Rather, the Department's use of the notice-and-comment process reflects the Department's recognition of the importance of notifying owners of bump stocks that the Department had corrected its understanding of whether bump stocks are machine guns and of the need to explain appropriate methods for disposal within a specified timeframe so that owners of bump stocks would not find themselves unexpectedly subject to criminal liability.  *See* 83 FR 66523.  Relatedly, the fact that the Rule contains an "effective date" does not make it legislative, as the D.C. Circuit wrongly suggested. *Guedes II*, 920 F.3d at 20. Before identifying an "effective date," the Rule states that it is "specifically designed to notify the public" about the changes in the Department's interpretation. 83 FR 66523.  The Department could have revoked the prior classification decisions through a letter ruling and could have simply begun applying the NFA's and GCA's requirements to bump stocks without altering the regulatory definitions—as it has done in the past, including with the Akins Accelerator, *see Akins*, 312 F. App'x at 200—but elected instead to make greater efforts to

provide public notice. That the Department used a more public process to raise awareness of its corrected interpretation and to put the public on notice regarding regulation of bump stocks does not alter the basic interpretive nature of the Rule.

**B. If The Court Concludes The Rule Is Legislative, Not Interpretive, It Should Determine Whether the Agency Has Legislative Authority to Issue The Rule.**

During trial, the Court requested that the government's closing argument address the appropriate remedy in the event the Court concludes that the Rule is legislative. Tr. 29-30. In that event, the Court should first determine whether 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a), the sources of authority for the Rule, authorize the Attorney General to issue legislative rules. As Plaintiff notes, *see* FFCL ¶¶ 251-302, if the Rule is legislative and if Congress did not provide Defendants with authority to issue legislative rules regarding the meaning of "machinegun," the Rule would be *ultra vires*.[5] On the other hand, if the Rule is legislative and if Congress did provide Defendants with authority to issue legislative rules regarding the meaning of "machinegun," that challenge would fail.

The Court would then need to address Plaintiff's constitutional challenges to, *inter alia*, the delegation of legislative authority to Defendants, *see, e.g.*, Compl. ¶¶ 155-59, 170, but the Rule should be upheld against those challenges. Congress can delegate some authority to Executive Branch agencies to engage in rulemaking without transgressing constitutional limits, even where such rulemaking may lead to criminal consequences. *See, e.g.*, 15 U.S.C. § 78n(e); Loving v. United States, 517 U.S. 748, 768 (1996) (noting that the Supreme Court has "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal").

---

[5] Defendants previously explained why, if the Rule is interpretive, it is not *ultra vires*, and Defendants incorporate those arguments—which the parties did not address at trial—by reference. *See* Defs. Trial Br. at 31, ECF No. 46.

**C.  Deference Under *Chevron* Is Not Needed Because the Rule Sets Forth The Best Interpretation of the Statute.**

Plaintiff devotes significant effort to arguing that the Court should not defer to the Department's interpretations set forth in the Rule, but even if the Court concludes that the Rule is legislative, not interpretive, this is not a relevant issue.  At the outset, because the Rule sets forth the best interpretation of the statutory text, deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is not required to resolve this case. As the Supreme Court has explained, "there is no occasion to defer and no point in asking what kind of deference, or how much" would apply where the agency has adopted "the position [the court] would adopt" when "interpreting the statute from scratch."  *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002); *see also id.* at 114 n.8 ("there is no need to resolve deference issues when there is no need for deference").  As explained above, the Court should conclude that the Rule is lawful because it embodies the "best interpretation" of the statute, *Aposhian I*, 374 F. Supp. 3d 1151, 1153; *see* 83 FR 66518, 66521, and not through the application of *Chevron* deference. *See Guedes III*, 140 S. Ct. 789-90 (Gorsuch, J., statement regarding denial of certiorari); Defs. Trial Brief, ECF No. 46, at 24-25.

If, however, the Court concludes that the Rule is a legislative rule issued in the exercise of the Department's delegated authority, then the Rule should be upheld regardless of whether deference is afforded.  For the same reasons the rule represents the correct understanding of the statutory text, it is at a minimum a permissible understanding of the text, and plaintiff cannot prevail.

**III.     THE RULE IS NOT ARBITRARY OR CAPRICIOUS UNDER THE APA**

Plaintiffs' arguments that the Rule is arbitrary and capricious" under the APA likewise fail.  First, the Rule properly reflects input from elected officials.  Second, the Rule properly explains the Department's change in position.  Third, the Rule properly reflects agency expertise and thoroughly considers the relevant evidence.

### A.  The Rule Properly Reflects Input From Elected Officials

Plaintiff wrongly contends that the Department was required to disregard "political" factors, such as the views of the President, in adopting the Rule.  *See* FFCL ¶¶ 303, 306, 309. "Presidential administrations are elected to make policy," *Guedes II*, 920 F.3d at 34, and so, as the Supreme Court has recognized, it is entirely proper for an agency to consider "Presidential oversight" in adopting policy changes.  *See FCC v. Fox Television Stations*, 556 U.S. 502, 523 (2009) (rejecting dissent's view that independent agencies should be "sheltered" from political influence); *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (July 8, 2020) (rejecting argument that challenged rules were invalid because the agency had failed to "maintain[] an open mind throughout" the administrative process). "[A]s long as [an] agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Guedes II*, 920 F.3d at 34 (citation omitted).  Moreover, the President's direction to the Attorney General regarding the Rule explicitly instructed that the agency follow "the rule of law and . . . the procedures the law prescribes," recognizing the "established legal protocols" required by the APA. AR000790, *Definition of Machinegun*, 83 FR 7949.  Because the Rule is open in its acknowledgment that public attention, congressional interest, and Presidential input played a role in prompting review of the Department's past analysis and definitions, the Department's consideration of these factors is fully consistent with the APA. *See id*.; *see also ATX, Inc. v. U.S. Dep't of Transp*., 41 F.3d 1522, 1528 (D.C. Cir. 1994).

### B.  The Rule Properly Explains the Department's Change in Course

Plaintiff also argues that the Rule is arbitrary and capricious because it represents a departure from the Department's prior views.  *See* FFCL ¶ 281 ("Despite this settled meaning and technical understanding, ATF has now discarded its prior understanding of the statute."). But agencies can and should change their views, particularly when confronted with experience or

events that call their prior positions into doubt, as the Las Vegas attack did here.  *See Clean Water Action v. EPA*, 936 F.3d 308, 315-16 (5th Cir. 2019); *see also Springfield, Inc. v. Buckles*, 292 F.3d 813, 819 (D.C. Cir. 2002) (noting that "agency views may change"). When an agency changes its position, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates."  *Fox Television*, 556 U.S. at 515; *see also Springfield*, 292 F.3d at 819.  The Rule explicitly described the Department's prior treatment of bump stock devices, acknowledged that the agency was changing course, and explained that the Rule adopted "the best interpretation of [the statute]."  *Guedes I*, 356 F. Supp. 3d at 133-34; *see also* 83 FR 66514, 66516-517, 66520, 66527.  This fully satisfied the APA.

## C. The Rule Properly Reflects Agency Expertise and Thoroughly Considers the Relevant Evidence

Plaintiff also argues that the Rule violates the APA because it purportedly fails to reflect agency expertise or consider the relevant evidence. *See* FFCL ¶¶ 307-310.  Contrary to Plaintiff's claims, however, *see id.* ¶¶ 296, 306, the Rule falls well within the Department's areas of expertise.  Although ATF, rather than DOJ, serves as the front-line actor for most firearms regulation, the NFA and GCA vest ultimate rulemaking authority in the Attorney General, and the ATF Director operates under the Attorney General's direction.  *See* 26 U.S.C. § 7801(a)(2)(A) ("[t]he administration and enforcement" of the NFA "shall be performed by or under the supervision of the Attorney General"); 18 U.S.C. § 926(a) (Attorney General "may prescribe . . . such rules and regulations as are necessary to carry out the provisions" of the GCA); *see also* 28 C.F.R. § 0.130(a) (ATF Director acts "[s]ubject to the direction of the Attorney General").  Nor is there any requirement that the Department conduct physical testing before reclassifying a particular device as a machinegun, *see* Tr. at 62-64—indeed, Plaintiff does not (and cannot) cite any statutory basis for this supposed requirement. *See* FFCL ¶ 307. In any

event, such renewed testing would be unnecessary because, as Plaintiff concedes, "neither the mechanism of bump stocks in general, nor the Slide Fire in particular, changed since their [previous] approval." *Id.* at ¶ 311.

## **CONCLUSION**

For the foregoing reasons, the Court should grant judgment to Defendants based on the administrative record and the factual presentation at trial.

Dated: October 1, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

_____*/s/* Eric J. Soskin_____
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
MATTHEW J. GLOVER
CHRISTOPHER A. BATES
Senior Counsels to the Assistant Attorney General
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Facsimile: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
Counsel for Defendants