THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHAEL CARGILL, | § | No. 1:19-CV-349-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WILLIAM P. BARR, in his official | § | |
| capacity as Attorney General of the | § | |
| United States, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Plaintiff Michael Cargill ("Plaintiff") seeks injunctive relief to enjoin

Defendants Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"),

William Barr, in his official capacity as Attorney General of the United States

("AG Barr"), the United States Department of Justice ("DOJ"), Regina Lombardo,[1]

in her official capacity as Acting Director of ATF ("Lombardo") (collectively

"Defendants") from enforcing their Final Rule, *Bump-Stock-Type Devices*, 83 Fed.

---

[1] Plaintiff's original complaint listed former Acting Director of ATF Thomas
Brandon as a Defendant instead of Lombardo.  (Dkt. # 1 at 1.)  By operation of
Fed. R. Civ. P. 25(d), Lombardo automatically replaced Brandon as a Defendant in
this action when she succeeded him in this role.

Reg. 66514 (Dec. 26, 2018) ("the Final Rule").  A bench trial was held in this case on September 9, 2020.  Having considered the pleadings, evidence, and written and oral arguments of counsel, the Court makes the following findings of fact and conclusions of law, denying Plaintiff's requested relief on all counts.

Plaintiff filed this action on March 25, 2019.[2]  In support of his petition for injunctive relief, Plaintiff argues that: (1) the Final Rule is a legislative rule that ATF lacks the authority to promulgate (Counts IV, VII, VIII); (2) Defendants violated principles of non-delegation and/or separation of powers principles by issuing the Final Rule (Counts I, II, III, VIII); (3) the Final Rule's interpretations of terms within the statutory definition of "machinegun," which includes bump stocks and bump stock-type devices, are unreasonable and conflict with the statute (Counts I, V, VIII); and (4) Defendants violated the Administrative Procedures Act ("APA") in promulgating the Final Rule (Counts V, VI, VII, VIII).

After a status conference on February 13, 2020 (Dkt. # 31), the parties submitted proposed findings of fact and conclusions of law on April 3, 2020 (Dkts. ## 33, 34) in advance of the bench trial in this case, and Plaintiff revised his

---

[2] The case was transferred to the undersigned on October 23, 2019.  (Dkt. # 23.)

proposal on June 22, 2020.  (Dkt. # 39.)  The parties submitted their trial briefs on August 28, 2020.  (Dkts. ## 45, 46.)

On September 9, 2020, the Court held a bench trial in this case.  Caleb Kruckenberg, Esq., and Mark Chenoweth, Esq., appeared at the trial on behalf of Plaintiff.  Eric Soskin, Esq., Matthew Glover, Esq., and Christopher Bates, Esq., appeared at the trial on behalf of Defendants.  At trial, Plaintiff did not call any witnesses but introduced eleven (11) exhibits.  (Dkt. # 54 (and attachments).)  Defendants called one in-person witness, David A. Smith, Firearms Enforcement Officer for the Firearms & Ammunition Technology Division ("FATD") of ATF, and introduced forty-five (45) exhibits, with Government Exhibit Two ("Exh. G-2") admitted for demonstrative purposes only.  (Id.)  After trial, the parties submitted written post-trial briefs in lieu of closing oral arguments.  (Dkts. ## 70, 71.)

The Court has considered the record evidence submitted, made determinations as to relevance and materiality, assessed the credibility of the witness and evidence, and ascertained the probative significance of the evidence presented.  Upon consideration of the above, the Court finds the following facts by a preponderance of the evidence, and, in applying the applicable law to such factual findings, makes the following conclusions of law.  To the extent any

3

findings of fact as stated may also be deemed to be conclusions of law, they shall also be considered conclusions of law; similarly, to the extent any conclusions of law as stated may be deemed findings of fact, they shall also be considered findings of fact.  See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 781 (5th Cir. 2001).

I.      FINDINGS OF FACT

## The Parties

**1.**      Plaintiff Michael Cargill is a natural person and resident of the State of Texas.  (Dkt. # 54-2, Exh. P-1 ("Stipulated Facts"), ¶ 1.)

**2.**      Plaintiff is a law-abiding person and has no disqualification that would prevent him from lawfully owning or operating a firearm and related accessories.  (Id. ¶ 2.)

**3.**      Defendant William Barr ("AG Barr"), Attorney General of the United States, is the head of the United States Department of Justice.  (Dkt. # 1 ¶ 3; Dkt. # 11 ¶ 3.)

**4.**      AG Barr is sued in his official capacity.  (Dkt. # 1 ¶ 4; Dkt. #11 ¶ 4.)

**5.**      Defendant United States Department of Justice ("DOJ") is an executive agency of the United States, which is partially responsible for

administering and enforcing the National Firearms Act ("the NFA") and Gun Control Act ("the GCA").  (Dkt. # 1 ¶ 5; Dkt. # 11 ¶ 5.)

6.     AG Barr and DOJ are responsible for overseeing the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  <u>See</u> 28 C.F.R. § 0.130(a)(1).

7.     Defendant Regina Lombardo is the Acting Director of the Bureau of Alcohol, Firearms, Tobacco, and Explosives.  (Dkt. # 1 ¶ 6; Dkt. # 11 ¶ 6.)[3]

8.     Lombardo is sued in her official capacity.  (Dkt. # 1 ¶ 7; Dkt. # 11 ¶ 7.)

9.     Defendant ATF is an agency of the United States partially responsible for administering and enforcing the NFA and the GCA.  (Dkt. # 1 ¶ 8; Dkt. # 11 ¶ 8.)

## Jurisdiction and Venue

10.     The Court has federal question jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

11.     Venue for this action is proper in the Western District of Texas pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2), (e)(1)(C) because

---

[3] See <u>supra</u> Note 1.

Plaintiff resides in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and because the property at issue in this action is situated in this judicial district.  (Dkt. # 1 ¶ 11; Dkt. # 11 ¶ 11.)

## Statutory Framework: The NFA, GCA, and FOPA

12.    In 1934, Congress passed the National Firearms Act ("the NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (June 26, 1934), originally codified at 26 U.S.C. §§ 2720–2733 (1939), now codified as amended at 26 U.S.C. §§ 5801–5872.

13.    The NFA criminalized possession or transfer of an unregistered firearm, while also prohibiting the registration of firearms otherwise banned by law.  See 26 U.S.C. §§ 5812(a).

14.    The NFA defined "machinegun" as a specific type of "firearm." National Firearms Act § 1(b).

15.    The original proposed definition of "machinegun" included "any weapon designed to shoot automatically, or semi-automatically, 12 or more shots without reloading."  Hearing on H.R. 9066, House Ways and Means Comm., 73rd Cong., 6 (1934) (Testimony of Homer S. Cummings, Attorney General of the United States).

16.     In hearings prior to adoption of the NFA, the House of Representatives received testimony that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machinegun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machineguns."  Hearing on H.R. 9066, 73rd Cong., 2nd Sess., at 40 (1934) (statement of Karl T. Frederick, President of the National Rifle Association of America).

17.     In a report on the legislation that became the NFA, the House Committee on Ways and Means stated that the bill "contains the usual definition of machinegun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger."  H.R. Rep. No. 73-1780, at 2 (1934).

18.     When enacted in 1934, the final statutory definition of "machinegun" under the NFA excluded the 12-shot threshold originally proposed, but still included a prohibition on weapons "designed to shoot . . . semiautomatically." National Firearms Act § 1(b).

19.     In 1968, Congress passed the Gun Control Act ("the GCA").  Pub. L. No. 90-618, 82 Stat. 1214 (Oct. 22, 1968); see 18 U.S.C. § 921 et seq.

20.     The GCA was enacted less than four months after the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (June 19, 1968), in which Congress made findings that "the high incidence of crime in the United States threatens the peace, security, and general welfare of the Nation and its citizens," and that gun control laws and other measures were warranted "[t]o prevent crime and to insure the greater safety of the people" through "law enforcement efforts [that] must be better coordinated, intensified, and made more effective at all levels of government." Id.

21.     A Senate report on the legislation that became the GCA indicates that the law was passed to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, to "assist the States and their political subdivisions to enforce their firearms control laws," and to "help combat . . . the incidence of serious crime." S. Rep. No. 89-1866, at 1 (1966).

22.     The GCA deleted the phrase "or semiautomatically" from the statutory definition of "machinegun," but otherwise expanded the definition to include "parts designed and intended for use in converting a weapon into a machinegun." Gun Control Act, tit. II, § 201 (codified at 26 U.S.C. § 5845(b)).

23.     In 1986, Congress amended the GCA by enacting the Firearm Owners Protection Act ("the FOPA"). Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986).

**24.**    The FOPA added 18 U.S.C. § 922(o) to the GCA, which reads:

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

    (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

    (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

**25.**    Violation of 18 U.S.C. § 922(o) is a felony punishable by up to ten (10) years imprisonment.  <u>See</u> 18 U.S.C. § 924(a)(2).

**26.**    The FOPA was prospective only, in that its criminal sanctions did "not apply with respect to" "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect."  18 U.S.C. § 922(o).

**27.**    A House report indicates that the FOPA was intended in part "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime."  H.R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. at 1327.  <u>See</u> H.R. Rep. No. 99-495, at 2, 7 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1328, 1333.

**28.**    The same report states that 18 U.S.C. § 922(o) was included in the FOPA because of its "benefits for law enforcement."  <u>Id.</u>  The legislative history of

the FOPA further describes "the need for more effective protection of law enforcement officers from the proliferation of machineguns."  H.R. Rep. No. 99-495, at 4.

29.     As defined by Congress, under both the GCA and NFA, the term "machinegun" now means:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); see also 18 U.S.C. § 921(23) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act.").

30.     The United States Code uses the uncommon spelling "machinegun." The two-word spelling "machine gun" is the synonymous, common term. See Guedes v. ATF, 356 F. Supp. 3d 109, 122 n.2 (D.D.C. 2019) ("Guedes I").

31.     The President is also empowered by the Arms Export Control Act of 1976, 22 U.S.C. § 2778, to limit the import and export of certain firearms.  This law restricts the import and export of "machineguns" by reference to both the GCA and the NFA.  27 C.F.R. § 447.2(a); see also 27 C.F.R. § 447.21 (U.S. Munitions

Import List, Category I(b) ("Machineguns, submachineguns, machine pistols and fully automatic rifles")).

## Delegations of Statutory Authority

**32.**     With respect to the NFA, Congress provided that the Secretary of the Treasury was tasked with "the administration and enforcement" of the statute, while ATF was tasked with issuing certain "rulings and interpretations" related to the NFA's requirements.  26 U.S.C. § 7801(a)(2)(B).

**33.**     Congress also granted the Secretary of the Treasury the authority to "prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."  26 U.S.C. § 7805(a).

**34.**     ATF was under the supervision of the Department of Treasury and Secretary of the Treasury prior to 2002, see 26 U.S.C. § 7805(a), but 26 U.S.C. § 7801(a)(2)(A) provides that "[t]he administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General and the term 'Secretary' or 'Secretary of the Treasury' shall, when applied to those provisions, mean the Attorney General . . . (i) Chapter 53[;] (ii) Chapters 61 through 80, to the extent such chapters relate to the enforcement and administration of [Chapter 53]."  26 U.S.C. § 7801(a)(2)(A).

11

**35.**    The Attorney General is now responsible for "the administration and enforcement" of the NFA.  <u>See</u> 26 U.S.C. §§ 7801(a)(2)(A)(i)–(ii).

**36.**    With respect to the GCA, Congress granted the Attorney General the authority to "prescribe only such rules and regulations as are necessary to carry out the provisions of" the GCA.  18 U.S.C. § 926(a).

**37.**    This authority also previously belonged to the Secretary of the Treasury, but now belongs to the Attorney General.  <u>See</u> Pub. L. 107-296, Title XI, § 1112(f)(6), Nov. 25, 2002, 116 Stat. 2276 (transferring Secretary's authority to the Attorney General).

**38.**    The Attorney General has delegated his authority under the GCA and the NFA to ATF.  28 C.F.R. §§ 0.130(a)(1)–(3).

**39.**    In particular, 28 C.F.R. § 0.130(a) provides that "[s]ubject to the direction of the Attorney General and the Deputy Attorney General, the Director of ATF shall: (a) Investigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and perform other duties as assigned by the Attorney General, including exercising the functions and powers of the Attorney General under [provisions including the NFA and GCA]."  28 C.F.R. § 0.130(a).

12

**Expert Testimony of David A. Smith: Bump Firing and Bump Stocks**

**40.**     At trial, Defendants called David A. Smith, a Firearms Enforcement Officer with ATF's Firearms and Technology Division ("FATD") in Martinsburg, West Virginia, to testify "as an expert in the field of firearm mechanics and operations." (Dkt. # 57, Trial Transcript, at [25:7–25:13].)  Plaintiff did not object to Smith's qualifications as an expert in this field, and the Court, finding Smith qualified as an expert, received his testimony as expert testimony.  (Id. at [39:17–39:22].)  Smith testified "to give a technical explanation of how bump fire systems work," and "how semi-automatic firearms and automatic firearms work."  (Id. at [40:17–40:20].)

**41.**     "A bump stock is an accessory attached to a firearm to increase its rate of fire, to make it easier for somebody to fire a weapon faster."  (Id. at [44:1–44:3].)  Bump stocks harness the force of recoil to enable a weapon to fire multiple rounds when, while keeping the trigger finger stationary, the shooter pushes forward with the non-shooting hand.  (Id. at 84:2–84:9].)  A bump stock works because "[t]he weapon recoils faster than you can react."  (Id. at [84:3–84:4].)  Smith explained that

> part of how the bump fire system works is that you are attempting to continually press forward, but the recoil impulse overcomes your ability to press forward, moves the firearm back inside the stock and

13

mentally you're doing nothing but pressing forward so it brings it back
in contact with your trigger finger and fires again.

(<u>Id.</u> at [83:4–83:9].)

**42.** Bump stocks are parts designed to modify semi-automatic long guns.
83 Fed. Reg. 66516; <u>see</u> Dkt. # 54-5, Exh. G-8, AR000716,
https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-
gun.html (last visited Nov. 13, 2020). They are manufactured with a sliding
shoulder stock molded or otherwise attached to a grip that includes a "trigger
ledge," on which the shooter places his finger. (Dkt. # 54-8, Exh. G-8,
AR000126–AR000132, AR000133.) These devices also typically have a
detachable rectangular receiver module that goes in the receiver well of the bump
stock's handle to guide the recoil of the weapon when fired. (<u>Id.</u> at AR000160–
AR000166.)

**43.** The firing sequence begins when the shooter presses forward on the
firearm to initially engage the trigger finger. (Dkt. # 57 at [82:25–83:3].) When
this happens, the rifle slides back and forth and its recoil energy bumps the trigger
finger into the trigger to continue firing until the shooter stops pushing forward
with his non-shooting hand or the weapon runs out of ammunition or malfunctions.
(<u>See</u> Dkt. # 54-5, Exh. G-8, AR000716,

14

https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html (last visited Nov. 13, 2020).)  The shooter does not have to pull rearward to continue firing as long as he keeps his finger on the trigger ledge.  (See Dkt. # 57 at [80:22–81:6].)  In fact, Smith testified that the trigger finger "could be replaced by a post and would function the same way."  (Id. at [56:18–56:20].)  Therefore, when a bump stock is used as intended, the shooter pushes forward to engage the trigger finger with the trigger, which causes a single trigger pull that initiates a firing sequence that continues to fire as long as the shooter continues to push forward.  (Dkt. # 54-5, Exh. G-8, AR000716; 83 Fed. Reg. 66519; Aposhian v. Barr, 374 F. Supp. 3d 1145, 1152–53 (D. Utah 2019) ("Aposhian I").)

    **44.**    By comparison, manufactured automatic firearms continue to fire if "you continue to keep your finger down on the trigger."  (Id. at [81:22–82:5].)  These weapons also stop firing if the firearm runs out of ammunition or malfunctions.  (See id.)  "So, basically the pressing forward on the [bump stock-equipped semi-automatic weapon] is the equivalent of pulling the trigger on the [weapon] in full automatic."  (Id. at [83:4–83:7].)  If the shooter stops pressing forward with a bump stock-equipped firearm or stops pulling the trigger with a fully automatic firearm, firing ceases.  (Id.)

**45.**     Smith explained that installing a bump stock on an AR-type firearm requires removing the pistol grip and stock assembly to replace them with the bump fire system (bump stock part).  (Id. at [44:4–44:16].)  According to Smith, this transformation is "fairly simple" for an individual weapon owner to accomplish without professional assistance.  (Id. at [44:17–44:20].)

**46.**     Smith has test fired weapons equipped with bump stock devices, including the Slide Fire bump stock device Plaintiff possessed.  (Id. at [42:11–42:24].)  To expand his understanding of bump stocks, Smith also reviewed materials from the Administrative Record for ATF and website for the United States Patent and Trademark Office ("PTO").  (Id. at [42:14–42:18].)  Smith was not involved in the issuance of the Final Rule.  (Id. at [43:5–43:7].)

**47.**     On cross-examination, Smith testified that, even with his extensive experience, firing a weapon equipped with a bump stock did not come all that naturally, and required practice "as you would learn [how to use] any mechanical device."  (Id. at [85:11–85:24].)

**48.**     The recoil-harness fire method employed by bump stock devices is colloquially called "bump firing" and, if the shooter has "physically practiced it enough," this method can be achieved with other devices (like a belt loop) or with no device at all.  (Dkt. # 54-8, Exh. G-22, AR000134; Dkt. # 57 at [85:25–86:6,

16

87:2–87:4].)  Smith testified that, while the shooter is still "not pulling the trigger between each shot" in these cases, "[i]t is much more difficult to bump fire a weapon without a stock or without some additional accessory compared to firing with a bump-stock."  (Id. at [87:12–87:15, 89:25–90:4].)

49.      Without bump firing, a semi-automatic weapon will go through its cycle of operations and fire a shot just once.  (Dkt. # 57 at [46:15–46:16].)  This means that, "[o]nce the firing is initiated [through one of a number of actions, the weapon] has a self-regulating mechanism that allows it to extract the spent cartridge, eject it, load the new cartridge and either cock the hammer or charge the firing pin system and then it stops."  (Id. at [46:8–46:14].)

50.      "A semi-automatic rifle can typically fire as fast as the shooter can pull with their trigger finger."  (Dkt. # 57 at [47:21–47:22].)  Smith testified that a shooter like Jerry Miculek, who "is known for having one of the fastest trigger fingers in the world," still has "his trigger finger going back and forth for every single shot" when rapidly firing a semi-automatic weapon.  (Id. at [47:21–48:7].)  When ATF solicited comments before issuing the Final Rule, some commenters argued that there was no meaningful distinction between Miculek's fingers and bump stock devices because they both increased the rate of fire of a semi-automatic weapon.  (See, e.g., Dkt. # 54-10, Exh. G-26, Comment from Tyler

17

Capobres, AR002200 ("Jerry Miculek is a professional shooter, who can accurately fire nearly as fast as a bumpfire stock [*sic*] with just his finger. . . . Are you going to ban/regulate his fingers?").)

51.     As Smith explained, it is not the rate of fire that separates semi-automatic firearms from automatic ones.  (Dkt. # 57 at [53:9–53:23].)  Rather, "[a]n automatic firearm is a weapon which, when the firing cycle of operations is initiated[,] . . . however that cycle of operations is initiated, [it] has some self-regulating mechanism to assist with that cycle of operation" to "continue that cycle of operations until something changes, either that initiation sequence is stopped or the weapon malfunctions or runs out of ammunition."  (Id.)

52.     This characterization echoes that in the Final Rule, which defines "automatically" in 26 U.S.C. § 5845(b) to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single [pull of the trigger or analogous motion]."  83 Fed. Reg. 66515.

## Past Regulation of Bump Stocks and Related Devices

53.     ATF allows manufacturers and owners to solicit the agency's view regarding the correct classification of a firearm, accessory, or other item.  (See Dkt. # 54-5, Exh. G-12, NFA Handbook, at 35.)  In response to such requests, ATF may provide a classification letter indicating its current position on a particular device.

18

(Id.)  The NFA Handbook specifically notes that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations."  (Id.)

54.     These classifications are performed by the Firearms Technology Industry Services Branch ("FTISB"), formerly known as the Firearms Technology Branch ("FTB"), a division within ATF's FATD.  (Dkt. # 1 ¶¶ 32–33, Dkt. # 11 ¶¶ 32–33.)

55.     In many cases, FTB declined to make a classification without first test-firing a device.  (See, e.g., Dkt. # 54-6, Exh. G-19, AR000084; Dkt. # 54-2, Exh. P-4, AR000095; Dkt. # 54-8, Exh. G-22, AR000188; Dkt. # 54-9, Exh. G-22, AR000210, AR000212, AR000228, AR000231, AR000233.)

56.     In one letter dated April 5, 2007, Richard Vasquez, then-Assistant Chief of FTB, opined that "FTB cannot make a classification on pictures, diagrams, or theory" and suggested the requester submit a prototype for evaluation. (Dkt. # 54-2, Exh. P-4, AR000095–AR000096 (emphasis in original).)

57.     In 2002 and 2004, Florida inventor William Akins asked ATF to determine whether the Akins Accelerator, a bump stock that "uses an internal spring and the force of recoil to reposition and refire the rifle," would be classified as a machinegun under the NFA.  (Dkt. # 54-5, Exh. G-18, AR000007–AR000021;

see Dkt. # 54-7, Exh. G-20, AR000494–AR000511; Dkt. # 54-7, Exh. G-21, AR000534–AR000537.)

**58.**     The firearm's trigger reset between each shot during the operation of the Akins Accelerator.  (See Dkt. # 54-5, Exh. G-18, AR000007–AR000008; Dkt. # 54-7, Exh. G-20, AR000507–AR000509.)

**59.**     The Akins Accelerator contained an internal spring that channeled the recoil energy to move the trigger back and forth.  (See Dkt. # 54-5, Exh. G-18, AR000010, AR000015; Dkt. # 54-6, Exh. G-19, AR000076, AR00008; Dkt. # 54-7, Exh. G-20, AR000498, AR000509.)

**60.**     ATF tested a prototype of the Akins Accelerator and initially concluded it did not constitute a machinegun.  (Dkt. # 54-5, Exh. G-18, AR000019–AR000020; see Dkt. # 54-7, Exh. G-20, AR000494–AR000511; Dkt. # 54-7, Exh. G-21, AR000534–AR000537; see Akins v. United States, 82 Fed. Cl. 619, 621 (Ct. Cl. 2008).)

**61.**     ATF subsequently reversed its view on November 22, 2006, and reclassified the Akins Accelerator as a "machinegun." (Dkt. # 54-6, Exh. G-19, AR000076–AR000083; see Dkt. # 54-7, Exh. G-20, AR000494–AR000511, AR000534–AR000537.)

62.     On December 13, 2006, ATF issued a policy statement asserting that the portion of the definition of "machinegun" applying to "a part or parts designed and intended for use in converting a weapon into a machinegun . . . includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted."  (Dkt. # 54-3, Exh. G-3, ATF Ruling 2006-2, AR005599–AR005601; Dkt. # 54-2, Exh. P-5, AR000081–AR000083.)

63.     Between 2008 and 2017, ATF received many classification requests seeking determinations regarding whether other bump stocks were also properly classified as machineguns.  (See Dkt. # 54-8, Exh. G-22, AR000105–AR000205; Dkt. # 54-9, Exh. G-22, AR000206–AR000278.)

64.     During this period, ATF determined that several proposed bump stocks were not machineguns because, unlike the Akins Accelerator, they did not have internal springs or similar mechanical parts to channel recoil energy.  (See, e.g., Dkt. # 54-8, Exh. G-22, AR000104–AR000110; AR000111–AR000115; AR000126–AR000132; AR000137–AR000144; AR000157–AR000159; AR000160–AR000165; AR000167–AR000170; AR000171–AR000174; AR000179–AR000187; AR000191–AR000197; AR000201–AR000205; Dkt. # 54-9, Exh. G-22, AR000206–AR000209; AR000210–AR000211; AR000218–

21

AR000227; AR000242–AR000249; AR000258–AR000262; AR000275–

AR000278; see also Dkt. # 54-8, Exh. G-22, AR000145–AR000147; AR000198–

AR000200.)

**65.**   During this same period, ATF also concluded that some proposed

bump stock devices were machineguns because, in ATF's view, they relied on

mechanical parts to channel recoil energy.  (See, e.g., Dkt. # 54-8, Exh. G-22,

AR000119–AR000125; AR000149–AR000156.)

**66.**   One manufacturer submitting a classification request during this

period was Slide Fire.  In 2010, ATF informed Slide Fire that a bump stock

submitted for classification by Slide Fire was a firearm part not regulated under the

GCA or NFA, and not a machinegun.  (Dkt. # 54-2, Exh. P-3, AR000126–

AR000130; Dkt. # 54-2, Exh. P-6, AR000324–AR000329.)

**67.**   In its patent application, Slide Fire stated that "[t]he shoulder stock

and pistol grip and finger rest [of the bump stock] are fixed together as a

monolithic handle unit that, in use, is held tight to the user's body."  (Dkt. # 54-5,

Exh. G-13, AR000382.)  Slide Fire also stated that this unit (including the user's

trigger finger) "remain[s] relatively stationary as . . . pulled" in the bump firing

mode.  (Id. at AR000385.)

22

68.     Beginning in 2010, Slide Fire made its bump stocks commercially available in the United States.  See 83 Fed. Reg. 66546–47.

69.     Another manufacturer submitting a classification request to ATF between 2008 and 2017 was Bump Fire Systems.  ATF determined that a bump stock submitted for classification by Bump Fire Systems was not a machinegun because the "device is incapable of initiating an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." (Dkt. # 54-8, Exh. G-22, AR000160–AR000167.)

### Development of the Final Rule Following Las Vegas Shooting

70.     On October 1, 2017, a gunman armed with more than two dozen rifles fired "several hundred rounds of ammunition in a short period of time [into a crowd of concertgoers in Las Vegas, Nevada], killing 58 people and wounding approximately 500."  83 Fed. Reg. 66516.

71.     Investigators recovered fourteen firearms equipped with Slide Fire bump stocks from the hotel room from which the shooter carried out his attack ("the Las Vegas shooting").  (See Dkt. # 54-10, Exh. G-24, AR001027–AR001043.)

72.     On October 2, 2017, ATF Acting Director Thomas Brandon sent an email to a subordinate, asking "are these [bump stocks] 'ATF approved' as advertised?"  (Dkt. # 54-2, Exh. P-6, AR000323.)

73.     Later that day Acting Director Brandon received a reply that said, "They are approved as advertised as long as an individual doesn't perform additional modifications to the firearm."  (Id. at AR000330.)

74.     Members of Congress and members of the public also inquired about the regulatory status of bump stocks following the Las Vegas shooting.  (See Dkt. # 54-2, Exh. P-7, AR001094; see also 83 Fed. Reg. 66516.)

75.     On October 4, 2017, Representative David Cicilline proposed H.R. 3947, "The Automatic Gunfire Prevention Act," which would have amended the GCA to prohibit any "trigger crank, a bump-fire device, or any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun."  (Dkt. # 1 ¶ 88; Dkt. # 11 ¶ 88.)

76.     H.R. 3947 was never advanced in the House of Representatives and lapsed with the conclusion of the 115th Congress.  (Dkt. # 1 ¶ 89; Dkt. # 11 ¶ 89.)

24

77.     Also on October 4, 2017, Senator Dianne Feinstein proposed S. 1916, which was identical to H.R. 3947 and never received a vote in the Senate.  (Dkt. # 1 ¶ 90; Dkt. # 11 ¶ 90.)

78.     On October 5, 2017, the Chief Counsel for ATF sent a proposed memorandum entitled, "Legality of 'Bump-Fire' Rifle Stocks" to the Office of the Attorney General of the United States, which described ATF's prior interpretation as applied to bump stocks.  (Dkt. # 54-7, Exh. G-21, AR000534.)

79.     The memorandum noted that the "key factor" ATF looked to "in making the determination that these 'bump-fire' devices did not fall within the statutory machinegun definition was whether the device artificially enhanced the rate of fire by using a mechanical feature, as opposed to facilitating a shooter's ability to physically pull the trigger at a higher rate than would be possible without the device."  (Id.)

80.     The memorandum also noted that ATF had previously concluded that a bump stock device "that relied on the shooter to apply forward pressure on the fore-end of the firearm . . . wasn't a machinegun because [ATF then reasoned] it was incapable of initiating an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted."  (Id. at AR000536 (internal quotations omitted).)

81.     On October 6, 2017, Jim Cavanaugh, then a "Law Enforcement

Analyst" for NBC and MSNBC, sent Acting Director Brandon an email outlining

his "outside view . . . on Bump Stocks."  (Dkt. # 54-2, Exh. P-8, AR000685.)  In

this email, Cavanaugh noted that, with bump stocks, "[t]he trigger is only pulled

once, by human action" and "recommend[ed] an overruling of the prior

decision[s]," arguing that Acting Director Brandon could "do it fast and it is the

right thing to do."  (Id.)  Cavanaugh cautioned against, in his view, "let[ting] the

technical experts take [Brandon] down the rabbit hole."  (Id.)

82.     Acting Director Brandon responded to this email later that day,

writing, in full, "Thanks, Jim.  At FTB now.  Came to shoot it myself.  I'm very

concerned about public safety and share your view.  Have a nice day, Tom."  (Id.)

83.     Acting Director Brandon's calendar for that day indicates his presence

at ATF's National Training Center in Martinsburg, West Virginia, but the Court

finds no evidence in the Administrative Record regarding whether Acting Director

Brandon, or anyone affiliated with ATF, actually test-fired or physically examined

a bump stock device that day or since.  (Id. at AR000686.)

84.     On October 10, 2017, Representative Carlos Curbelo proposed H.R.

3999, which would have amended the GCA.  (Dkt. # 1 ¶ 91; Dkt. # 11 ¶ 91.)  This

bill would have added a prohibition to the GCA for "any part or combination of

26

parts that is designed and functions to increase the rate of fire of a semiautomatic rifle but does not convert the semiautomatic rifle into a machinegun."  (Dkt. # 1 ¶ 92; Dkt. # 11 ¶ 92.)

85.    H.R. 3999 was never advanced in the House and lapsed with the conclusion of the 115th Congress.  (Dkt. # 1 ¶ 93; Dkt. # 11 ¶ 93.)

86.    The DOJ issued an advance notice of proposed rulemaking ("ANPRM") in the Federal Register on December 26, 2017.  (See Dkt. # 54-10, Exh. G-35, AR000773–AR000776, Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 Fed. Reg. 60929 (Dec. 26, 2017).)

87.    The ANPRM solicited comments concerning the market for bump stocks, asking manufacturers, consumers, and retailers to share information about, *inter alia*, the cost of bump stocks, the number of sales, the cost of manufacturing, and the potential effect of a rulemaking prohibiting bump stocks.  (Id.)

88.    Public comment on the ANPRM concluded on January 25, 2018. (See id.; https://www.regulations.gov/document?D=ATF-2018-0001-0001 (last visited Nov. 13, 2020).)  The DOJ received 115,916 comments on the ANPRM. (Id.)

27

89.    ANPRM commenter Bernard Owens stated in a comment that bump stocks "help reduce the learning curve for [bump firing]," "are used to better control aim while bump firing," "are used to better control the number of shots fired when bump-firing," and have the "primary purpose[]" of "enabl[ing] firing 2 or 3 shots very quickly with good accuracy."  (Dkt. # 54-5, Exh. G-10, AR001526; see https://www.regulations.gov/document?D=ATF-2018-0001-1385 (last visited Nov. 13, 2020).)

90.    ANPRM commenter Nathan Johnson stated in a comment that bump stocks are "an aesthetically and ergonomically pleasing replacement for numerous methods" of bump firing.  (Dkt. # 54-5, Exh. G-16, AR001664; see https://www.regulations.gov/document?D=ATF-2018-0001-20294 (last visited Nov. 13, 2020).)

91.    In this process, Acting Director Brandon considered a *New York Times* online graphic to be a "great" tool for "understanding bump stocks."  (See Dkt. # 54-5, Exh. G-8, AR000716, https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-lasvegas-gun.html (last visited Nov. 13, 2020).)  That online graphic accurately depicts the mechanical operation of a bump stock.

28

92.     On February 20, 2018, President Donald Trump issued a

memorandum to the Attorney General concerning bump stocks, which was

published in the Federal Register.  (Dkt. # 54-5, Exh. G-11, AR000790–

AR000791, 83 Fed. Reg. 7949 ("President's Memo").)

93.     The President's Memo directed DOJ "to dedicate all available

resources to complete the review of the comments received, and, as expeditiously

as possible, to propose for notice and comment a rule banning all devices that turn

legal weapons into machineguns."  (Id.)

94.     On March 16, 2018, Acting Director Brandon answered questions

before the Senate Judiciary Committee.  (See Dkt. # 54-2, Exh. P-7, AR001094.)

In response to a question about the authority to ban bump stocks from Senator

Richard Blumenthal, Acting Director Brandon explained ATF's decision process

by responding, in full:

> Senator, when I first was with the tragedy on October 1st and dealing
> with bump stocks, internally within ATF from our technical experts,
> firearms experts, and our lawyers [the theory] was that they didn't fall
> within the [GCA and the NFA].
>
> I have kept an open mind in the interest of public safety from the letters
> I received from both Republicans and Democrats, and to be candid with
> you, I went outside and over to DOJ and I said, "I don't want us to have
> tunnel vision."

> And I'm being told one thing.  And so, the Attorney General tasked the team to look at it.  Since that time, the – our experts [*sic*], working with the DOJ experts, have led to the advancements from an advanced notice of proposed rulemaking now to a notice of proposed rulemaking that is currently sitting at the Office of Management and Budget.

(Dkt. # 54-2, Exh. P-7, AR001094.)

94.     On March 29, 2018, DOJ published a Notice of Proposed Rulemaking ("NPRM") establishing changes to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 to re-interpret the terms "single function of the trigger" and "automatically" within the federal definition of "machinegun" in 26 U.S.C. § 5845(b).  (Dkt. # 54-10, Exh. G-30, AR001238–AR001240, 83 Fed. Reg. 13442 (Mar. 29, 2018), https://www.regulations.gov/document?D=ATF-2018-0002-0001 (last visited Nov. 13, 2020.)  The NPRM received 193,297 comments.  Id.

## The Final Rule and Bump Stocks

96.     On December 26, 2018, DOJ published in the Federal Register a final rule entitled *Bump Stock Type Devices*.  See 83 Fed. Reg. 66514 (Dec. 26, 2019) ("The Final Rule").

97.     The Final Rule was promulgated by the Attorney General, DOJ, and ATF.  Id. at 66514, 66554.

98.     The Final Rule acknowledged the role of Presidential direction in the Final Rule's adoption, including from the President's Memo.  Id. at 66516–17.

**99.** The Final Rule sets forth the DOJ's understanding of the terms "automatically" and "single function of the trigger." Id.

**100.** The Final Rule states that the phrase "single function of the trigger" means a "single pull of the trigger and analogous motions." Id. at 66515, 66553.

**101.** The Final Rule states that the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot" means "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." Id. at 66518–19, 66553–54.

**102.** The Final Rule instructed individuals who purchased bump stocks prior to its implementation that they could destroy the devices themselves or abandon them at their local ATF office prior to the effective date of the Final Rule, March 26, 2019.  83 Fed. Reg. 66514, 66530.

**103.** Most firearms operate through the pull of a shooter's finger on a curved trigger.  See United States v. Jokel, 969 F.2d 132, 134–35 (5th Cir. 1992); United States v. Carter, 465 F.3d 658, 664–65 (6th Cir. 2006).

**104.** "Pull the trigger" is the commonly accepted terminology for the method by which firearms are usually operated.  See "trigger," n.1., OED Online,

https://www.oed.com/view/Entry/206003; Webster's New World Dictionary 1177

(3d ed. 1988); Guedes I, 356 F. Supp. 3d at 130.

105.   "Automatically" is the adverbial form of "automatic," which, when

the NFA was enacted in 1934, was defined to mean "having a self-acting or

self-regulating mechanism that performs a required act at a predetermined point in

an operation."  (Dkt. # 54-10, Exh. G-33, Webster's New International Dictionary

187 (2d ed. 1934).)

### Plaintiff and the Final Rule

106.   In April 2018, Plaintiff purchased two Slide Fire bump stock devices,

which had been approved for sale by ATF, for use in recreational shooting and

targeting practice.  (Dkt. # 54-2 ¶ 3.)

107.   Plaintiff owned those two Slide Fire bump stocks until he surrendered

them to ATF on March 25, 2019, in compliance with the Final Rule.  (Id. ¶ 4.)

108.   ATF agreed to preserve Plaintiff's bump stocks while this lawsuit is

pending.  (Dkt. # 1 ¶ 124; Dkt. # 11 ¶ 124.)

109.   ATF has preserved Plaintiff's Slide Fire devices pending the outcome

of this lawsuit.  (Dkt. # 54-2 ¶ 5.)

110.   In this suit, Plaintiff seeks the return of his bump stock devices, as

well as a declaratory judgment and permanent injunction preventing the

enforcement of the Final Rule against him and others similarly situated within the

Court's jurisdiction.  (Dkt. # 1 ¶ 251; Dkt. # 39 ¶¶ 325–327.)

II.     CONCLUSIONS OF LAW

A.      **Whether Plaintiff has standing to bring this case**

**111.**    Under Article III of the U.S. Constitution, federal courts only have
jurisdiction to decide cases and controversies.  Lujan v. Defenders of Wildlife, 504
U.S. 555, 559–60 (1992).  Accordingly, the party invoking federal jurisdiction—in
this case, Plaintiff—must prove three elements to establish standing: injury in fact,
causation, and redressability.  Id. at 561.  Plaintiff claims he "has continued and
will continue to suffer harm in the form of a violation of his constitutional rights, a
deprivation of his property, and potential criminal prosecution.  (Dkt. # 1 ¶ 250.)
As explained below, the Court finds Plaintiff has met the standing bar for his claim
of property deprivation and, therefore, does not unnecessarily reach his other
asserted grounds for standing.

**112.**    First, Plaintiff must have suffered an "injury in fact" that is "concrete
and particularized" and "actual or imminent."  Id. at 560.  An "invasion of a legally
protected interest" supplies Plaintiff with the requisite personal stake in the
outcome of this case.  Deutsch v. Annis Enterprises, Inc., 882 F.3d 169, 173 (5th
Cir. 2018).  Because Plaintiff was required to surrender his bump stock devices to
ATF on March 25, 2019 to comply with the Final Rule, he has met this element.
(Dkt. # 1 ¶ 2.)  Second, Plaintiff must show a "causal connection between the

injury and the conduct complained of." <u>Lujan</u>, 504 U.S. at 560.  Plaintiff has

sufficiently traced this property deprivation injury to Defendants' issuance of the

Final Rule by accurately noting that the Final Rule "direct[ed] him to destroy or

surrender his Slide Fire devices before March 26, 2019."  (Dkt. # 1 ¶¶ 122, 124;

<u>see</u> 83 Fed. Reg. 66547).)  Third, Plaintiff must show that it is likely—not merely

speculative—that his injury "will be redressed by a favorable decision."  <u>Lujan</u>,

504 U.S. at 561.  If Plaintiff were to succeed in this case and obtain a permanent

injunction against the Final Rule's enforcement, the Court could redress Plaintiff's

harm by ordering ATF to return Plaintiff's devices.  Accordingly, Plaintiff has met

his constitutional burden to prove standing.

**113.**   "Even if a plaintiff establishes Article III standing, [the Court] may

consider whether prudential standing principles nonetheless counsel against

hearing the plaintiff's claims." <u>Cibolo Waste, Inc. v. City of San Antonio</u>, 718

F.3d 469, 474 (5th Cir. 2013).  "For a plaintiff to have prudential standing under

the APA, 'the interest sought to be protected by the complainant [must be]

arguably within the zone of interest to be protected or regulated by the statute in . .

. question.'" <u>Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.</u>, 522 U.S.

479, 488 (1998) (quoting <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397

U.S. 150, 153 (1970)).  "Whether a plaintiff comes within 'the zone of interests' is

an issue that requires [the Court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014). The APA permits suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. In this case, Plaintiff was forced to surrender or destroy his own property in response to the issuance of the Final Rule. (Dkt. # 1 ¶¶ 52, 122, 124.) Accordingly, Plaintiff's arguments are not "generalized grievance[s]" or attempts to "rais[e] another person's legal rights." Cibolo Waste, 718 F.3d at 474. There are no prudential limitations preventing the Court from deciding this case.

114.   Plaintiff can seek injunctive relief if "continuing, present adverse effects" accompany his allegation of past injury. Lyons v. City of Los Angeles, 461 U.S. 95, 102 (1983). Plaintiff alleges that he has suffered and "will continue to suffer harm in the form of a violation of his constitutional rights, a deprivation of his property, and potential criminal prosecution. (Dkt. # 1 ¶ 250.) Because the Final Rule does not permit ATF—who has retained Plaintiff's devices while this suit is pending—to lawfully return Plaintiff's devices, Plaintiff has met this requirement. (See id. ¶¶ 5, 52, 122, 124; 83 Fed. Reg. 66515, 66539 (requiring

current bump stock owners to destroy or "abandon" their devices at their local ATF field office by March 26, 2019 and prohibiting possession after that date).)

115. For the reasons above, Plaintiff has a direct interest in the outcome of this case and standing to pursue it.

**B.    Whether the Final Rule was validly issued pursuant to appropriately delegated authority from Congress**

**1.    Whether the Final Rule was a legislative or interpretive rule**

116. Agency statements usually fall into one of two types: legislative or interpretive. Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 96–97 (2015). Legislative—or substantive—rules are issued pursuant to statutory authority and have the force and effect of law. PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055 (2019). These rules also "affect individual rights" and "create new law." Davidson v. Glickman, 169 F.3d 996, 999 (5th Cir. 1999). By contrast, interpretive rules simply "advise the public of [an] agency's construction of the statutes and rules which it administers." Perez, 575 U.S. at 96–97 (quoting Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 99 (1995)). Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." Shalala, 514 U.S. at 99.

117.    The Court is not bound by an agency's choice of label for its action. U.S. Dep't of Labor v. Kast Metals Corp., 744 F.2d 1145, 1149 (5th Cir. 1984). Instead, it must first look to whether an agency "intended" to speak with the force of law when classifying a rule as legislative or interpretive.  See Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2122 (2016).  To uncover this intent, the Court examines the "language actually used by the agency."  Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987).  Second, the Court sees "whether the agency has published the rule in the Code of Federal Regulations."  Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993). Third, the Court must determine "whether the agency has explicitly invoked its general legislative authority."  Id.; see Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 18–19 (D.C. Cir. 2019) ("Guedes II").  Fourth, courts in the Fifth Circuit must consider whether the rule will "produce [] significant effects on private interests."  Gulf Restoration Network v. McCarthy, 783 F.3d 227, 236 (5th Cir. 2015).  Finally, if a court finds an express invocation of the Chevron framework in the rule, the rule is likely legislative because Chevron deference can only apply to legislative rules.  See Guedes II, 920 F.3d at 18–19.

118.    Defendants intended the Final Rule to speak with the force of law.  As the D.C. Circuit noted, the Final Rule "unequivocally bespeaks an effort by

38

[Defendants] to adjust the legal rights and obligations of bump-stock owners—i.e., to act with the force of law." Id. at 18.  The prospective, binding language in the Final Rule makes this intent clear.  Id.  For instance, the Final Rule states that bump stocks "*will be prohibited when* this rule becomes effective."  83 Fed. Reg. 66514 (emphasis added).  Defendants went out of their way to clarify that—before the Final Rule's effective date—any person "currently in possession of a bump-stock-type device *is not acting unlawfully*."  Id. at 66523 (emphasis added).  The Final Rule also provides guidance for how individuals can comply "*to avoid violating* 18 U.S.C. § 922(o)" and emphasizes that it will "criminalize *only future conduct, not past possession*" of bump-stock-type devices.  Id. at 66525, 66530.[4]

**119.**   Second, the Final Rule's "publication in the Code of Federal Regulations also indicates that it is a legislative rule."  Guedes II, 920 F.3d at 19 (citing Am. Mining Cong., 995 F.3d at 1112).  Publication in the Code of Federal Regulations ("the CFR") is statutorily limited to rules with "general applicability and legal effect."  44 U.S.C. § 1510.  Because the Final Rule purports to amend three definitional sections of the CFR (27 C.F.R. §§ 447.11, 478.11, and 479.11),

---

[4] For this reason, the Court also rejects Plaintiff's challenge that the Final Rule violates the Administrative Procedure Act for its "retroactive effect."  (Dkt. # 1 ¶ 249.)

this factor also suggests the Final Rule is legislative.  See Guedes II, 920 F.3d at 19.

**120.**    Third, "the agency has explicitly invoked its general legislative authority" from two sources.  Id.  The Final Rule cites 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a)[5] in support of Defendants' ability to promulgate the Final Rule. 83 Fed. Reg. 66515.  Under section 926(a), the Attorney General has the power to "prescribe only such rules and regulations as are necessary to carry out the provisions of [the GCA]."  18 U.S.C. § 926(a).  Section 7805(a) grants the Attorney General authority to "prescribe all needful rules and regulations for the enforcement of [the NFA]."  26 U.S.C § 7805(a); see Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (transferring NFA enforcement power from the Secretary of the Treasury to the Attorney General without altering the language still present in section 7805).

**121.**    Fourth, the Final Rule "impose[s] obligations [and] produce[s] . . . significant effects on private interests."  Gulf Restoration Network, 783 F.3d at 236

---

[5] The Final Rule also cites 26 U.S.C. § 7801(a)(2)(A), which clarifies that the authority in section 7805(a) related to the NFA belongs to the Attorney General, rather than the Secretary of the Treasury.  26 U.S.C. § 7801(a)(2)(A).  For the sake of brevity, the Court simply refers to this combined authority as an invocation of Defendants' authority under section 7805(a).

40

(distinguishing rulemaking from an unreviewable enforcement decision).  The D.C. Circuit has reasoned that "[t]he most important factor in differentiating between binding and nonbinding actions is the actual legal effect (or lack thereof) of the agency action in question."  Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta, 785 F.3d 710, 717 (D.C. Cir. 2015) ("Huerta").  "Agency action that creates new rights or imposes new obligations on regulated parties or narrowly limits administrative discretion constitutes a legislative rule."  Id.  Defendants estimate that the Final Rule will have an economic impact of $102.5 million by voiding the sale of as many as 520,000 bump-stock devices.  83 Fed. Reg. 66547.  This adjustment imposes the type of "significant effect[] on private interests" characteristic of legislative rules.  See Gulf Restoration Network, 783 F.3d at 236; see Huerta, 785 F.3d at 717.

   **122.**   ATF further demonstrated the legislative character of the Final Rule by explicitly invoking the framework of Chevron U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837 (1984) because interpretive rules "enjoy no Chevron status as a class."  United States v. Mead Corp., 533 U.S. 218, 232 (2001); 83 Fed. Reg. 66527.  For all these reasons, the Final Rule is a legislative rule.

2.      **Whether the Final Rule is *ultra vires* as a legislative rule issued pursuant to 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a)**

123.    Defendants first invoked 18 U.S.C. § 926(a) as delegated authority to issue a legislative rule like the Final Rule.  83 Fed. Reg. 66515.  That statute authorizes the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of [the GCA]."  18 U.S.C. § 926(a). Defendants then invoked 26 U.S.C. § 7805(a) for the authority to "prescribe all needful rules and regulations for the enforcement of [the NFA]."  26 U.S.C. § 7805(a).

124.    Plaintiff characterizes the delegation under 18 U.S.C. § 926(a) as "implementing authority."  (Dkt. # 39 ¶ 263.)  He argues that "Congress withheld a different type of legislative rulemaking authority," instead providing a limited delegation for implementation.  (Id.)  By contrast, the D.C. Circuit found this delegation to be "a general conferral of rulemaking authority" that clearly included the authority to issue legislative rules that fill gaps in the statutory definition of "machinegun" like the Final Rule does.  Guedes II, 720 F.3d at 20–21.

125.    Like Plaintiff, Defendants contend—in this litigation and in related cases on appeal—that every court which has examined the delegations cited in the Final Rule has read the delegations too broadly.  (Dkt. # 59 at 16; see Br. for the

42

Respondents in Opp. at 14, 25, <u>Guedes v. ATF</u>, <u>cert.</u> <u>denied</u>, No. 19-296 ("<u>Guedes</u> <u>III</u>") (Dec. 4, 2019); Br. for Appellees at 40-41, <u>Aposhian v. Barr</u>, No. 19-4036 (10th Cir. Aug. 26, 2019) ("<u>Aposhian II</u>").)  Defendants agree with Plaintiff that "the narrow statutory delegation on which the [Final Rule] relies does not provide the Attorney General the authority" to issue legislative rules with criminal consequences.  (Dkt. # 59 at 16.)

126.    In <u>Texas v. United States</u>, 497 F.3d 491 (5th Cir. 2007), the Fifth Circuit emphasized that "[a]gency authority may not be lightly presumed" or implied *sub silentio*.  <u>Id.</u> at 502 (citing <u>Michigan v. E.P.A.</u>, 268 F.3d 1075, 1082 (D.C. Cir. 2001)).  On the other hand, "[i]n this circuit, [courts] apply <u>Chevron</u> to an agency's interpretation of its own statutory jurisdiction." <u>City of Arlington,</u> <u>Tex. v. F.C.C.</u>, 668 F.3d 229, 248 (5th Cir. 2012).  Normally, that means that courts in the Fifth Circuit must begin with "the traditional tools of statutory construction" and, if the scope of the delegation is ambiguous, afford deference to an agency's reasonable interpretation of its authority.  <u>Id.</u>; <u>Texas</u>, 497 F.3d at 503; <u>see</u> <u>generally</u> <u>Chevron</u>, 467 U.S. at 842–43.

127.    At the same time, when an agency abandons its interpretation of a statute, that interpretation no longer deserves deference.  <u>Estate of Cowart v.</u>

Nicklos Drilling Co., 505 U.S. 469, 480 (1992).[6]  The Supreme Court has noted that "it would be quite inappropriate to defer to an interpretation which has been abandoned by the policymaking agency itself."  Id.  Therefore, although the Final Rule is a legislative rule for which Defendants invoked their authority under 18 U.S.C. § 926(a) and 26 U.S.C. § 7805, the Court examines the delegations under these statutes without the deferential thumb of Chevron on the scale.  See id.

128.    The parties are correct that section 926(a) could have delegated broader authority to Defendants.  But see Guedes I, 356 F. Supp. 3d at 128. Nevertheless—like every other court to have considered the issue—the Court still concludes that section 926(a) is a *broad enough* delegation for ATF to issue a legislative rule that fills gaps in the definition of "machinegun" under the GCA. "Because [section 926(a)] authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'"  Nat'l Rifle Ass'n v. Brady, 914 F.2d 475, 479 (4th Cir. 1990) (Wilkinson, J.).  Filling gaps for how to apply the terms within the statutory definition of "machinegun" to bump

---

[6] In the Final Rule, ATF abandoned its prior determinations regarding the status of bump stocks.  See 83 Fed. Reg. 66531.  The principle in Estate of Cowart explains why those prior determinations are not entitled to Chevron deference, while the new interpretation may or may not be (see Part II.C below).

stocks is within the scope of this "measure of discretion" under section 926(a).  See id.; see also Demko v. United States, 44 Fed. Cl. 83, 99 (1999) (recognizing ATF's authority to classify a shotgun as a "destructive device" under another provision of the GCA); 83 Fed. Reg. 66527.

**129.**   The Court also agrees with the courts in Guedes I, Guedes II, Aposhian I, and Aposhian II[7] that 26 U.S.C. § 7805 provides Defendants the authority to issue a legislative rule like the Final Rule.  In Guedes II, the D.C. Circuit noted that the Supreme Court has characterized section 7805 as an "express

---

[7] The Court is aware that the Panel's decision in Aposhian II has been vacated pending a rehearing *en banc* by the Tenth Circuit.  See Aposhian v. Barr, 973 F.3d 1151, 1151 (10th Cir. Sept. 4, 2020) ("Aposhian III").  Accordingly, when the Court cites to this vacated decision in these Findings of Fact and Conclusions of Law, it does so by relying on the reasoning behind these parts of the Aposhian II court's determination—which, in each case, finds support outside the Tenth Circuit—rather than on that case's holding itself.  See, e.g., Guedes II, 720 F.3d 1 (D.C. Cir. 2019).

Accordingly, should the Tenth Circuit's *en banc* decision support Plaintiff's view of the Final Rule, the Court would still find that Defendants shall prevail in this case.  Cf. Whole Woman's Health v. Smith, 338 F. Supp. 3d 606, 624–25 (W.D. Tex. 2018) (Ezra, J.) (ruling opposite to the Seventh Circuit's subsequently-reversed decision in Planned Parenthood of Indiana and Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health, 888 F.3d 300, 309 (7th Cir. 2018), regarding an Indiana fetal tissue remains law virtually identical to that of Texas); Box v. Planned Parenthood of Indiana and Kentucky, Inc., 139 S. Ct. 1780, 1782 (2019) (reversing the Seventh Circuit's determination—not relied on by the undersigned—that a state's asserted interest in "the humane and dignified disposal of human remans" was illegitimate on its face).

congressional authorization[] to engage in the process of rulemaking" that served as "a very good indicator of delegation meriting <u>Chevron</u> treatment" (which is necessarily a delegation authorizing legislative rulemaking).  <u>Guedes II</u>, 920 F.3d at 20–21 (quoting <u>Mayo Found. For Med. Educ. & Research v. United States</u>, 562 U.S. 44, 57 (2011)).

130.    Accordingly, Defendants issued the Final Rule pursuant to valid delegated authority and the Final Rule is not *ultra vires*.

### 3.    Whether Defendants violated principles of non-delegation and/or separation of powers in this case

131.    Under Article I of the U.S. Constitution, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.  Yet, Congress can delegate some authority to the Executive Branch (or independent agencies) to engage in rulemaking without violating principles of non-delegation, even where such rulemaking may lead to criminal consequences.  <u>See</u> <u>Loving v. United States</u>, 517 U.S. 748, 768 (1996) (documenting the Supreme Court's history of "uphold[ing] delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal").  Plaintiff's reliance on <u>United States v. Eaton</u>, 144 U.S. 677 (1892) is inapposite, as that case has been severely limited since the Supreme Court reached that decision

46

more than a century ago.  See, e.g., United States v. Howard, 352 U.S. 212, 216–17

(1957) ("[Eaton] turned on its special facts . . . [and] has not been construed to

state a fixed principle that a regulation can never be a 'law' for purposes of

criminal prosecutions.").  Because executive actors (like Defendants) may issue

rules that lead to criminal consequences, there is no separation of powers issue

with the Final Rule.  Loving, 517 U.S. at 768.

132.   The Final Rule also comports with non-delegation principles.  "[T]he

Constitution does not 'deny[] to the Congress necessary resources of flexibility and

practicality to perform its function[s].'"  Gundy v. United States, 139 S. Ct. 2116,

2123 (2019) (quoting Yakus v. United States, 321 U.S. 414, 425 (1944)).  The

Supreme Court has "held, time and again, that a statutory delegation is

constitutional as long as Congress 'lay[s] down by legislative act an intelligible

principle to which the person or body authorized to [exercise the delegated

authority] is directed to conform.'"  Id., 139 S. Ct. at 2123 (quoting J.W. Hampton,

Jr. & Co. v. United States, 276 U.S. 394, 409 (1928)).

133.   The Supreme Court "has made clear" that the standards for

compliance with non-delegation principles "are not demanding."  Gundy, 139 U.S.

at 2129.  In fact, "[o]nly twice in this country's history [has the Supreme Court]

found a delegation excessive."  Id.

**134.**   The Final Rule explains the criminal consequences of bump stock

ownership by fleshing out the definitions of "single function of the trigger" and

"automatically" within 26 U.S.C. § 5845(b).  See 83 Fed. Reg. 66515.  By not

defining those terms explicitly in the statute, Congress implicitly delegated the

authority to clarify those terms.  See FDA v. Brown & Williamson Tobacco Corp.,

529 U.S. 120, 159 (2000); see also Aposhian I, 374 F. Supp. 3d at 1151 (citing

Chevron, 467 U.S. at 844 (recognizing the need for "the making of rules [by

agencies] to fill any gap left, implicitly or explicitly, by Congress").

**135.**   As explained in Part II.B.2, Defendants acted within the scope of

delegated authority by issuing this legislative rule.  See Brady, 914 F.2d at 479

(explaining the scope of 18 U.S.C. § 926(a)); Guedes II, 920 F.3d at 20–21

(finding the Final Rule within the scope of 26 U.S.C. § 7805).  The delegations of

authority supporting the Final Rule also do not violate non-delegation principles

because 18 U.S.C. § 926(a) only permits the Attorney General to "prescribe such

rules and regulations as are necessary to carry out the provisions of [the GCA]"

and 26 U.S.C. § 7805 provides similar authority for "all needful rules and

regulations for the enforcement of [the NFA]."  18 U.S.C. § 926(a); 26 U.S.C.

§ 7805(a).  Given that the Supreme Court has "over and over upheld even very

broad delegations," like ones requiring an agency merely "to regulate in the 'public

48

interest,'" the delegations underlying the Final Rule certainly pass the "intelligible principle" test.  Gundy, 139 U.S. at 2129 (citing Nat'l Broadcasting Co. v. United States, 319 U.S. 190, 216 (1943)).

136.    Therefore, the Court is not convinced by either Plaintiff's separation of powers argument or his non-delegation argument.

### C.    Whether Defendants' current interpretations are entitled to deference under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984)

#### 1.    Whether Chevron deference can be—and, in this case, has been—waived

137.    In their trial briefs, Defendants avoid relying on Chevron deference to support their interpretation of "machinegun" in the Final Rule.  (Dkt. # 46 at 24; Dkt. # 59 at 17.)  However, the Supreme Court's decision in Chevron is binding precedent that, when applicable, the Court is not permitted to ignore.  At the same time, it is less clear whether Chevron deference applies when the lawyers for both sides avoid raising it in litigation.  See SoundExchange, Inc. v. Copyright Royalty BD., 904 F.3d 41, 54 (D.C. Cir. 2018); Global Tel*Link v. F.C.C., 866 F.3d 397, 417 (D.C. Cir. 2017).  While courts should generally reach only those arguments that the parties present, some argue that Chevron represents an interpretive framework that binds courts regardless of the arguments raised by the parties.

United States v. Sineneng-Smith, 140 S. Ct. 1575, 1578–79 (2020); see, e.g., Anya

Bernstein, Who is *Chevron* For?, Yale J. Reg.: Notice & Comment (Aug. 24,

2017), https://perma.cc/3UP6-AJQB (last visited Nov. 13, 2020).

138.    Both circuits that have considered similar challenges to the Final Rule

have wrestled with the role of Chevron deference in the case.  In Guedes II, Judges

Srinivasan and Millett of the D.C. Circuit concluded that "an agency's lawyers . . .

cannot waive Chevron if the underlying agency action 'manifests its engagement in

the kind of interpretive exercise to which review under Chevron generally

applies.'"  Guedes II, 920 F.3d at 23 (quoting SoundExchange, 904 F.3d at 54).

Judge Henderson dissented from this portion of the decision, preferring to "leave

for another day whether the Government can 'waive' Chevron review."  Id. at 41

n.10 (Henderson, J., concurring in part and dissenting in part); see also Global

Tel*Link, 866 F.3d at 417 (declining to decide whether Chevron deference applied

when no party raised the issue).

139.    While granting a rehearing *en banc*, the Tenth Circuit asked litigants

for supplemental briefing on whether "Chevron step-two deference depend[s] on

one or both parties invoking it, i.e., can it be waived."  Aposhian v. Barr, 973 F.3d

1151, 1151 (10th Cir. Sept. 4, 2020) ("Aposhian III") (granting petition to rehear

Aposhian II *en banc*).

50

**140.**   For its part, the Supreme Court has built a backstop to <u>Chevron</u>

applicability by noting that "it would be quite inappropriate to defer to an

interpretation which has been abandoned by the policymaking agency itself."

<u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505 U.S. 469, 480 (1992).  In a statement

regarding the denial of certiorari in <u>Guedes III</u>, Justice Gorsuch further noted that

the Supreme Court "has often declined to apply <u>Chevron</u> deference when the

government fails to invoke it."  140 S. Ct. at 790.  For example, in <u>Epic Systems

Corp. v. Lewis</u>, 138 S. Ct. 1612 (2018), the Supreme Court found <u>Chevron</u>

deference inappropriate where "the Executive seems of two minds" about the result

it prefers.  <u>Id.</u> at 1630 (noting conflict between briefs submitted by the Solicitor

General and National Labor Relations Board); <u>see</u> <u>also</u> <u>Baldwin v. United States</u>,

140 S. Ct. 690, 693 (2020) (Thomas, J., dissenting from denial of certiorari)

(disfavoring deference when an agency's interpretation "has not been uniform").

An interpretation that "conflicts with the agency's earlier interpretation is entitled

to considerably less deference than a consistently held agency view."  <u>INS v.

Cardoza-Fonseca</u>, 480 U.S. 421, 446 n.30 (1987) (internal quotations omitted).

**141.**   Here, the conflict regarding the role of <u>Chevron</u> comes from the

explicit invocation of the <u>Chevron</u> framework in the Final Rule by Defendants (<u>see</u>

83 Fed. Reg. 66527) and the deliberate avoidance of the framework by *counsel for*

Defendants (and Plaintiff) in their briefs.  (See Dkt. # 57 at [27:12–27:13].)

Whether a divergence between the Final Rule and arguments made in defense of

the Final Rule can result in a Chevron waiver is an open question the Court need

not decide today.  See Guedes II, 920 F.3d at 41 n.10 (Henderson, J. concurring in

part, dissenting in part).  As explained below, it is irrelevant whether counsel for

Defendants could waive reliance on Chevron deference in the abstract or in this

case because Chevron does not apply to criminal statutes.  See United States v.

Apel, 571 U.S. 359, 369 (2014).

### 2.  Whether Chevron deference applies to agency interpretations of criminal statutes

**142.**  Nevertheless, Chevron deference is still inapplicable in this case

because "the law before [the Court] carries the possibility of criminal sanctions."

Guedes III, 140 S. Ct. at 790.  As Justice Gorsuch noted in a statement regarding

the Supreme Court's denial of certiorari in Guedes III, Chevron deference "has no

role to play when liberty is at stake."  Id.  The Supreme Court has "never held that

the Government's reading of a criminal statute is entitled to any deference."  Apel,

571 U.S. at 369; see also Abramski v. United States, 573 U.S. 169, 191 (2014)

("[C]riminal laws are for courts, not for the Government, to construe"); but see

United States v. O'Hagan, 521 U.S. 642, 673–77 (1997) (deferring to an SEC

interpretation of a criminal statute); Babbitt v. Sweet Home Chapter of Cmties. for

a Great Ore., 515 U.S. 687, 703 (1995) (applying "some degree of deference" to

regulations interpreting parts of the Endangered Species Act that provide for

criminal penalties).  With Justice Gorsuch's guidance in mind, the Court will rely

solely on "the traditional tools of statutory construction" to determine whether the

Final Rule adopts the correct interpretation of the definition of "machinegun" as

applied to bump-stock type devices.  Texas, 497 F.3d at 503.  In other words, the

Court will place no "thumb on the scale in favor of the government."  Guedes III,

140 S. Ct. at 790.

     **143.**   Notably, the Supreme Court has cautioned against wading into

deference determinations when the Court determines that an agency rule adopts

"not only a reasonable [position], but the position that [the Court] would adopt

even if there were no formal rule and [the Court] were interpreting the statute from

scratch."  Edelman v. Lynchburg College, 535 U.S. 106, 114 (2002); see, e.g.,

Aposhian I, 374 F. Supp. 3d at 1151 ("The court need not confront the deference

dilemma here because the Final Rule's clarifying definitions reflect the best

interpretation of the statute.").  As discussed below, the Court independently finds

that the Final Rule adopts the proper interpretation of "machinegun" by including

bump stock devices, so there really is no occasion to apply the deference afforded

under <u>Chevron</u> step-two in this case.  See <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2415

(2019) ("If uncertainty does not exist, there is no plausible reason for deference.");

<u>Aposhian I</u>, 374 F. Supp. 3d at 1151.

> **D.   Whether a bump stock is properly considered a "machinegun" under 26 U.S.C. § 5845(b)**

**144.**   Defendants posit that the best reading of the statutory definition of

"machinegun" includes bump stocks like Mr. Cargill's two Slide Fire devices.  A

"machinegun" is defined statutorily as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); <u>see also</u> 18 U.S.C. § 921(23) ("The term 'machinegun' has the

same meaning given such term in section 5845(b) of the National Firearms Act.").

**145.**   In the Final Rule, Defendants amend three regulatory definitions of

"machinegun" at 27 C.F.R. §§ 447.11, 478.11 and 479.11.  The Final Rule sets the

definition of "machinegun" in each provision to mean any weapon

> which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or

54

receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger and analogous motions. The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. 66553–54.

**146.**   From the interpretation above, there are two definitions at issue in this case.  First, the Final Rule defines "single function of the trigger" as a "single pull of the trigger and analogous motions."  Id.  Second, the Final Rule defines "automatically" as "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger."  Id.

**147.**   Courts "interpret the words [of a statute] consistent with their ordinary meaning at the time Congress enacted the statute."  Wisconsin Central Ltd. v. United States, 138 S. Ct. 2067, 2070 (2018).

**148.**   Plaintiff argues that, because members in both houses of Congress proposed—but did not enact—legislation explicitly criminalizing bump stock possession before Defendants issued the Final Rule pursuant to existing authority, existing law must not prohibit bump stock possession.  (Dkt. # 39 ¶¶ 135–37, 194–97.)  Unenacted legislative proposals and views of individual legislators from a later Congress, however, present "a particularly dangerous ground on which to rest an interpretation of a prior statute."  Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650 (1990).  "Failed legislative proposals" provide no insight into the intentions of a previous Congress "because several equally tenable inferences can be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."  See United States v. Craft, 535 U.S. 274, 287 (2002) (quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 187 (1994)).

**149.**   Accordingly, below the Court addresses Defendants' interpretations of "single function of the trigger" and "automatically" according to their "ordinary meaning at the time Congress enacted the statute," and without considering the unreliable evidence of legislative history of unenacted proposals.  See Wisc. Central Ltd., 138 S. Ct. at 2070.  Because the traditional tools of statutory

interpretation yield unambiguous meanings for these terms, the rule of lenity does not apply.  See Yates v. United States, 574 U.S. 528, 547–48 (2015).

### 1.   Whether the Final Rule adopts the proper reading of "single function of the trigger" in 26 U.S.C. § 5845(b)

**150.**   First, as the court in Aposhian I determined, the phrase "single function of the trigger" is best interpreted to mean "a single pull of the trigger and analogous motions." Aposhian I, 374 F. Supp. 3d at 1151. The Aposhian I court called this definition the "shooter-focused interpretation" (as opposed to the "mechanically-focused interpretation"). Id. at 1151–52.  It seems likely Congress chose the word "'function' to forestall attempts by weapon manufacturers or others to implement triggers that need not be pulled, thereby evading the statute's reach." Id. at 1152.  In other words, Congress chose a broader term than the obvious alternative (pull).  Consistent with the broad word choice of "function," the Final Rule includes the phrase "and analogous motions" after "single pull of the trigger." 83 Fed. Reg. 66518.

**151.**   Given that most firearms "function" by the pull of a trigger, courts have "instinctively reached for the word 'pull' when discussing the statutory definition of machinegun." Guedes I, 356 F. Supp. 3d at 130 (citing United States v. Staples, 511 U.S. 600, 602 n.1 (1994); United States v. Oakes, 564 F.2d

384, 388 (10th Cir. 1977)).  The Supreme Court has described a machinegun as "a weapon that fires repeatedly with a single pull of the trigger."  Staples, 511 U.S. at 602 n.1.  In Oakes, the Tenth Circuit equated "a single function of the trigger" with "the shooter . . . fully pulling the trigger."  Oakes, 564 F.2d at 388.

    **152.**  Defendants also provided evidence that "pull" has meant "function" in this ordinary use since before the NFA was passed until at least after the FOPA was passed.  See, e.g., Dwight D. Eisenhower, Address to the American Society of Newspaper Editors (Apr. 17, 1958), in Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit the target than it is to haggle over who makes a weapon or who pulls a trigger"); Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); Nightline: Biting the Bullet at the NRA [National Rifle Association] (ABC television broadcast, June 8, 1990) (NRA President Joe Foss: "[semi-automatic] guns are like any other gun . . . they're a single-shot, every time you pull the trigger it shoots"); see also Oliver Wendell Holmes, Jr., The Common Law: Lecture IV (1881) (an ordinary person "would foresee the possibility of danger from pointing a gun which he had not inspected into a crowd, and pulling the trigger, although it was said to be unloaded").

**153.**   Accordingly, the Court finds that the Final Rule's definition of "single function of the trigger" to mean "a single pull of the trigger and analogous motions" is the correct interpretation.  See Aposhian I, 374 F. Supp. 3d at 1151–52.

## 2.    Whether the Final Rule adopts the proper reading of "automatically" in 26 U.S.C. § 5845(b)

**154.**   Second, also like the Aposhian I court found, the Final Rule endorses the correct reading of "automatically" within section 5845(b) by interpreting it to mean "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." Aposhian I, 374 F. Supp. 3d at 1153.  As that court found, the "interpretive language is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the NFA's enactment." Id. at 1152.

**155.**   Courts "often look to dictionary definitions for help" in determining the ordinary meaning of a statutory term.  Cascabel Cattle Co. v. United States, 955 F.3d 445, 451 (5th Cir. 2020); see generally A. Raymond Randolph, Dictionaries, Plain Meaning, and Context in Statutory Interpretation, 17 Harv. J.L. & Pub. Pol'y 71 (1994).  Webster's definition for "automatic" ("having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation") from the same year Congress passed the

NFA nearly mirrors the regulatory definition in the Final Rule.  (Dkt. # 54-11, Exh. G-41, Webster's New International Dictionary, Second Edition 187 (1934); see also Dkt. # 54-11, Exh. G-42, "automatic," 1 Oxford English Dict. 574 (1933) ("self-acting under conditions fixed for it, going of itself").)

**156.**   Defendants point out that, in United States v. Olofson, 563 F.3d 652 (7th Cir. 2009), the Seventh Circuit similarly concluded that "automatically . . . delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." Id. at 658; (Dkt. # 54-5, Exh. G-7, AR004477–AR004478.)

**157.**   Plaintiff, on the other hand, makes two arguments that these regulatory definitions are improper interpretations of the statutory definition of "automatically."  (Dkt. # 39 ¶¶ 282–283.)  First, he contends that "additional physical manipulation of the trigger" occurs with bump firing because the trigger "re-engage[s]" between shots.  (Id. ¶ 282.)  Second, he argues that the Final Rule "disregards the other physical manipulation bump firing requires" from retaining forward pressure with the non-trigger hand.  (Id. ¶ 283.)  Judge Henderson, in dissent, found the second argument particularly persuasive in Guedes II, 940 F.3d at 44 (Henderson, J., concurring in part and dissenting in part) ("The statutory

definition of 'machinegun' does not include a firearm that shoots more than one round 'automatically' by a single pull of the trigger **AND THEN SOME** (that is, by 'constant forward pressure with the non-trigger hand').").

158.   Nevertheless, Plaintiff's arguments are of no avail.  As Defendants persuasively point out, "the movement of the weapon back and forth between shots while the trigger finger remains stationary on the trigger ledge *is* the result of an automatic, 'self-acting or self-regulating mechanism.'"  (Dkt. # 46 at 14 (quoting 83 Fed. Reg. 66553).)  Therefore, even though the shooter's finger disengages and re-engages with the trigger during the bump firing process, the sequence set in motion by the initial forward pressure causing a trigger pull continues.  Multiple rounds fire because "[t]he weapon recoils faster than you can react."  (Id. at [84:3–84:4].)

159.   Defendants also respond convincingly to Plaintiff's argument that, because the shooter must maintain constant forward pressure on the fore-grip or barrel shroud to continue firing, the recoil-propelled process is not "automatic."  (See Dkt. # 46 at 14.)  There is no dispute that fully automatic weapons—those that discharge multiple rounds if "you continue to keep your finger down on the trigger"—shoot "automatically."  (Dkt. # 57 at [81:22–82:5].)  The difference between such weapons and semi-automatic weapons equipped with bump stocks is

61

that—for the latter—the shooter must maintain constant forward pressure with his non-shooting hand and keep his trigger finger stationary, rather than keep constant pressure on the trigger with his shooting hand's trigger finger.  (Id. at [82:5–83:9].)

**160.**   As they relate to the statutory definition, there is no meaningful difference between these two actions.  Smith testified that, for firing with a bump stock, "mentally, you're doing nothing but pressing forward."  (Id. at [84:7–84:8].) In both cases, maintaining pressure in one direction allows shooting to continue from a "self-acting or self-regulating mechanism" until that pressure is released, or the firearm runs out of ammunition or malfunctions.  83 Fed. Reg. 66553.  Like in Aposhian I, the Court finds this similarity—that a shooter can continue firing by just maintaining pressure on the weapon—more accurately reflects the line Congress drew with the term "automatically" than would a distinction based on the strict mechanical workings within the weapon.  See Aposhian I, 374 F. Supp. 3d at 1152–53; National Firearms Act: Hearings Before the Committee on Ways and Means 73rd Cong. 40 (1934).

**161.**   Therefore, as a near-copy of the dictionary definition that "accords with past judicial interpretation," the definition of "automatically" in the Final Rule is the proper interpretation of that term in section 5845(b).  Aposhian I, 374 F. Supp. 3d at 1152 (citing Olofson, 563 F.3d at 658).  This is especially true

considering how fully automatic weapons function by comparison.  (Id. at [82:5–83:9].)

### 3.    Whether, applying these interpretations, the Final Rule properly placed bump stocks within the statutory definition of "machinegun" in 26 U.S.C. § 5845(b)

**162.**    Applying the definitions of these two terms in the Final Rule to bump stocks makes it clear that a bump stock fits the statutory definition of a "machinegun," as seen in section 5845(b).  Congress expanded the definition of "machinegun" in 26 U.S.C. § 5845(b) by adding any part or parts "designed and intended solely and exclusively" to "convert[] a weapon into a machinegun." 26 U.S.C. § 5845(b).  The Fifth Circuit has held that semi-automatic weapons outfitted with parts that change the firing capabilities are "machineguns."  United States v. Camp, 343 F.3d 743, 744–45 (5th Cir. 2003).

**163.**    Plaintiff contends that bump firing with a bump stock involves separate "functions" of "pulling and releasing the trigger," just as ATF incorrectly used to believe.  (See, e.g., Dkt. # 54-8, Exh. G-22, AR000138.)  As explained above, the word "function" was interchangeable for "pull" in most cases.  See 83 Fed. Reg. 66518 (citing testimony of then-president of the National Rifle Association, National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066, 73rd Cong., 2nd Sess., at 40 (1934)).  And, if anything, the use

of the word "function" instead of "pull" was intended to *expand* the definition of "machinegun."  83 Fed. Reg. 66518 n.1 (citing <u>Camp</u>, 343 F.3d at 745 (''To construe 'trigger' to mean only a small lever moved by a finger would be to impute to Congress the intent to restrict the term to apply only to one kind of trigger, albeit a very common kind.  The language [in 18 U.S.C. § 922(o)] implies no intent to so restrict the meaning.") (internal quotations omitted)).

**164.**   The Court agrees with Defendants that a shooter's finger unconsciously disconnecting from the trigger does not constitute multiple "pulls" of the trigger.  (<u>See</u> Dkt. # 57 at [84:3–84:4].)  In fact, "pull" is defined to mean

> to exert upon (something) a force which tends to draw, drag, or snatch it towards oneself, or away from its present position (whether or not movement takes place as a result); to drag or tug.

"Pull, v." OED Online, Oxford University Press, December 2018, https://www.oed.com/view/Entry/154317?rskey=QI8tWH (last visited Nov. 13, 2020).  Applying this definition, the trigger mechanically resetting as recoil pushes the bump stock-equipped weapon back and forth does not constitute multiple "pulls" of the trigger while the shooter maintains constant forward pressure.  The dictionary definition focuses on a person's intent to "pull" something by noting that a pull results "whether or not movement takes place as a result."  <u>See</u> <u>id.</u>

**165.**   Like other courts interpreting the Final Rule, the Court finds the "shooter-focused interpretation" of the statute is the proper reading.  See <u>Aposhian I</u>, 374 F. Supp. 3d at 1151 (stating that a "shooter-focused interpretation" of the statute is the "best" way to read the statute); <u>Guedes I</u>, 356 F. Supp. 3d at 130 (recognizing that the Final Rule understands machineguns from "the perspective of the shooter"); <u>Aposhian II</u>, 958 F.3d at 988 (rejecting argument that the Final Rule improperly adopts a "trigger finger" focus in its definition of the statute).  It does not matter that the trigger mechanically resets to "function" again when the shooter only takes one "function" to initiate the firing of multiple rounds.  The continuous exertion of forward pressure on the fore-end of the gun while "[t]he weapon recoils faster than you can react" is a "single pull of the trigger [or] analogous motion" just the same as continuing to hold the trigger of a fully automatic weapon is.  (Dkt. # 57 at [84:3–84:4].)

**166.**   Therefore, the Final Rule properly classifies a bump stock as a "machinegun" within the statutory definition codified at 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(23).

### 4.     Whether the Final Rule drew a reasonable line between bump stock devices and other methods of bump firing

**167.**   Plaintiff contests Defendants' decision to classify a bump stock device as a "machinegun" while excluding semi-automatic rifles themselves or other items that enable bump firing, like belt loops from the definition.  (Dkt. # 39 ¶¶ 279–80.)  As the Final Rule noted in response to similar comments, bump firing without a bump stock is not accomplished by a "self-acting or self-regulating mechanism."  83 Fed. Reg. 66532–33.  The belt loop method of bump firing "relies on the shooter—not a device—to harness the recoil energy" to continuously engage the trigger.  Id. at 66533.  Not to mention, unlike a bump stock, a belt loop is not "designed and intended . . . for use in converting a weapon into a machinegun."  26 U.S.C. § 5845(b).  Plaintiff seems to even concede this distinction by characterizing a bump stock in his closing argument as "just a tool for a particular shooting technique."  (Dkt. # 58 at 15.)

**168.**   The fact that bump stock devices permit replacing the trigger finger with a post if the shooter just keeps pushing forward also distinguishes these devices from the other methods of bump firing.  (See Dkt. # 57 at [82:25–83:3].)  This conclusion is supported by Smith's testimony at trial that bump firing without a bump stock is "much more difficult."  (Dkt. # 57 at [87:12–87:15, 89:25–90:4].)

66

**169.**   In any case, Plaintiff does not assert a specific cause of action for why this distinction should invalidate the Final Rule.  (<u>See</u> Dkt. # 1; Dkt. # 39 ¶¶ 279–80.)  Assuming Plaintiff challenges this distinction under the Administrative Procedure Act, Defendants would only need to demonstrate that they "clearly thought about [these] objections and provided reasoned replies."  <u>Guedes I</u>, 356 F. Supp. 3d at 135 (citing <u>City of Portland v. EPA</u>, 507 F.3d 706, 714 (D.C. Cir. 2007)).  Defendants' response in the Final Rule more than meets that burden.

**170.**   Accordingly, Defendants reasonably concluded that "belt loops, unlike bump stocks, do not transform semiautomatic weapons into statutory 'machineguns.'"  <u>Guedes II</u>, 920 F.3d at 32.

> ## E.    Whether ATF's actions violate the Administrative Procedure Act

**171.**   Plaintiff argues that the Final Rule should be enjoined for violating 5 U.S.C. §§ 706(2)(A) and/or (C), parts of the Administrative Procedure Act ("APA").  (Dkt. # 1 ¶¶ 182–240.)  For the reasons described below, the Court rejects Plaintiff's APA challenges under both provisions.

> ### 1.    Whether Defendants' actions were "arbitrary and capricious" or "otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A)

**172.**   Under section 706(2)(A) of the APA, the Court must "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an

67

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  Agency action violates this provision of the APA

> if the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29,

43 (1983).  The Court "may not substitute its own judgment for that of the

agency," but must require "substantial evidence in the record" to support the

agency decision.  Texas Oil & Gas Ass'n v. U.S. E.P.A., 161 F.3d 923, 933–

34 (5th Cir. 1998).  "The central purpose of arbitrary or capricious review is

to assure that the agency has engaged in 'reasoned decisionmaking.'"  Guedes

II, 920 F.3d at 34 (quoting State Farm, 463 U.S. at 52).

### a.      Whether ATF considered inappropriate factors in formulating the Final Rule

**173.**   Plaintiff challenges Defendants' consideration of "overtly political

factors" in adopting the Final Rule.  (Dkt. # 39 ¶¶ 303, 306, 309.)  "All would

agree that [Defendants] enacted [the Final Rule] in response to the urging of the

President, Members of Congress, and others, as part of an immediate and

widespread outcry in the wake of the 2017 mass shooting in Las Vegas."  Guedes

68

II, 920 F.3d at 34 (internal quotations omitted).  The Final Rule itself cites a

memorandum from President Trump to then-Attorney General Jeff Sessions

"direct[ing] the Department of Justice 'as expeditiously as possible, to propose for

notice and comment a rule banning all devices that turn legal weapons into

machineguns.'"  83 Fed. Reg. 66516–17 (quoting Dkt. # 54-5, Exh. G-11,

AR000790–AR000791 ("President's Memo")).  Notably, the President's Memo

instructed DOJ to "follow the rule of law and . . . the procedures the law

prescribes," including the APA.  (Id.)

    **174.**    Agencies do not act arbitrarily when they consider political factors.

"Presidential administrations are elected to make policy."  Guedes II, 920 F.3d at

34; see also FCC v. Fox Television Stations, 556 U.S. 502, 523 (2009) (Scalia, J.).

"As long as the agency remains within the bounds established by Congress, it is

entitled to assess administrative records and evaluate priorities in light of the

philosophy of the administration."  Nat'l Ass'n of Home Builders v. EPA, 682

F.3d 1032, 1043 (D.C. Cir. 2012) (quoting State Farm, 463 U.S. at 59 (Rehnquist,

J., concurring in part and dissenting in part).  Transparent consideration of political

factors has long been permissible under the APA.  See, e.g., ATX, Inc. v. U.S.

Dep't of Transp., 41 F.3d 1522, 1528 (D.C. Cir. 1994).

69

**175.**   Here, Defendants transparently considered political input when changing their interpretations of terms within the statutory definition of "machinegun" in section 5845(b).  Because political factors are not excluded from permissible considerations in the statutory delegations to Defendants, Defendants were entitled to consider the political input in formulating the Final Rule.

> **b.    Whether ATF adequately explained its departure from prior interpretations of the statutory definition of "machinegun"**

**176.**   The Fifth Circuit has recognized that agencies may re-evaluate their past actions "even when the agency 'offered no new evidence to support its decision.'"  <u>Clean Water Action v. EPA</u>, 936 F.3d 308, 315 (quoting <u>Nat'l Ass'n of Home Builders v. EPA</u>, 682 F.3d 1032, 1038 (D.C. Cir. 2012)).  Notwithstanding the fact that the change in the Final Rule is merely a re-evaluation of a past legal determination, the Las Vegas shooting itself *is* "new evidence" that sparked action from Executive actors ranging from the President to Defendants, themselves.  <u>See id.</u>

**177.**   The Supreme Court has held that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action."  <u>Fox</u>, 556 U.S. at 515.  When changing course, an agency must simply "provide reasoned explanation for its action."  <u>Id.</u>  Under the APA, the relevant

inquiry is not whether the Court is satisfied "that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better" while engaging in a conscious change of course.  Id.

178.   The Final Rule includes a description of ATF's previous interpretation: that a bump stock did not constitute a "machinegun" because ATF "relied on the mistaken premise that the need for 'shooter input' (i.e. maintenance of pressure) for firing with bump-stock-type devices mean[t] that such devices d[id] not enable 'automatic' firing."  83 Fed. Reg. 66531.  In this same statement, the Final Rule identifies the error in prior agency classification decisions and subsequently rectified the interpretation as applied to bump stocks.  See id.

179.   By clearly identifying the agency's departure from past interpretations and identifying appropriate reasons for the new interpretation, Defendants' actions withstand Plaintiff's challenge under 5 U.S.C§ 706(2)(A).

> c.   **Whether the Final Rule reflects agency expertise and resulted from a thorough consideration of relevant evidence**

180.   Plaintiff argues that the "change in position was entirely political" and not rooted in agency expertise.  (Dkt. # 39 ¶ 306.)  This is not true.  Together, Defendants ATF and DOJ properly relied on their expertise in the areas of firearms

regulation to "reconsider and rectify" prior classification decisions regarding bump stocks.  83 Fed. Reg. 66516.  The Final Rule corrects a legal interpretation of a statute as applied to bump stocks, which is within the expertise of the DOJ and ATF.  See 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement [of the NFA] shall be performed by or under the supervision of the Attorney General."); 18 U.S.C. § 926(a) (empowering the Attorney General to "prescribe . . . such rules and regulations as are necessary to carry out the provisions [of the GCA]."); 28 C.F.R. § 0.130(a) ("Subject to the direction of the Attorney General and the Deputy Attorney General, the Director of ATF shall (a) Investigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and perform other duties as assigned by the Attorney General.").

181.   Plaintiff next argues that the change in the Final Rule "was plainly not spurred by any new factual analysis."  (Dkt. # 39 ¶ 307.)  However, Defendants are free to rely "on a reevaluation of which policy would be better in light of the facts."  National Ass'n of Home Builders, 682 F.3d at 1038.  The Supreme Court has "ma[de] clear that this kind of reevaluation is well within an agency's discretion."  Fox, 556 U.S. at 514–15.

182.   Then Plaintiff contends, without citing statutory authority, that "[c]lassification rulings can *only* be issued after a physical examination of a

device."  (Dkt. # 39 ¶ 307; <u>see</u> Dkt. # 54-2, Exh. P-4, AR000095.)  Even if

physical examination were a requirement, *re*-examination would not be necessary

in this case.  Both sides agree that "neither the mechanism of bump stocks in

general, nor [that of] the Slide Fire in particular, changed since their [previous]

approval."  (<u>Id.</u> ¶ 311; Dkt. # 46 at 28.)  Defendants did not need to re-examine

physical bump stocks to update their legal analysis of the same facts in the Final

Rule.

**183.**   Finally, Plaintiff argues that Defendants inadequately considered

comments from Former Assistant Chief and Acting Chief of FTB, Rick Vasquez,

and President of the ATF Association, Michael R. Bouchard.  (Dkt. # 39 ¶ 310.)

But the Administrative Record indicates that Defendants "kept an open mind

throughout the notice-and-comment process and final formulation of the [Final

Rule]."  (<u>See</u> Dkt. # 54-2, Exh. P-7, AR001094; <u>Guedes II</u>, 920 F.3d at 34 (citing

<u>Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.</u>, 663 F.3d 476, 487–88 (D.C. Cir.

2011)).)  Because the Court agrees with Defendants' legal conclusions and

reasoning in the Final Rule, it follows that the Court finds that Defendants have

"articulate[d] a satisfactory explanation for [their] actions."  <u>State Farm</u>, 463 U.S.

at 43.

**184.**   Because Defendants relied on their expertise in issuing the Final Rule and merely re-evaluated existing factual evidence "in light of the philosophy of the administration" and the Las Vegas shooting, the Final Rule is not arbitrary, capricious, or "otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A).  (See Dkt. # 54-2, Exh. P-7, AR001094.)  From a review of the reasoning in the Final Rule, the Court finds that Defendants have engaged in the necessary "reasoned decision-making."  See State Farm, 463 U.S. at 52.

### 2.   Whether Defendants exceeded their statutory authority in violation of 5 U.S.C. § 706(2)(C)

**185.**   As explained in Part II.B.2 above, the Final Rule is not *ultra vires*. Applying the same reasoning, Defendants did not exceed their statutory authority in issuing the Final Rule.

### CONCLUSION

For the reasons stated above, the Court finds that Plaintiff is not entitled to the relief requested on any of the stated counts.  The Final Rule is a validly issued legislative rule that does not violate principles of non-delegation or separation of powers.  Even without reliance on Chevron step-two deference, the Court finds Defendants' interpretations of the terms "single function of the trigger" and "automatically" in the statutory definition of "machinegun" properly include

bump stocks within that definition.  The Final Rule complied with the requirements

of the Administrative Procedure Act.

This order constitutes final judgment in this case, and the case is

hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, November 23, 2020.

_____
David Alan Ezra
Senior United States District Judge

75